**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**DIVISION OF ST. THOMAS AND ST. JOHN**

IN RE

INNOVATIVE COMMUNICATION            Bankruptcy No. 07-30012
CORPORATION,
                                    Chapter 11

      Debtor.


STAN SPRINGEL, CHAPTER 11           Adv. No. 08-3004
TRUSTEE OF THE BANKRUPTCY
ESTATE OF INNOVATIVE
COMMUNICATION CORPORATION           Related to Doc. Nos. 1 & 117
EMERGING COMMUNICATIONS,
INC., AND INNOVATIVE
COMMUNICATION COMPANY, LLC,

      Plaintiff

v.

LYNDON ADRIAN PROSSER,
MICHELLE LABENNETT PROSSER,
SYBIL G. PROSSER, AND JOHN
JUSTIN PROSSER,

      Defendants

**MEMORANDUM OPINION**[1]

    Before the court is the Original Complaint Against the Adult Prosser Children to Recover

Pre-Petition Fraudulent Transfers and Unauthorized Post-Petition Transfers ("Complaint"), Adv.

Doc. No. 1, filed by Stan Springel, the Chapter 11 Trustee of the bankruptcy estates of Innovative

---

[1] This Memorandum Opinion constitutes our findings of fact and conclusions of law. All Doc. Nos. provided herein are docketed in Adv. No. 08-3004 unless otherwise noted.

Communication Corporation ("New ICC"), Emerging Communications, Inc. ("EmCom" or

"Emerging"), and Innovative Communication Company, LLC ("ICC-LLC", collectively the "ICC

Debtors").  Trustee Springel seeks to avoid and recover transfers made to or for the benefit of

Lyndon Adrian Prosser ("Adrian Prosser"), Michelle LaBennett Prosser ("Michelle LaBennett"),

Sybil G. Prosser, and John Justin Prosser ("Justin Prosser") (collectively, "Defendants" or "Adult

Prosser Children").  This adversary proceeding was consolidated for the purposes of discovery

and trial with Adv. No. 07-3010 ("Turnover Action"), in which the Adult Prosser Children, *inter

alias*, are also Defendants. *See* Scheduling Order and Discovery Plan, Adv. Doc. No. 52.[2] Trial

was held on November 17-20, 2008, December 8-10, 2008, February 9-11, 2009,[3] March 10,

2009, and March 23-26, 2009, with closing arguments held on July 23, 2009.

For the reasons expressed herein, we find that the Chapter 11 Trustee met his burden as to

certain of the transfers identified and established multiple fraudulent conveyances and post-

petition transfers which he is entitled to avoid and recover from the Defendants as provided

herein. As to other transfers addressed, he has not met his burden for the reasons expressed in

this Memorandum Opinion.

---

[2] Per the Scheduling Order and Discovery Plan, Adv. Doc. No. 52, two other adversary proceedings (Adv. Nos. 08-3003 and 08-3006) were to be consolidated with this adversary proceeding for the purposes of discovery and trial. However, those actions were tried in the District Court as Case Nos. 3:08-cv-00146 and 3:08-cv-00147. The District Court granted motions to withdraw the reference in each.
   This court's Memorandum Opinion and Order in the Turnover Action (hereinafter "Turnover Opinion") were entered on February 9, 2011. Adv. No. 07-3010, Adv. Doc. No. 728.

[3] Trial was scheduled to proceed on February 10 and 11, 2009, but was continued to provide Dawn Prosser, a defendant in Adv. No. 07-3010, with an opportunity to retain new counsel.

2

Background

New ICC is a management and holding company that owned, at the times relevant to this

adversary proceeding, directly or indirectly, 100% of the common stock of various operating

subsidiaries that provide telephone, newspaper, and other services to the citizens of the United

States Virgin Islands and surrounding areas.[4] New ICC is a wholly-owned subsidiary of

Emerging, which, in turn, is directly and indirectly owned by ICC-LLC (collectively, Emerging

and ICC-LLC are referred to as the "Parent Debtors"). Jeffrey Prosser was Chairman of the

Board, President, and CEO of New ICC and sole member of its ultimate parent company, ICC-

LLC.

Although there were prior filed involuntary bankruptcy cases then pending, on July 31,

2006, Emerging, ICC-LLC, and Jeffrey Prosser each filed voluntary petitions seeking relief under

chapter 11 of the Bankruptcy Code, commencing Case Nos. 06-30007, 06-30008,[5] and 06-30009,

respectively. The commencement of the voluntary cases constituted orders for relief.

Subsequently, Jeffrey Prosser's case was converted to a chapter 7, and John Ellis was

appointed as trustee. *See* Case No. 06-30009, Doc. No. 865. Mr. Ellis later resigned, and James

Carroll was appointed and continues to serve as Chapter 7 Trustee. Case No. 06-30009, Doc. No.

948.

---

[4] On August 17, 2010, this court entered its Final Order (A) Approving Sale of Group 1
Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Approving
Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (C)
Granting Related Relief, Case No. 07-30012, Doc. No. 1883. The Group 1 Assets consisted
primarily of New ICC's interests in the direct and indirect subsidiaries that own telecom and non-
French cable operations.

[5] ICC-LLC and Emerging's bankruptcy cases are being jointly administered. *See In re
Innovative Communication Company, LLC*, Case No. 06-30008, Doc. No. 661.

On July 5, 2007, the Greenlight Entities[6] filed an Involuntary Petition against New ICC, commencing Case No. 07-30012. An Order for Relief was entered on September 21, 2007. *See* Case No. 07-30012, Doc. No. 60. Stan Springel was appointed Trustee in the Chapter 11 cases. Case No. 06-30007, Doc. No. 543, on March 15, 2007; Case No. 06-30008, Doc. No. 523, on March 15, 2007; Case No. 07-30012, Doc. No. 125, on October 4, 2007.  Jeffrey Prosser's control of the Parent Debtors was severed when the trustee was appointed in these bankruptcy cases. Thereafter, he was removed from the Board of Directors of New ICC.

Jurisdiction and Venue

In their Answer to the Complaint, the Adult Prosser Children assert that this court lacks subject matter jurisdiction.[7]  Adv. Doc. No. 25, at 2. The Defendants contend that this is not a core proceeding and that venue is not proper in the Bankruptcy Division of the District Court of the Virgin Islands. *Id.* Venue is proper pursuant to 28 U.S.C. §1409. Although this is a core proceeding pursuant to 28 U.S.C. §157, a recent Supreme Court decision requires a deeper look at subject matter jurisdiction.

On July 6, 2011, Defendants filed a Motion to Dismiss based upon the recent Supreme Court decision *Stern v. Marshall*, No. 10-179, 2011 U.S. LEXIS 4791 (June 23, 2011).

---

[6] The Greenlight Entities include Greenlight Capital Qualified, L.P., Greenlight Capital, L.P., and Greenlight Capital Offshore, Ltd.

[7] Also in their Answer to the Complaint, the Adult Prosser Children contend that the court lacks jurisdiction over them. The same argument was made in their Motion to Dismiss Complaint with Prejudice. *See* Adv. Doc. No. 9, at ¶3.  For the reasons stated on the record at the April 16, 2008, hearing, the court found it does have personal jurisdiction over the Defendants and the Motion to Dismiss was denied with prejudice. Adv. Doc. No. 24. *See also* Fed.R.Bankr.P. 7004(f).

4

*See* Motion to Dismiss, Adv. Doc. No. 117.[8] In *Marshall*, the Court held that, although the

bankruptcy court had the statutory authority pursuant to 28 U.S.C. §157(b)(2)(C) to enter a final

judgment on the debtor's counterclaim, Article III of the Constitution did not permit the

bankruptcy court to do so. *See Marshall*, 2011 U.S. LEXIS 4791, at *38. The Court explained:

> Although the history of this litigation is complicated, its resolution ultimately
> turns on very basic principles. Article III, §1, of the Constitution commands that
> "[t]he judicial Power of the United States, shall be vested in one supreme Court,
> and in such inferior Courts as the Congress may from time to time ordain and
> establish." That Article further provides that the judges of those courts shall hold
> their offices during good behavior, without diminution of salary. *Ibid.* Those
> requirements of Article III were not honored here. The Bankruptcy Court in this
> case exercised the judicial power of the United States by entering final judgment
> on a common law tort claim, even though the judges of such courts enjoy neither
> tenure during good behavior nor salary protection. We conclude that, although the
> Bankruptcy Court had the statutory authority to enter judgment on [the]
> counterclaim, it lacked the constitutional authority to do so.

*Id.* at *15-16. The Court's broad rationale in reaching its conclusion has resulted in much

speculation of the ultimate impact of the decision on other matters considered to be core.

Nonetheless, the Court expressly stated that its holding was narrow: "We do not think the

removal of counterclaims such as [the one at issue] from core bankruptcy jurisdiction

meaningfully changes the division of labor in the current statute; we agree with the United States

that the question presented here is a 'narrow' one." *Id.* at *73. In conclusion, the Court

reemphasized this point: "We conclude today that Congress, *in one isolated respect*, exceeded

that limitation in the Bankruptcy Act of 1984. The Bankruptcy Court below lacked the

---

[8] The full title of the Motion to Dismiss is "Motion to Dismiss Based on the Supreme
Court Ruling that Curtails the Court's Authority to Enter a Judgment." The Motion to Dismiss
was filed only in this adversary proceeding, though its caption identifies four additional adversary
proceedings and the motion itself refers to the Turnover Action. In this Memorandum Opinion,
we address the Motion to Dismiss only as it relates to this adversary proceeding.

constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at *74 (emphasis added). As the Supreme Court deems its holding to be narrow, we take the Court at its word.

The Motion to Dismiss also refers to *Marshall* as it cites to *Granfinanciera v. Nordberg*, 492 U.S. 33 (1989). However, as in *Marshall*, despite the Court's broad rationale, the holding of the Court was limited:

> We do not decide today whether the current jury trial provision -- 28 U.S.C. §1411 (1982 ed., Supp. V) -- permits bankruptcy courts to conduct jury trials in fraudulent conveyance actions like the one respondent initiated. Nor do we express any view as to whether the Seventh Amendment or Article III allows jury trials in such actions to be held before non-Article III bankruptcy judges subject to the oversight provided by the district courts pursuant to the 1984 Amendments. We leave those issues for future decisions. We do hold, however, that whatever the answers to these questions, the Seventh Amendment entitles petitioners to the jury trial they requested.

492 U.S. at 64. In a footnote, the Court explains that "however helpful it might be for us to adjudge every pertinent statutory and constitutional issue presented by the 1978 Act and the 1984 Amendments, we cannot properly reach out and decide matters not before us. The only question we have been called upon to answer in this case is whether the Seventh Amendment grants petitioners a right to a jury trial. We hold unequivocally that it does." *Id.* at 64, n.19. Collier on Bankruptcy comments on the characterization of avoidance actions as core proceedings and adjudication of these actions by non-Article III bankruptcy judges and specifically addresses *Granfinanciera*:

> In *Granfinanciera*, on the other hand, while specifically avoiding the issues, the Supreme Court seemed to point to a result that such actions, at least where the defendant has not filed a proof of claim and has properly demanded trial by jury, must be heard in the United States district courts, if the parties do not consent to a jury trial in the bankruptcy court pursuant to 28 U.S.C. §157(e). This result is not

6

based upon whether an avoidance action is core or not (it is core) but has to do
with jury trial rights. While other avoidance actions, such as those arising under
sections 544, 545 and 549, are not included in the list of section 157(b)(2), these,
too, are core proceedings.

See 1 COLLIER ON BANKRUPTCY ¶3.02[3][b] (Alan N. Resnick & Henry J. Sommer eds, 16th

ed.). While we note that the Supreme Court made limited holdings, we recognize the rationale

expressed within the Court's opinions in *Marshall* and *Granfianciera* and proceed cautiously so

as not to exceed the limits of our jurisdiction. We are not faced with a circumstance where a jury

trial applied. As the Adult Prosser Children state in their Motion to Dismiss, "they did not timely

perfect their request for a jury trial." Adv. Doc. No. 117, at 3.

In this adversary proceeding, the Trustee seeks to avoid and recover prepetition fraudulent

conveyances and unauthorized postpetition transfers. An action to avoid and recover

unauthorized postpetition transfers pursuant to 11 U.S.C. §549 is purely a creation of the

Bankruptcy Code and does not otherwise exist outside of Title 11. In contrast, as is the case here,

an action to recover a fraudulent conveyance can be asserted on the basis of 11 U.S.C. §548

alone or pursuant to 11 U.S.C. §544(b) *and* applicable state law. (We use the term "state law" to

include the law of the Virgin Islands, as applicable.) Fraudulent conveyance actions as set forth

in 11 U.S.C. §548 are a creation of federal statute for application in bankruptcy proceedings.

However, the dicta in *Marshall* results in uncertainty as to how to proceed with actions brought

pursuant to §544(b) and applicable state law. As was the case in *Marshall*, 28 U.S.C. §157

designates "proceedings to determine, avoid, or recover fraudulent conveyances" as core. *See* 28

U.S.C. §157(b)(2)(H). Although the Supreme Court narrowly limited its holding to the

constitutionality of §157(b)(2)(C), as to the claims asserted pursuant to §544(b) and applicable

7

state law, this is our Report and Recommendation. As to claims asserted pursuant to §§548 and

549, we issue a final judgment in this matter. Assuming, *arguendo*, that the District Court

disagrees and reads *Marshall* broadly to conclude that the dicta in the opinion limits this court's

jurisdiction to making a Report and Recommendation, this Memorandum Opinion in its entirety

constitutes our Report and Recommendation to the District Court.


Doctrines of the Election of Remedies and Acceptance of Benefits

At the outset, we address the Adult Prosser Children's contention that the Chapter 11

Trustee is precluded from pursuing the fraudulent conveyance claims. The Adult Prosser

Children assert:

> By seeking turnover against the Adult Prosser Children and obtaining an
> injunction contending that the children are in possession of property belonging to
> one of the estates, the Trustees have elected a remedy, and accepted a benefit, that
> is at odds with a fraudulent conveyance theory.

Post-Trial Brief, Adv. Doc. No. 102, at 15. In support of their assertion, they cite to California

law which precludes a plaintiff from seeking an inconsistent remedy from his previous election.

*Id.* California law is not applicable here. Although the Adult Prosser Children do not provide any

citation of the doctrine pursuant to applicable law, the Third Circuit has addressed the doctrine of

election of remedies. *See Abdallah v. Abdallah*, 359 F.2d 170 (3d Cir.1966). "As a general rule, a

party may have as many remedies as the law gives provided they are consistent." *Id.* at 174. The

issue is whether "a certain state of facts relied upon as the basis of a certain remedy is

inconsistent with and repugnant to another certain state of facts relied upon as the basis of

another remedy." *Id.* at 175 (citing *McMahan v. McMahon*, 115 S.E. 293 (S.C. 1922)).

8

In this case, the Trustee is ultimately seeking the same remedy sought in the Turnover Action on the same set of facts: return of the transfers made by the ICC Debtors to or for the benefit of the Adult Prosser Children.[9] In the Turnover Action, the Chapter 11 Trustee took the position that the payments disbursed were "fraudulent and wrongful" in nature. *See* Turnover Opinion, Adv. No. 07-3010, Adv. Doc. No. 728, at 96. We noted that "[a]llegations of that nature sound in fraudulent conveyance, not in turnover. In fact, the Chapter 11 Trustee did bring fraudulent conveyance actions regarding the property as an alternative method of recovery...." *Id.* at 96, n. 126. The outcome of the Turnover Action as to the Chapter 11 estate turned on the manner in which New ICC recorded transfers to or for the benefit of the Prosser family. Ultimately, the Chapter 11 Trustee was not successful in the Turnover Action as "[a] turnover action does not lie against assets that are not property of the estate and the alleged impropriety of the transfers is simply not a §542 issue." *Id.* at 99.[10] The method by which transfers were

---

[9] Counsel for the Chapter 11 Trustee stated that the fraudulent conveyance action was brought in the alternative to turnover: "I think that one of the things that I must highlight here to begin with is that the trustee is seeking this relief in the alternative to turnover. Because of the way the case has ended up procedurally we tried them together. And the court knows that, obviously, to the extent there is a finding that some of the items that are actually still in the possession of these defendants and are property of this estate should be turned over, but especially with respect to services, in particular, where there's nothing left, those are clearly the subject of the fraudulent transfer. But, by bringing this [fraudulent conveyance] action, we in no way intend to exclude any of the claims that we have asserted in turnover." Transcript of 07/23/2009, Adv. Doc. No. 113, at 9.

[10] We noted in the Turnover Opinion that "[t]he authority to make these distributions is an issue repeatedly raised by the Chapter 11 Trustee. However, [the Turnover] adversary proceeding is not to determine whether property was fraudulently conveyed or whether Mr. Prosser breached his fiduciary duty to the company, ignored corporate formalities or treated the company's funds as his own. This is a turnover proceeding limited simply to the issue of whether property of any bankruptcy estate can be recovered by either trustee pursuant to §542." *See* Turnover Opinion, Adv. No. 07-3010, Adv. Doc. No. 728, at 24, n.41. Therefore, the court did not determine in the
(continued...)

recorded, however, is not dispositive in a fraudulent conveyance action. It is merely one factor in assessing what actually occurred when the corporate funds left the corporate enterprise pursuant to the transfers. In other words, whereas turnover sought to recover the assets acquired with the corporate funds to the extent the assets were corporate assets, fraudulent conveyance looks to the circumstances surrounding the transfer and the intent and financial status of the transferor to determine whether the conveyance is avoidable. The Trustee relies upon the same set of facts in this adversary proceeding: improper use of corporate funds to or for the benefit of the Adult Prosser Children. We find that the Trustee has not taken inconsistent positions. Furthermore, the Turnover Action and this adversary proceeding were tried simultaneously and the Chapter 11 Trustee offered the same, consistent evidence in support of both assertions. We find that, while the Chapter 11 Trustee is pursuing alternative theories to achieve recovery based upon the same facts, he is not seeking inconsistent remedies and is not precluded from proceeding based upon the election of remedies doctrine.

The Adult Prosser Children also contend that the "pursuit of fraudulent conveyance claims are [*sic*] barred under the 'acceptance of benefits' doctrine, which provides that a party who voluntarily and knowingly accepts the benefits of a judgment or decree cannot seek a reversal of the judgment or decree on appeal." Post-Trial Brief, Adv. Doc. No. 102, at 16. We note that the Defendants cite only to a Florida Supreme Court case in support of the doctrine without a statement as to how the law of Florida is applicable. Nonetheless, this is not an appeal and the doctrine does not bar the Trustee from proceeding with the fraudulent conveyance action.

---

[10](...continued)
Turnover Opinion whether the transfers were proper or authorized. *See id.* at 24.

As already noted, the Chapter 11 Trustee was not successful in the Turnover Action.

Therefore, the judgment in the Turnover Action did not benefit the Chapter 11 Trustee. However,

the Adult Prosser Children assert that the Trustee has "accepted and to a great extent collected

and benefitted under the turnover theory, seizing and reselling a significant portion of the

Defendants['] assets, or freezing such so as to the [*sic*] benefit and enjoyment of such by the

Defendants." *Id.* at 16-17.[11] An Order Granting Application for Preliminary Injunction

("Injunction Order") was entered in the Turnover Action. *See* Adv. No. 07-3010, Adv. Doc. No.

79. The Injunction Order required Defendants to "keep the Property in secure locations and

protect the Property from destruction, damage, modification, theft, removal, or transfer pending

its turnover to the Trustees. The Defendants shall safeguard the Property and shall not spend,

consume, damage, dispose of, sequester, abscond with, secrete, or transfer the Property in any

form whatsoever without prior, written approval obtained from both Trustees, pending further

Order of the Court." *Id.* at ¶2.[12] The Chapter 11 Trustee did not accept the benefits of the

Injunction Order and then subsequently seek its reversal on appeal. The acceptance of benefits

doctrine does not preclude the Chapter 11 Trustee from proceeding with his fraudulent

---

[11] The court is unaware of any seizure or reselling of the Adult Prosser Children's assets by the Trustee. The Adult Prosser Children are the only Defendants in this adversary proceeding, and they have identified no examples of seized or sold assets to the court in support of this assertion in the evidence at trial or in their Post Trial Brief.

[12] The preliminary injunction remains in place as to certain items enumerated in the Order (1) Requiring Turnover of Certain Property to the Chapter 7 Trustee; (2) Imposing a Constructive Trust in Favor of the Chapter 7 Trustee; (3) Amending the Terms of the Injunction; (4) Setting a Status Conference; (5) Denying Turnover Relief as to the Chapter 11 Estate; and (6) Denying Emergency Motion to Stay. *See* Adv. No. 07-3010, Adv. Doc. No. 728. The only items enumerated therein at issue in this adversary proceeding are the Mercedes in the possession of Sybil Prosser and the West Palm Beach condominium titled to Adrian Prosser. *Id.*

conveyance claims. Therefore, we will address the Chapter 11 Trustee's claims for avoidance and recovery.

## FINDINGS OF FACT

The Chapter 11 Trustee asserts that fraudulent transfers and postpetition transfers were made to the Adult Prosser Children. The Trustee seeks avoidance according to three theories: (1) intentional fraudulent transfers pursuant to both provisions of the Bankruptcy Code and applicable state law; (2) constructively fraudulent transfers pursuant to both provisions of the Bankruptcy Code and applicable state law; and (3) unauthorized postpetition transfers pursuant to §549 of the Bankruptcy Code. *See* 11 U.S.C. §§544, 548, 549; NY CLS Dr & Cr §270 *et. seq.*; 28 V.I.C. §201 *et. seq.*; Fla. Stat. §726.101 *et. seq.* A trustee can avoid a transfer of an interest in the debtor in property made with the actual intent to hinder, delay, or defraud a creditor as demonstrated through common badges of fraud and the circumstances surrounding the transaction. Without proving actual intent, a trustee can avoid a constructively fraudulent transfer for which the debtor did not receive reasonably equivalent value at a time when the debtor was insolvent, had unreasonably small capital, or had debts beyond its ability to pay. A trustee can also recover unauthorized postpetition transfers of property of the estate. If a trustee successfully avoids a transfer as a fraudulent conveyance or postpetition transfer, he can recover from a transferee or beneficiary of the transfer. The Chapter 11 Trustee asserts that he has produced the requisite evidence to establish these elements to avoid and recover transfers made to or for the benefit of the Adult Prosser Children.

We address the contentions of the parties and find as follows:

12

<u>1. We find that the Adult Prosser Children were the recipients and/or beneficiaries of a number
of transfers from the ICC Debtors from January 1, 1999 through September 30, 2007.[13]</u>

The Chapter 11 Trustee asserts that "[a]t trial he demonstrated via a multitude of
documentary and testimonial evidence that the Defendants received or were the beneficiaries of
numerous transfers made by one or more of the ICC Debtors." Trustee Springel's Proposed
Findings of Fact and Conclusions of Law, Adv. Doc. No. 104, at ¶15. We address the transfers
that the Chapter 11 Trustee contends were to or for the benefit of the Adult Prosser Children and
find as follows:[14]

*Transfers were made out of New ICC to or for the benefit of Justin Prosser in the form of*
*direct payments, rental payments, and American Express payments beginning in 2005 through*

---

[13] Ingrid Christian, the Custodian of Records of New ICC, compiled information and
summarized that information to create Trustee's Exhibit TT60, which "is a summary of the
non-business-related expenses that were identified of [*sic*] New ICC books and records, that [in
her view] appeared to be to be [*sic*] made for the benefit of Mr. Prosser and/or his family."
Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 84, at 170-71. The source
documents from which the summary was derived make up the ten binders of Trustee's Exhibit
TT8. *See* Transcript of 11/17/2008, Adv. Doc. No. 84, at 171. Exhibit TT60 is a summary of
transfers which occurred between January 1, 1999, and September 30, 2007. As indicated at trial,
the court does not accept Ingrid Christian's characterization of the transfers but makes its own
based upon evidence presented regarding the transfers as identified in this Memorandum
Opinion.
     The Chapter 11 Trustee has limited the transfers he seeks to avoid and recover to the
transactions as listed on TT60. *See* Transcript of 03/25/2009, Adv. Doc. No. 112-2, at 14-15.
     As some of the transfers occurred as many as eight years prepetition, we note that the
applicable statutes of limitation are discussed *infra*.

[14] Although the Complaint addresses multiple tickets to athletic events that were
purchased for the benefit of Justin and Sybil Prosser, counsel for the Trustee stated on the record
that the Trustee was not suing for sporting event tickets. *See* Complaint, Adv. Doc. No. 1, at ¶16;
Transcript of 03/25/2009, Adv. Doc. No. 112-2, at 12. Therefore, we do not address those
transactions herein.

*2007.*

The Chapter 11 Trustee asserts that one or more of the ICC Debtors made transfers to or for the benefit of Justin Prosser totaling at least $174,236.13. *See* Chapter 11 Trustee's Brief in Support of Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 105, at 9; TT60, at TT4-1820. Based on the evidence, the transfers to or for the benefit of Justin Prosser occurred beginning in the year 2005 through 2007. *See* discussion *infra.* Justin Prosser was eighteen years old when the transfers at issue began and twenty-one years old when they ended.[15] *See* 12/19/2007 Deposition of Justin Prosser, at 16-17.

Ingrid Christian, the Custodian of Records for New ICC, testified that she found no evidence in the books and records of New ICC that any of the Adult Prosser Children, other than Adrian Prosser, were employed by the ICC Debtors. Transcript of 11/18/2008, Adv. Doc. No. 111, at 112. Furthermore, Justin Prosser admitted that he has never been employed by or provided services to New ICC, ICC-LLC, or Emerging. *See* Amended Responses to Plaintiff's First Request for Admissions From John Justin Prosser, TT87.[16]

---

[15] Counsel for the Adult Prosser Children asserted that the age of the Defendants at the time of the transfers is relevant:

> MR. GOLDMAN: It wasn't relevant for [Ms. Christian's] categorization. But I would probably submit in closing that such is extremely relevant to whom the true beneficiary is. So if I may continue, I'd like to.
> THE COURT: All right.
> MR. GOLDMAN: So excuse me, Your Honor, to restate the question.
> BY MR. GOLDMAN:
> Q. Is age material in any of the decisions that you have made on TT60?
> A. No, age was not an issue.

Testimony of Christian, Transcript of 11/19/08, Adv. Doc. No. 111-1, at 244. As to Justin, the argument does not apply. He was not a minor at the time of the transfers to him or for his benefit.

[16] Although Jeffrey Prosser's former corporate executive secretary, Eling Joseph, testified
(continued...)

14

New ICC made payments to Justin Prosser directly in the amount of $22,500.00. *See*
Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 111, at 112; TT60, at TT4
1820, 1823, 1873; Tab 94 of TT8. Copies of four checks issued in 2006 in the amount of $1,250
each are included in Exhibit TT8, and the checks were made out to Justin Prosser. Tab 94 of
TT8, at T 03587-90. Despite the fact that checks issued to Justin Prosser clearly identified
"Innovative Communications Corp." in the upper left corner of the check, Justin Prosser
contends that "[a]ny monies received were believed to have come from Jeffrey Prosser or Dawn
Prosser." *See* Amended Responses to Plaintiff's First Request for Admissions from John Justin
Prosser, TT87; Tab 94 of TT8, at T 03587-90. A wire transfer in the amount of $5,000 was made
from New ICC's bank account listing Justin Prosser as the beneficiary on January 30, 2007. *Id.* at
T 03591-92. In 2007, New ICC's records indicate that five checks were made out to Justin
Prosser in the amount of $2,500 each. *Id.* at T 03584. Therefore, the records of New ICC
substantiate the Trustee's allegation, and we find that $22,500 in direct payments were made by
New ICC to Justin Prosser in 2006 and 2007.

New ICC also made rental payments totaling $16,001.21 on behalf of Justin Prosser for
his apartment in New York City.[17] *See* Testimony of Christian, Transcript of 11/17/2008, Adv.

---

[16](...continued)
that, at some point in time, Justin Prosser worked for New ICC in the company's summer
program, Justin Prosser stated that he was neither employed by nor provided services to any of
the ICC Debtors. *See* Transcript of 03/23/2009, Adv. Doc. No. 112, at 36. We accept Justin
Prosser's statement to the contrary.

[17] The location of Justin Prosser's residence in New York City has been referred to as
"Trump Plaza" and "Trump Tower." *See* Trustee Springel's Proposed Findings of Fact and
Conclusions of Law, Adv. Doc. No. 104, at ¶17 ("Trump Plaza"); Chapter 11 Trustee's
Supplemental Post-Trial Brief, Adv. Doc. No. 110, at 3 ("Trump Tower"); *see also* Testimony of
(continued...)

15

Doc. No. 84, at 131, 133-34. *See also* TT60, at TT4 1820, 1826, 1851; Tab 50 of TT8

(supporting documentation evidencing payments to Cheng Ping Lee). One payment was by check

dated February 20, 2007, in the amount of $8,501.21. Tab 50 of TT8, at T 01989. Another

payment was a wire transfer in the amount of $7,500 dated March 9, 2007. *Id.* at T 01990-91. A

wire transfer fee of $35 was charged to New ICC.[18] We find that New ICC made rental payments

for the benefit of Justin Prosser and incurred fees related to those rental payments in the total

amount of $16,036.21.[19]

In the Complaint, the Trustee asserts that New ICC paid for most, if not all, of the goods

---

[17](...continued)
Ms. Christian, Transcript of 11/17/2008, Adv. Doc. No. 84, at 133-134:
> Q. And with respect to the -- let me ask you a question. With respect to the rental payments that were made on behalf of Justin Prosser, what were those for? Were you able to determine?
> A. Yes, those were for rental of an apartment in Trump Plaza, I believe it was in New York but it might have been Florida. I believe it was New York, though.

Some of the confusion appears to be the result of where Adrian Prosser (Justin Prosser's brother) previously resided, which was also Trump Plaza, but located in West Palm Beach. *See* 12/19/07 Deposition of Adrian Prosser, at 7. The rental payments for Adrian Prosser are not at issue in this adversary proceeding.

[18] We note that the Virgin Islands Community Bank statement identifying activity in New ICC's account includes a $35.00 wire transfer fee on March 9, 2007, the same date as the wire transfer to Cheng Ping Lee. Tab 50 of TT8, at T 01990. The $35 wire transfer fee is reflected in Exhibit TT60 and included in the total beneath the column "Prosser Related Amount." TT60, at TT4 1851. Thus, the amount attributed to the Prossers, i.e. the "Prosser Related Amount" listed in Exhibit TT60, is $16,036.21, which is the amount of the rental payments plus a $35 wire transfer fee. *Id.*

[19] Justin Prosser has not contested that he lived in the Trump apartments in New York City, that his landlord was Cheng Ping Lee, or that his rent was paid for him, and we so find. We note, however, that the backup documentation provided by the Trustee does not connect these payments to Justin Prosser. The backup documentation at Tab 50 of Exhibit TT8 proves that New ICC made payments to an individual named Cheng Ping Lee. The connection to Justin Prosser was provided by Ingrid Christian's testimony that rental payments were made for Justin Prosser's residence at Trump Plaza.

16

and services Justin Prosser acquired using his American Express card. *See* Adv. Doc. No. 1, at

¶15.[20] Two American Express accounts are involved in this adversary proceeding, a Platinum

account and a Centurion account. *See* TT28.[21] Both the Platinum account and Centurion account

have multiple cardholders on each account, and thus various charges for each cardholder are

reflected on the monthly statements. The evidence established that the American Express

accounts were the accounts of Jeffrey Prosser, with sub-accounts for others, mainly Prosser

family members. For the purposes of this adversary proceeding, the relevant cardholders are

Justin Prosser, Sybil Prosser, and Michelle LaBennett. The Trustee does not seek to recover

payments for charges made by Adrian Prosser. The charges to the American Express accounts

contained both business and non-business charges. Typically, the business transactions were

charges made by Jeffrey Prosser. Neither Justin Prosser, Sybil Prosser, nor Michelle LaBennett

provided services to New ICC; thus, their charges to the American Express accounts were

generally non-business in nature. However, tuition payments charged by the Adult Prosser

---

[20] The Complaint asserts that Justin Prosser's aggregate charges on the American Express
card from June 29, 2005, through October 29, 2007, totaled $241,112.76. *See* Adv. Doc. No. 1, at
¶15. At trial, the Trustee asserted that New ICC made payments totaling $135,699.92 to
American Express for purchases made by Justin Prosser. Testimony of Christian, Transcript of
11/18/2008, Adv. Doc. No. 111, at 109-10; TT60, at TT4 1820, 1824; Tab 11 of TT8.

[21] Statements from an American Express Gold account are also included in Exhibit TT28
but do not reflect activity relevant to these proceedings. The charges at issue, i.e., those made by
Justin Prosser, Sybil Prosser, and Michelle LaBennett, are limited to the Platinum and Centurion
accounts.
    We note that, beginning with the statement listing charges made in February of 2005, a
different account number is reflected on the statement for American Express Centurion activity.
However, the balance of $66,967.09 from the January 2005 statement (account number ending in
51009) is carried over to the February 2005 statement (account number ending in 52007) and
reflected as paid.  *See* TT28, at TT02968-82. Therefore, the only change in the account was the
assignment of a new account number.

Children are considered business expenditures and are not included in the amounts the Trustee

seeks to avoid and recover.[22]

The credit card statements list the monthly activity of each cardholder (e.g., beneath the

heading "Due in Full Activity for John Justin Prosser" each charge made by Justin and the date

and amount of the charge for that monthly statement are listed and then reported as "Total of Due

in Full Activity of John Justin Prosser". The total for Justin Prosser individually is then added

together with the total monthly activity for the other cardholders to reach the "Total Due in Full

Activity" for the monthly statement, *see generally,* TT28.) Payments to American Express for the

balance due were credited toward the total due on the account, and not allocated to the amount

due for specific cardholders. Payments relating to these American Express accounts were made

by New ICC as well as other sources, such as Jeffrey Prosser. The only American Express

payments which the Trustee seeks to avoid and recover in this proceeding are the portion of New

ICC payments credited toward the non-business charges of the Defendants. Payments by the

other ICC Debtors (i.e., ICC-LLC and EmCom) to American Express were not included in the

relief sought.

According to the statements in evidence, Justin Prosser was a cardholder only of the

Centurion account, and the first statement reflecting activity under his name is the statement of

---

[22] Tuition payments were treated as business expenditures and the Trustee is not seeking
recovery of these payments as the company paid the tuition for the children of executives.
*See* Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 84, at 222. Therefore,
charges for tuition were not included in the calculation of non-business charges. *See e.g.* TT28, at
TT03469, identifying a $11,964 charge made to New York University by Justin Prosser and paid
by New ICC.

charges made in June of 2005.[23] *See* TT28, at TT03055. Justin Prosser acknowledges that he did

not remit payment for American Express charges and contends that, as the statements went

directly to his parents, they made the payments. *See* Amended Responses to Plaintiff's First

Request for Admissions from John Justin Prosser, TT87. In order to determine the amount of

non-business payments made by New ICC to American Express on behalf of Justin Prosser, Ms.

Christian reviewed American Express statements, identified payments made by New ICC, and

analyzed the transactions. Transcript of 11/17/2008, Adv. Doc. No. 84, at 42-43. Ms. Christian

described the process she used to determine the total amount which reflected, in her opinion,

personal transactions of the Prossers:

> Q. Now just using American Express as an example, since you mentioned them by
> name, what would you do, if anything, to tie up payments that were going out of
> New ICC with respect to the statements on American Express that you received?
> A. Well, we would review the American Express statements, identify all the
> payments that were being applied to those statements and trace the payments from
> New ICC to those particular credit card statements. In order to determine the
> non-business portion of those payments, we then reviewed the actual transactions
> that occurred on American Express statements and tried to identify the
> transactions that appeared to be non-business in nature, clearly non-business in
> nature, and took into consideration the amounts that were applied as paid by
> Jeffrey Prosser and/or Dawn Prosser personally, and then the difference where we
> would have considered it to be non-business.
> Q. So you're saying if you could see payment by either Mr. or Mrs. Prosser then
> those were eliminated. Is that what I understood you to say?
> A. If we could see payments by Mr. or Mrs. Prosser but in the same period that
> New ICC was making a payment, we basically would have considered their
> payments to have been applied to those non-business expenses first. So we took
> into consideration the payments that they made. We took into consideration that

---

[23] Throughout this opinion, we refer to charges made during particular months, *e.g.*
charges made in June of 2005. These charges reflect the activity which is identified on the
American Express statement with a closing date of June 29, 2005, and generally include charges
made during June of 2005. Therefore, the majority of the activity on the statement are charges
made during the month identified. We do this for ease of reference and identify the supporting
statement located in Exhibit TT28 by bates number as the citation.

19

some of those charges may have been business charges specifically. So we did not take the whole universe of expenses that were charged on those credit cards.

Q. Now whose credit card statements were these, just to be clear?

A. There were two cards in Dawn's name. Those did not end up on our schedule because they appeared to have been paid solely by Dawn Prosser. And the rest of the cards, there were a Centurion card, a [G]old card, a Platinum card, if I can remember correctly, and those were all in the name of Jeffrey Prosser. There were then sub accounts under that Mastercard [*sic*] for various family members, and there was one other card for a Procter [*sic*] & Campbell, PC I believe.

Transcript of 11/17/2008, Adv. Doc. No. 84, at 42-44. Ms. Christian reviewed the credit card statements and identified the charges specifically made by Justin Prosser and attributed a portion of the total payments made by New ICC to him based on that review. *See* Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 111, at 108-10. With the exception of tuition payments, the amounts charged by Justin Prosser, who admits he was never an employee of and did not provide services to the ICC Debtors, are personal, non-business charges. No argument or evidence to the contrary was produced. According to Ms. Christian, the $135,699.92 sought to be recovered by the Trustee represents "a portion of the expenses that were charged by Justin Prosser on the credit card that he maintained under the main account held by Jeffrey Prosser." Transcript of 11/18/2008, Adv. Doc. No. 111, at 109-10.

We note that the first twenty pages of the Trustee's exhibit containing evidence of New ICC's American Express payments consist of schedules prepared by the Trustee summarizing the activity on the American Express accounts and related payments. *See* Tab 10 of TT8, at T 00293-312. The schedules purport to reflect the monthly activity for each cardholder: (1) how much was charged by that individual, (2) the amounts deemed by the Trustee to be business versus non-business charges, and (3) the source and amount of payment credited to each monthly statement. *Id.* However, neither the schedules nor Ms. Christian's testimony identify which New ICC

payments or portions of payments make up the $135,699.92 which the Trustee asserts is the total

of payments by New ICC made on Justin Prosser's behalf.[24] Therefore, although Ms. Christian

described her method for analyzing the American Express statements, precisely how she

calculated the portions attributed to each of the Adult Prosser Children is unclear.  Nonetheless,

the Trustee produced clear evidence that New ICC did make multiple payments to American

Express for charges made by Justin Prosser.

The court reviewed the American Express statements (Exhibit TT28) and the proof of

payments by New ICC to American Express (Tabs 10 and 11 of Exhibit TT8). The analysis of

the evidence reveals that New ICC was not the only source of payment for American Express

transactions. Some statements reflect payments from multiple sources credited to the same

statement. Payments did not always reflect the amount due on the invoice. At times, partial

payments or overpayments were made. Sometimes, no payment was made before the due date.

When a partial payment was made, the statement does not attribute the payment to particular

transactions. An outstanding balance was simply carried to the next statement. When two

payments toward the same statement activity were made resulting in an overpayment, it is not

clear which transactions were satisfied by which funds. An overall credit is simply reflected on

the following month's statement. The Trustee produced no fact or expert evidence to explain

---

[24] Exhibit TT60 reflects payments New ICC made to American Express. TT60, at TT4
1831-1833. One column lists "Check Amount" and another column characterizes what the
Trustee identifies as the "Prosser Related Amount" for each check. *Id.*  We note that the Trustee
asserts in Exhibit TT60 that American Express payments were made for the benefit of the
Defendants *and* Jeffrey and Dawn Prosser. Thus, the "Prosser Related Amount" column not only
fails to identify which portion of each payment the Trustee has allocated to a particular
Defendant in this adversary proceeding, but it includes payments for the benefit of two
individuals who are not parties to this action.

21

how (or whether) there were any allocations. Therefore, we find that the Trustee may only seek avoidance and recovery where transactions for the benefit of the Adult Prosser Children were clearly paid with New ICC's funds. Thus, unless New ICC paid the full invoice in one or a number of payments, the court has excluded any attribution of fraudulent conveyance to the Defendants. This effort to understand the Trustee's evidence resulted in literally months of time devoted by the court to reconciling the evidence, something that the Trustee, a partner in an investment banking firm, and his experienced counsel should have been able to provide through witnesses. Upon the court's review of the statements, the evidence supports that the following non-business charges were made by Justin Prosser and paid by New ICC:[25]

(1) $45,005.41 for charges made in June and July of 2005, *see* TT28, at TT03046-TT03080; Tab 10 of TT8, at T00399-402;[26]

(2) $82,497.74 for charges made in October of 2005 through July of 2006, *see* TT28, at TT03112-3228; Tab 10 of TT8, at T00414-421, T00428-442, Tab 11 of TT8, at T00443-446, T00449-450, T00458-459;

(3) $14,344.65 for charges made in December of 2006 through February of 2007, *see* TT28, at TT03344-3419; Tab 11 of TT8, at T00478-479, T00482-483, T00486-490, T00494-495, T00498-500, T00503, T00505-508, T00512-514, T00515-518, T00523-532, T00538-541, T00544-546; and

(4) $15,528.59 for charges made in May through July of 2007, *see* TT28, at TT0349-

---

[25] An example of the court's conclusions regarding the evidence that established the minimum payments made by New ICC to American Express on behalf of the Adult Prosser is attached as an exhibit.

[26] *See* note 23, *supra*, for explanation of references to credit card statements.

3511; Tab 11 of TT8, at T00556-561, T00565-568, T00571-575, T00578-583, T00588-93, T00597-598.

These charges total $157,376.39. Of the payments made by New ICC toward the American Express charges, four payments were made postpetition and credited toward the American Express balance accrued during the months of June and July of 2007. In those two months, New ICC's post-petition funds satisfied $12,540.73 in charges made by Justin Prosser. The evidence establishes that New ICC transferred at least $144,835.66 to American Express prepetition for charges made by Justin Prosser. However, according to Exhibit TT60, the Trustee seeks to recover a total of $135,699.92 from Justin Prosser relating to American Express charges paid with prepetition *and* postpetition funds. We note that the evidence supports recovery in a higher amount than that listed in Exhibit TT60. Nonetheless, the Trustee has identified the transactions and amounts he seeks to recover in Exhibit TT60, and the court will limit the judgment to the amount sought.[27] Thus, we find that the documentary evidence establishes that New ICC transferred the amount the Trustee seeks to avoid and recover; i.e., $135,699.92 for American Express charges incurred by Justin Prosser, of which $12,540.73 was transferred postpetition.

In summary, we find that the Trustee established that New ICC transferred funds to or for the benefit of Justin Prosser in the amount of $174,236.13.[28] Of the $174,236.13, $161,695.40

---

[27] When Mr. Goldman, counsel for the Adult Prosser Children, requested an itemization of what the Trustee was claiming in this adversary proceeding, causing the court to inquire the same, counsel for the Chapter 11 Trustee represented that Mr. Goldman was defending against the items presented in Exhibit TT60. Therefore, we limit what the Trustee may avoid and recover accordingly. *See* Transcript of 03/25/2009, Adv. Doc. No. 112-2, at 14-15.

[28] The $174,236.13 represents $16,036.21 in rental payments, plus $135,699.92 in American Express payments, plus $22,500 in direct payments to Justin Prosser.

were prepetition payments to or for the benefit of Justin Prosser and $12,540.73 were

postpetition payments to American Express for the benefit of Justin Prosser.


*Transfers were made out of New ICC to or for the benefit of Sybil Prosser in the form of*

*direct payments, rental payments, purchase of a vehicle, payment of transportation services, and*

*American Express payments beginning in 1999 through 2007.*

The Chapter 11 Trustee asserts that, between January 1, 1999, and September 30, 2007,

one or more of the ICC Debtors made transfers to or for the benefit of Sybil Prosser totaling

$412,978.23. *See* Chapter 11 Trustee's Brief in Support of Proposed Findings of Fact and

Conclusions of Law, Adv. Doc. No. 105, at 9; TT60, at TT4 1820. Of the transfers to or for the

benefit of Sybil Prosser, several were made when she was seventeen years old.[29] We find, under

the facts of this case, that her age is relevant to determining whether she is properly characterized

as the beneficiary of New ICC's payments. *See* discussion *infra.*

Ms. Christian found no indication in the books and records that Sybil Prosser was ever

employed by New ICC or any of its subsidiaries. Transcript of 11/17/2008, Adv. Doc. No. 84, at

127. Sybil Prosser admitted that she has never been employed by or provided services to New

ICC, ICC-LLC, or Emerging. *See* Amended Responses to Plaintiff's First Request for

Admissions From Sybil G. Prosser, TT89.

New ICC made payments to Sybil Prosser directly in the amount of $25,500.00.

Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 111, at 112; TT60, at TT4

---

[29] Sybil Prosser was twenty-five years old at the time of her deposition on December 19,
2007. *See* 12/19/2007 Deposition of Sybil Prosser, at 4.

1820, 1823, 1896; Tab 141 of TT8. These payments included a wire transfer in the amount of

$9,000.00 on June 29, 2007, just seven days prior to the involuntary petition filed against New

ICC on July 5, 2007.[30] TT60, at TT1896; Tab 141 of TT8, at T 05420-21. Sybil Prosser also

received wire transfers in the amount of $5,000 on July 8, 2002, $2,000 on January 30, 2007, and

$4,500 on April 4, 2007. Tab 141 of TT8, at T05410-11, T05412-13, T05417-18. New ICC's

records also indicate five one thousand dollar payments to Sybil Prosser from February through

April of 2007. *Id.* at T 05408. At her deposition on December 19, 2007, Sybil Prosser testified

that her primary source of income at the time was her allowance of approximately $2,000 a

month, which she testified she received from her father (as opposed to New ICC). Deposition of

---

[30] Within the backup documentation in Exhibit TT8, there is an email from Eling Joseph
to Lynia Samuel (an employee in the accounting department) regarding the $9,000 transfer,
stating that the transfer to Sybil Prosser was for school tuition. *See* Tab 141 of TT8, at T05422.
Ms. Christian testified that tuition payments were considered business payments as the company
paid the tuition for the children of executives. *See* Transcript of 11/17/2008, Adv. Doc. No. 84, at
222. The Trustee is not seeking avoidance of tuition payments on that basis. However, the wire
transfer is directly to Sybil, when she was twenty-five years old, not a check or credit card charge
reflecting a payment to a school directly. This is in contrast to tuition payments charged by
Michelle LaBennett or Justin Prosser, *see* note 22 *supra*, to the American Express card which
were excluded from Exhibit TT60 and which the credit card statements reflect as charges to a
university in a specific amount.
    At her December 19, 2007, deposition, Sybil Prosser testified that the $9,000 payment to
her was for tuition. *See* 12/19/2007 Deposition of Sybil Prosser, at 7-8, 29-33. She admitted that
the cost of tuition was less than the $9,000 transfer to her, and the actual amount varied
depending upon the amount of credits she took. *Id.* at 29-33.
    Q. And has all of that $9,000 been forwarded to St. Thomas [University]?
    A. No. It was spent on school and then some of it was - I got like another - there is
    extra in there that I spent on books and whatnot.
    Q. How much was spent - paid to the school?
    A. I believe it was 8,000. I don't remember off the top of my head.
    Q. Approximately 8,000?
    A. Yeah. I did it in June, so I am guessing - it was like seven nine something or
    seven eight something.
*Id.* at 31-32. No one produced an invoice or proof that this specific transfer of $9,000 was the
sole source of any tuition payment. Therefore, we credit none to tuition and all to Sybil Prosser.

12/19/2007 at 13. When she needed to speak with someone about her allowance, she would

contact either her father or Eling Joseph, her father's secretary at New ICC. Deposition of

12/19/2007, at 47, 49. We find that the evidence established that payments totaling $25,500 were

made to Sybil Prosser from 2002 through 2007.

In addition, New ICC made rental payments on behalf of Sybil Prosser. TT60, at TT4

1820, 1826, 1863, 1889; Tabs 81 (payments to Grand & Associates Realty, Inc.) and 174 & 175

(payments to Rafael Nunez) of TT8;[31] Testimony of Christian, Transcript of 11/17/2008, Adv.

Doc. No. 84, at 131. Although Sybil Prosser testified that her father paid her rent, the records of

New ICC clearly reflect these corporate payments directly to her landlords. Deposition of

12/19/2007, at 13. A check history report of New ICC reveals that three payments of $2,500,

totaling $7,500, were made in January, February, and March of 2007, by the company to Sybil

Prosser's landlord Rafael Nunez. Tab 174 of TT8, at T06054. Each payment was made by wire

transfer, resulting in $30 wire transfer fees for each transaction.[32] On July 19, 2007, after the

---

[31] Sybil Prosser testified that Rafael Nunez was her previous landlord when she lived at 2832 North Bayshore Drive, but she did not know the name of her current landlord at the time of the deposition. 12/19/2007 Deposition of Sybil Prosser, at 13-14. At the time of her deposition, she provided her current address as 1717 North Bayshore Drive, Unit 2140. *Id.* at 4-5. New ICC made a wire transfer payment to Grand & Associates Realty Inc. Trust Account on July 19, 2007, in the amount of $8,145 for credit to Unit 2140. *See* Tab 82 of TT8, at T02928-30. The backup documentation in Exhibit TT8 substantiates that payments were made by New ICC to Sybil Prosser's landlords.

[32] Tabs 174 and 175 of Exhibit TT8 provide the back up documentation for the transfers to Rafael Nunez. New ICC's check history report behind Tab 174 reflects that a total of $7,500 was transferred to Mr. Nunez via wire transfers. Tab 175 contains New ICC's Requests for Telegraphic Transfers and bank statements reflecting the payments and associated fees. Exhibit TT60 identifies the total "Prosser Related Amount" as $7,590, accounting for each of the three payments as thirty dollars higher in the "Prosser Related Amount" column, due to wire transfer fees associated with each transaction.

involuntary petition was filed against New ICC, the company made a rental payment of $8,145 to

Grand & Associates Realty, Inc. on behalf of Sybil Prosser. TT60, at TT4 1863; Tab 82 of TT8,

at T02928-30. We find, based upon the records of New ICC, that the company made rental

payments for the benefit of Sybil Prosser in the amount of $15,735. The prepetition rental

payments totaled $7,590 and the postpetition rental payments totaled $8,145.

The evidence establishes that funds from New ICC's bank account were used to pay for a

Mercedes SLK 350 in the possession of Sybil Prosser. TT89, at TE2 02485; Testimony of Jeffrey

Prosser, Transcript of 12/09/2008, Adv. Doc. No. 89, at 219; Tab 158 to TT8, at T05820-22. The

amount of the wire transfer dated May 26, 2005, to the seller, Smythe European, was $55,708.00.

*See* Tab 158 of TT8, at T 05820-23.[33] The vehicle was purchased at a dealership in the San

Francisco area, delivered to Sybil Prosser, and is titled in her name. *See* 12/19/2007 Deposition

of Sybil Prosser, at 77, 93.[34] According to Sybil Prosser, the Mercedes was a graduation gift from

her father, and she gave no thought as to who actually paid for it. 12/19/2007 Deposition of Sybil

Prosser, at 77.[35] In an email from Eling Joseph to the accounting department, the Mercedes was

---

[33] The "total Prosser related amount" listed on TT60 is $55,823.00 ($115 more than the
purchase price). TT60, at TT4 1982. Although the additional $115 is likely meant to be a wire
transfer fee, the Virgin Islands Community Bank statement in the back up documentation of Tab
158 does not indicate any wire transfer fee debited from New ICC's account. *See* Tab 158 of
TT8, at T 05821. It appears that "55708 + 115" is handwritten next to the wire transfer debit
amount which has been covered with black marker. However, there is no description of a wire
transfer fee in the list of transactions as there are in other bank statements. Therefore, the
additional $115 will not be included in the amount of funds transferred relating to this transaction
for Sybil Prosser.

[34] Sybil Prosser lived in San Francisco for a year, but at the time of her deposition on
December 19, 2007, she had moved to Miami, Florida. *See* 12/19/2007 Deposition, at 4-5.

[35] Dawn Prosser testified that she and Jeffrey Prosser purchased the vehicle for Sybil
(continued...)

characterized as equipment for Shoys[36] at the direction of Jeffrey Prosser. *See* Testimony of Eling

Joseph, Transcript of 03/23/2009, Adv. Doc. No. 112, at 15-17, 25-26; Tab 158 to Exhibit TT8,

at T 05823. Sybil Prosser made no repayments to New ICC for the purchase of her Mercedes

paid for by New ICC. Testimony of Christian, Transcript of 11/17/2008, at 127. We find that

New ICC's funds in the amount of $55,708 were used to purchase the vehicle for Sybil Prosser.

   In addition to the purchase of the vehicle, Sybil Prosser also benefitted from

transportation services paid for by New ICC. TT60, at TT4 1826, 1855; Tab 230 of TT8. Exhibit

TT60 breaks down the parties who used Crawford's Travel, Inc. ("Crawford") for transportation

and attributes the services as being to the benefit of Sybil Prosser, Michelle Prosser (addressed

*infra*), and Jeffrey and Dawn Prosser based upon the statements received from Crawford.

*See* TT60, at TT4 1826. According to the Chapter 11 Trustee, a total of $17,380.40 was paid to

Crawford for air transportation for Sybil Prosser. *See* TT60, at TT4 1826. We find that the

backup documentation in Exhibit TT8 indicates that payments totaling $17,328.50 were made to

---

[35](...continued)
Prosser. *See* Transcript of 02/02/2009, Adv. Doc. No.  94, at 110-11. The records of New ICC
indicate otherwise.

   [36] The reference to Shoys, although not specified in the email, appears from testimony to
mean the main house that was under construction as a residence for Dawn and Jeffrey Prosser in
St. Croix. *See* Transcript of 03/23/2009, Adv. Doc. No. 112, at 25-26. Nonetheless, the attempt
to characterize the property in this manner would not result in a "personal" expenditure appearing
as a "business" purchase, but rather would continue to appear as personal in nature only with a
different purpose. The purpose of intentionally mischaracterizing the transaction was not
developed on the record, though a purchase for Shoys would appear to be a transfer directly to or
for the benefit of Jeffrey Prosser, the ultimate shareholder, as opposed to a transfer to purchase a
vehicle for his daughter in California. According to Eling Joseph, the Mercedes was intended to
be for Sybil Prosser from the time the Mercedes dealership (in California) was first contacted.
Transcript of 03/23/2009, Adv. Doc. No. 112, at 13. Therefore, the credible evidence establishes
that there was never an intention for the vehicle to go to Shoys.

Crawford for transportation for Sybil Prosser. *See* Tab 230 of TT8.[37]

We note that Exhibit TT60, prepared by Ms. Christian, attributes payments without regard to the age of the Adult Prosser Children at the time of travel or whether they were traveling with their parents. *See* Testimony of Christian, Transcript of 11/19/2008, Adv. Doc. No. 111-1, at 243-45. The portion allocated was simply based upon the amount related to travel for the particular individual included in the books and records of the company. *Id.* Two payments to Crawford relate to flights for Sybil Prosser in 1999 totaling $1,681.40. *See* Tab 230 of TT8, at T 06622. Three payments to Crawford relate to flights for Sybil Prosser in 2000 totaling $2,687.90. *See id*. at T 06644, T 06647, T 06654. In 1999 and part of 2000, Sybil Prosser was seventeen years old. Counsel for the Defendants has not directed the court to any case law prohibiting the Trustee from avoiding and recovering payments based upon the age of the beneficiary. Nonetheless, we will subtract the $4,369.30 from what is attributable to Sybil Prosser as we agree that in the unique circumstances of this case, Jeffrey Prosser should be responsible for the amounts he directed the company to transfer for the benefit of his minor child. We find that Sybil

---

[37] We note that a number of pages in Tab 230 relating to Crawford statements and payments are unreadable and it is unknown whether any transportation expenses for Sybil Prosser were included in those pages. The court calculated the following to determine payments made to Crawford for Sybil Prosser:

    (1) $704.20, paid for with New ICC's check dated 09/16/99 (*see* Tab 230 of TT8, at T 06608, T 06622)

    (2) $977.20, paid for with New ICC's check dated 09/16/99 (*Id.* at T 06608, T 06622)

    (3) $996.40, paid for with New ICC's check dated 04/18/00 (*Id.* at T 06608, T 06644)

    (4) $1,156.00, paid for with New ICC's check dated 05/17/00 (*Id.* at T 06608, T 06647)

    (5) $535.50, paid for with New ICC's check dated 09/07/00 (*Id.* at T 06608, T 06654-55)

    (6) $10,076.90, paid for with New ICC's check dated 03/07/01 (*Id.* at T 06609, T 06660-61)

    (7) $2,882.30, paid for with New ICC's check dated 05/21/01 (*Id.* at T 06609, T 06665)

The payments total $17,328.50. This is $51.90 less than the amount claimed by the Trustee.

Prosser was the beneficiary of New ICC's payments to Crawford totaling $12,959.20 (excluding the $4,369.30 in payments made while Sybil Prosser was a minor).

Sybil Prosser testified that her father paid for the charges to her American Express card, while she paid for charges to her Visa and MasterCard using her allowance (also provided by New ICC at the direction of Jeffrey Prosser). Deposition of 12/19/2007, at 15-16; Amended Response to Plaintiff's First Request for Admissions from Sybil G. Prosser, TT89. However, the records of New ICC reveal that the corporation made payments (distinct from any made by Jeffrey Prosser personally) associated with various American Express charges made by Sybil Prosser. Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 84, at 221-222; TT60, at TT4 1820, 1824. It is the corporate payments, not payments made by Sybil from her allowance, that the Trustee seeks to avoid and recover. We find that the amounts charged by Sybil Prosser, who admits she was never an employee of and did not provide services to the ICC Debtors, are personal, non-business charges unless they were tuition payments. *See* note 22, *supra.* No argument or evidence to the contrary was produced.

In the Complaint, the Trustee asserts that New ICC paid for most, if not all, of the goods and services Sybil Prosser acquired using her American Express card. *See* Adv. Doc. No. 1, at ¶15.[38] Ms. Christian reviewed the credit card statements and identified the charges specifically made by Sybil Prosser and attributed a portion of the total payments made by New ICC to her based upon that review. *See* Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No.

---

[38] The Complaint asserts that Sybil Prosser's aggregate charges on the American Express cards from January 29, 2001, through October 29, 2007, totaled $528,920.84. *See* Adv. Doc. No. 1, at ¶15. At trial, the Trustee asserted that New ICC made payments totaling $298,539.83 to American Express for purchases made by Sybil Prosser. Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 111, at 109; TT60, at TT4 1820, 1824.

30

111, at 108-10. For the same reasons expressed above, it is not clear how the Trustee calculated

this number, i.e., which of the New ICC payments are considered to be payments for charges

made by Sybil Prosser and how each payment was allocated among the Adult Prosser Children

and the other cardholders. As the American Express statements and proof of New ICC payments

are in evidence, the court can determine when New ICC paid for all of the charges reflected on a

particular statement in order to calculate the minimum amount paid by New ICC to American

Express on behalf of Sybil Prosser. Sybil Prosser was a cardholder of the Centurion account and

Platinum account.

 We find that the following American Express charges to the Platinum account by Sybil

Prosser were paid for with New ICC funds:[39]

 (1) $183.40 for charges made from May through August of 2004, *see* TT28, at TT02258-

2277; Tab 10 of TT8, at T00376-77, T00384, T00387-88;

 (2) $404.25 for charges made March through July of 2005, *see* TT28, at TT02309-2338;

Tab 10 of TT8, at T00394-96, T00404-405;

 (3) $183.40 for charges made in September through December of 2005, *see* TT28, at

TT02344-2363; Tab 10 of TT8, at T00408-410, T00412-413;

 (4) $556.50 for charges made from March through October of 2006, *see* TT28, at

TT02380-2430; Tab 10 of TT8, at T00422-427; Tab 11 of TT8, at T00447-448, T00457-

---

[39] We note that the Trustee's schedule summarizing credit card activity provided at the beginning of Tab 10 to TT8 includes charges to the Platinum account made from January of 2001 through October of 2007. *See* Tab 10 of TT8, at TT00294-304. However, the first American Express Platinum account statement in evidence reflects a closing date of January 30, 2004. *See* TT28, at TT02222. Therefore, we do not include any payments for charges made to the American Express Platinum account prior to that statement.

458, T00466-68, T00473-475, T00484-485;

(5) $382.80 for charges made from January through August of 2007, *see* TT28, at

TT02442-2496; Tab 11 of TT8, at T00519-522, T00542-543, T00562-564, T00584-586,

T00594-596, T00600-602.

New ICC paid $1,710.35 on behalf of Sybil Prosser for charges to the Platinum account.

Charges made in June of 2007 and after were paid postpetition. Therefore, New ICC transferred

$1,566.80 prepetition and $143.55 postpetition for charges incurred by Sybil Prosser on the

American Express Platinum account.

We find that the following American Express charges to the Centurion account by Sybil

Prosser were paid for with New ICC funds:

(1) $21,043.51 for charges made from January through April of 2004, *see* TT28, at

TT02804-2853; Tab 10 of TT8, at T00363-366, T00370-373;

(2) $25,494.90  for charges made from June through September of 2004, *see* TT28, at

TT02867-2910; Tab 10 of TT8, T00374-375, T00378-383, T00385–386, T00389;

(3) $8,774.63 for charges made in June and July of 2005, *see* TT28, at TT03046-

TT03080; Tab 10 of TT8, at T00399-402;

(4) $132,253.49 for charges made in October of 2005 through July of 2006, *see* TT28, at

TT03112-3228; Tab 10 of TT8, at T00414-421, T00428-442, Tab 11 of TT8, at T00443-

446, T00449-450, T00458-459;

(5) $31,389.45 for charges made in December of 2006 through February of 2007, *see*

TT28, at TT03344-3419; Tab 11 of TT8, at T00478-479, T00482-483, T00486-490,

T00494-495, T00498-500, T00503, T00505-508, T00512-514, T00515-518, T00523-532,

T00538-541, T00544-546; and

(6) $18,053.70  for charges made in May through July of 2007, *see* TT28, at TT0349-3511; Tab 11 of TT8, at T00556-561, T00565-568, T00571-575, T00578-583, T00588-93, T00597-598.

These Centurion charges total $237,009.68. Of the multitude of payments, New ICC made four postpetition payments which were credited toward the balance accrued during the months of June and July. These postpetition transfers on behalf of Sybil Prosser total $14,272.19. Excluding charges paid postpetition, we find that New ICC transferred at least $222,737.49 to American Express prepetition for charges made by Sybil Prosser on the Centurion Account.

We find that $238,720.03 was paid by New ICC to American Express for Sybil Prosser's purchases using the Platinum and Centurion accounts, of that amount $229,304.29 was transferred prepetition and $14,415.74 was transferred postpetition.

We find that New ICC transferred a total of $348,622.23[40] to or for the benefit of Sybil Prosser, of which $326,061.49 was transferred prepetition and $22,560.74 was transferred postpetition.

*Transfers were made out of New ICC to or for the benefit of Michelle LaBennett (Prosser) in the form of direct payments, rental payments, payments for transportation services,*

---

[40] The $348,622.23 consists of $12,959.20 in transportation costs, plus $238,720.03 in American Express payments, plus $55,708 for the purchase of the Mercedes, plus $15,735 for rental payments, plus $25,500 in direct transfers to Sybil Prosser.

33

*American Express payments, and house staff payments beginning in 1999 through 2007.*[41]

The Chapter 11 Trustee asserts that, between January 1, 1999, and September 30, 2007, one or more of the ICC Debtors made transfers to or for the benefit of Michelle LaBennett totaling at least $404,962.46.[42] *See* Chapter 11 Trustee's Brief in Support of Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 105, at 9.  At the time of her deposition on December 19, 2007, she was twenty-eight years old. *See* Deposition of 12/19/2007, at 5. Therefore, none of the transfers at issue occurred while Michelle LaBennett was a minor. *See* note 15, *supra.*

Ms. Christian found no evidence, based upon her review of the books and records of New ICC, that Michelle LaBennett was ever employed by New ICC. Transcript of 11/17/2008, Adv. Doc. No. 84, at 130. Michelle LaBennett admitted that she has never been employed by or provided services to New ICC, ICC-LLC, or Emerging. *See* Response to Plaintiff's First Request

---

[41] The Chapter 11 Trustee has identified payments made by New ICC related to Michelle LaBennett's wedding. However, the Chapter 11 Trustee has allocated those as payments for the benefit of Jeffrey and Dawn Prosser, and they are not an issue in this adversary proceeding. *See* TT60; Testimony of Christian, Transcript of 11/19/2008, Adv. Doc. No. 111-1, at 241-42.

[42] The Chapter 11 Trustee has limited the transfers he seeks to avoid and recover to the transactions listed on Exhibit TT60. *See* Transcript of 03/25/2009, Adv. Doc. No. 112-2, at 14-15. According to the Trustee's Exhibit TT60, transactions totaling $499,967.89 were identified as transfers to or for the benefit of Michelle LaBennett. TT60, at TT4 1820. However, in his Supplemental Post-Trial Brief (Fraudulent Transfer Action), the Trustee asserts that transfers were made to or for the benefit of Michelle LaBennett in the amount of $404,962.26. Adv. Doc. No. 110, at 2. The difference between the amounts is $95,005.43, the amount of the "House Staff Expenses" paid to The Officers Group Securite. *See* TT60, TT4 1820, 1825. We address these payments, *infra*, and find that the payments had a business purpose. As the Trustee has excluded payments deemed to have a business purpose from his effort to avoid and recover transfers, we do not consider these in our analysis of fraudulent conveyances.

34

for Admissions From Michelle LaBennett Prosser, TT88.[43]

The Chapter 11 Trustee asserts that direct cash payments were made to Michelle LaBennett by New ICC in the amount of $19,250.00. Transcript of 11/18/2008, Adv. Doc. No. 111, at 111; TT60, at TT4 1820, 1823, 1878; Tab 106 to TT8. These payments spanned from January 30, 2007, to April 5, 2007, and totaled approximately $5,500.00 per month. TT60, at TT4 1878; Tab 106 to TT8; Deposition of 12/19/2008, at 37. A wire transfer in the amount of $5,500 was made from New ICC to Michelle LaBennett on January 30, 2007. Tab 106 of TT8, at T 03931. New ICC's records indicate that five checks in the amount of $2,750 each were issued to Michelle LaBennett from February 8, 2007, to April 5, 2007. *Id.* at T 03927. At times, when Michelle LaBennett needed money, she would contact Eling Joseph, Jeffrey Prosser's corporate executive secretary at New ICC, though she insisted the money came from her father. Deposition of 12/19/2007, at 36, 44-45. To the contrary, the evidence proves payments were made by New ICC. Therefore, we find, based upon New ICC's records, that transfers were made by the company in the amount of $19,250 to Michelle LaBennett in 2007.

The Trustee alleges that New ICC also made rental payments to Madame Marie-Denise Leymarie ("Leymarie") for Michelle LaBennett totaling $142,619.40 while Michelle was studying in France. Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 84, at 133. TT60, at TT4 1820, 1826, 1876-77; Tab 114 of TT8. Michelle LaBennett testified that her rent had been paid for her since the time she moved from home. Deposition of 12/19/2007, at 34-35.

---

[43]   Although Jeffrey Prosser's former corporate executive secretary testified that Michelle LaBennett worked for New ICC in the company's summer program at some point in time, Michelle LaBennett stated that she was neither employed by nor provided services to any of the ICC Debtors. *See* Transcript of 03/23/2009, Adv. Doc. No. 112, at 36. We accept Michelle LaBennett's testimony.

35

Though she did not see a check from her father's personal account, she testified that Jeffrey

Prosser was the one who made these payments. *Id.* at 35. Despite her testimony to the contrary,

the records of New ICC indicate that New ICC made numerous rental payments for Michelle

LaBennett's benefit. Ms. Christian explained the contents of the backup documentation

contained in Tab 114 of Exhibit TT8:

> Q. And could you identify for the Court what documents exist in Tab 114?
> A. Well, the first set of documents, that would be T04160 through T04166, are
> actually just printouts of the check history report generated by the MAS 200
> accounting system that is used by New ICC.
> Q. And what do those records reflect?
> A. These records just reflect all of the payments that were made to Madam Denise
> Ley Marie over I think we ran these from the beginning of time.
> Q. And so these are -- each of the checks you found in the books and records of
> New ICC showing payments written to Madam Marie Denise Ley Marie and then
> the check amount and the date?
> A. Yes.
> Q. And then what is the remaining portion of that tab?
> A. The remaining portion reflects via [*sic*] if it was a wire transfer or in this
> particular case the payments were made out of the bank account. It reflects proof
> that the payment was made by New ICC.
> The money was debited from its bank account. And any additional supporting
> documents that were maintained -- was obtained from the books and records to
> verify the nature of the payments.

Transcript of 11/17/2008, Adv. Doc. No. 84, at 207-08. Although the check history report

contained in pages T04160 through T04166 of Tab 114 identifies a number of payments to

Leymarie, Ingrid Christian testified that not all payments are included in Exhibit TT60 and are,

therefore, not transfers at issue, because she could not obtain a bank statement as proof that the

funds were actually debited from New ICC's bank account. Transcript of 11/20/2008, Adv. Doc.

No. 111-2, at 57. The initial payment was made to Leymarie on March 17, 1999, in the amount

of $15,819.40. *See* Tab 114 of TT8, at T 04167-68. Payments were made thereafter ranging from

36

$5,280 to $5,295. *See* TT60, at TT4 1876; Tab 114 of TT8.[44] We find that New ICC made rental

payments from 1999 through 2002 for the benefit of Michelle Prosser in the amount of at least

$142,619.40.

In addition, New ICC paid for transportation for Michelle LaBennett. TT60, at TT4 1820,

1826, 1850, 1855; Tabs 18 and 230 of TT8. The Trustee alleges that payments to Chabe Verjat

totaling $38,218.44 were made to provide Michelle LaBennett with transportation services while

she was studying in France. Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 84,

at 128-29. According to Ms. Christian, the payments for these transportation services were only

included on Exhibit TT60 and attributed to Michelle LaBennett when the invoice identified her

by name. Transcript of 11/19/2008, Adv. Doc. No. 111-1, at 70. We have discovered

discrepancies between the total amount claimed by the Trustee and the amount which can be

confirmed from the backup documentation as the total amount for services provided to Michelle

LaBenentt.[45] We find that Michelle LaBennett benefitted from New ICC's payments to Chabe

---

[44] We note an inconsistency between the summary (TT60) and the backup documentation
(TT8). Exhibit TT60 indicates that a payment was made on August 1, 2001, in the amount of
$5,280. However, the bank statement in the backup documentation indicates that $5,285 was
debited from the Virgin Islands Community Bank Account on that date. Nonetheless, because
counsel for the Trustee represented that the Trustee was only seeking the transactions identified
in Exhibit TT60, we limit the amount to $5,280. *See* note 27, *supra.*

[45] According to Exhibit TT60, the Trustee is seeking avoidance and recovery of six
transfers or a portion thereof. *See* TT60, at TT4 1850. Chabe Verjat's services were not used
solely for Michelle LaBennett and only those portions of the statement for which her name is
listed are properly attributed to her. *See* Tab 18 of TT8. The Trustee asserts that the following six
transfers related to services for Michelle LaBennett:

    (1) A $4,248.15 wire transfer was made on November 14, 2000. *See* TT60, at TT4 1826,
    1850; Tab 18 of TT8, at T 00977-78. The backup documentation supports that all
    transportation services related to this payment were for Michelle LaBennett (Prosser).
    *See* Tab 18, at T 00979-80.

(continued...)

Verjat in the amount of $23,293.46.

In addition, the Trustee asserts that funds were paid to Crawford for air transportation for

the benefit of Michelle LaBennett in the amount of $14,894.73. TT60, at TT4 1826, 1855; Tab

230 of TT8. However, upon review of the documents in Tab 230 of Exhibit TT8, the court

determined that a total of $10,132.23 of New ICC's funds were used to pay for air transportation

---

[45](...continued)
(2) An $8,756.36 wire transfer was made on December 6, 2000, of which the Trustee asserts $7,940.80 was related to services for Michelle LaBennett. *See* TT60, at TT4 1826, 1850; Tab 18 of TT8, at T 00981-82. The backup documentation supports that, after a reduction for the cost of transportation provided to Mr. Prosser, $7,940.80 is attributable to transportation for Michelle LaBennett (Prosser). *See* Tab 18 of TT8, at T 00983-85.
(3) A wire transfer in the amount of $15,922.56 was made on January 4, 2001, of which the Trustee asserts $7,533.89 is related to services for Michelle LaBennett. *See* TT60, at TT4 1826, 1850; Tab 18 of TT8, at T 00986-87. The bill related to this payment does not support the Trustee's assertion. The total due is 110,377 Francs. *See* Tab 18 of TT8, at T 00992. The fees related to Michelle LaBennett total 19,439 Francs. *Id.* at T 00989-92. Therefore, only $2,805.20 is attributable to Michelle LaBennett. *See id.* at T 00988.
(4) A wire transfer in the amount of $11,240.50 was made on February 22, 2001, of which the Trustee asserts $587.68 is related to services for Michelle LaBennett. *See* TT60, at TT4 1826, 1850; Tab 18 of TT8, at T 00993-94. We find that the backup documentation supports the Trustee's assertion, and $587.68 is properly attributed to Michelle LaBennett (Prosser). *See* Tab 18 of TT8, at T 0996-97.
(5) A wire transfer in the amount of $7,907.91 was made on March 7, 2001. *See* Tab 18 of TT8, at T 00998-99. The Trustee asserts that the full amount is related to services provided to Michelle LaBennett. *See* TT60, at TT4 1825, 1850. However, transportation for another, otherwise unidentified individual (Mr. Gordon) is included in the billing statement and that cost must be subtracted. *See* Tab 18 of TT8, at T 01001. We find that the appropriate amount attributable to Michelle LaBennett (Prosser) is $7,711.63. *See id.* at T 01000-1001.
(6) A $10,000 wire transfer was made on August 3, 2001, and the Trustee attributes the full amount to Michelle LaBennett. *See* TT60, at TT4 1826, 1850; Tab 18 of TT8, at T 01002-04. The $10,000 payment is related to "Invoice F0103417" which is not provided in the backup documentation. *See* Tab 18 of TT8, at T 01003. Therefore, the court cannot confirm what portion, if any, of the $10,000 payment is attributable to Michelle LaBennett. The Trustee has not met his burden as to this payment.
Of these six payments made by New ICC to Chabe Verjat, we find that $23,293.46 is attributable to transportation costs for Michelle LaBennett.

for Michelle LaBennett.[46] Therefore, we find that Michelle LaBennet benefitted from

transportation services paid by New ICC to Crawford totaling $10,132.23.

In the Complaint, the Trustee asserts that New ICC paid for most, if not all, of the goods

and services Michelle LaBennett acquired using her American Express card. *See* Adv. Doc. No.

1, at ¶15.[47] Ms. Christian reviewed the credit card statements and identified the charges

specifically made by Michelle LaBennett and attributed a portion of the total payments made by

New ICC to her based on that review. *See* Testimony of Christian, Transcript of 11/18/2008,

Adv. Doc. No. 111, at 108-10. We note that the amounts charged by Michelle Prosser, who

admits she was never an employee of and did not provide services to the ICC Debtors, are

personal, non-business charges, except for tuition payments.[48] No argument or evidence to the

---

[46] We note that a number of pages in Tab 230 relating to Crawford statements and payments are unreadable and it is unknown whether any transportation expenses for Michelle LaBennett were noted on those pages. The court calculated the following to determine payments made to Crawford for Michelle LaBennett:

(1) $4,035, paid by New ICC's check dated 02/11/00 (*see* Tab 230 of TT8, at T 06608, T 06637)

(2) $725.20, paid by New ICC's check dated 02/11/00 (*Id.*)

(3) $5,372.23, paid by New ICC's check dated 01/12/01 (*Id.* at T 06609, T 06657, T 06658)

The payments total $10,132.43. This is a difference of $4,762.50 from the amount asserted by the Trustee.

[47] The Complaint asserts that Michelle LaBennett's aggregate charges on the American Express cards from January 29, 2001, through October 29, 2007, totaled $405,316.17. *See* Adv. Doc. No. 1, at ¶15. At trial, the Trustee asserted that New ICC made payments totaling $189,979.89 to American Express for purchases made by Michelle LaBennett. Testimony of Christian, Transcript of 11/17/2008, Adv. Doc. No. 84, at 220-224; Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 111, at 108-09; TT60, at TT4 1820, 1824; Tab 11 at TT8.

[48] The Chapter 11 Trustee is not seeking to avoid and recover tuition payments which Michelle charged to the American Express card. *See* Testimony of Christian, Transcript of

(continued...)

39

contrary was produced.

We calculate the amount New ICC paid on behalf of Michelle LaBennett to American Express in the same manner set forth above.

We find that the following American Express charges to the Platinum account by Michelle LaBennett were paid for with New ICC funds:[49]

(1) $1,663.38 for charges made from May through August of 2004, *see* TT28, at TT02258-2277; Tab 10 of TT8, at T00376-77, T00384, T00387-88;

(2) $374.75 for charges made March through July of 2005, *see* TT28, at TT02309-2338; Tab 10 of TT8, at T00394-96, T00404-405;

(3) $1,680.80 for charges made in September through December of 2005, *see* TT28, at TT02344-2363; Tab 10 of TT8, at T00408-410, T00412-413;

(4) $5,163.80 for charges made from March through October of 2006, *see* TT28, at TT02380-2430; Tab 10 of TT8, at T00422-427; Tab 11 of TT8, at T00447-448, T00457-458, T00466-68, T00473-475, T00484-485;

(5) $79.90 for charges made in January and February of 2007, *see* TT28, at TT02442-2496; Tab 11 of TT8, at T00519-522, T00542-543.

None of the New ICC payments toward Michelle LaBennett's charges were made postpetition. Therefore, New ICC transferred $8,962.63 prepetition for charges incurred by

---

[48](...continued)
11/17/2008, Adv. Doc. No. 84, at 222. Those payments were considered business expenditures and excluded from Exhibit TT60 as the company paid the tuition for the children of executives. *Id.*

[49] *See* note 39, *supra*, addressing the statements included in the calculation.

Michelle LaBennett on the American Express Platinum account.

We find that the following American Express charges to the Centurion account by Michelle LaBennett were paid for with New ICC funds:

(1) $3,496.23 for charges made from January through April of 2004, *see* TT28, at TT02804-2853; Tab 10 of TT8, at T00363-366, T00370-373;

(2) $11,403.99 for charges made from June through September of 2004 (excluding tuition payments), *see* TT28, at TT02867-2910; Tab 10 of TT8, T00374-375, T00378-383, T00385–386, T00389;

(3) $2,979.53 for charges made in June and July of 2005, *see* TT28, at TT03046-TT03080; Tab 10 of TT8, at T00399-402;

(4) $23,333.32 for charges made in October of 2005 through July of 2006 (excluding tuition payments), *see* TT28, at TT03112-3228; Tab 10 of TT8, at T00414-421, T00428-442, Tab 11 of TT8, at T00443-446, T00449-450, T00458-459;

(5) $3,991.60 for charges made in December of 2006 through February of 2007, *see* TT28, at TT03344-3419; Tab 11 of TT8, at T00478-479, T00482-483, T00486-490, T00494-495, T00498-500, T00503, T00505-508, T00512-514, T00515-518, T00523-532, T00538-541, T00544-546; and

(6) $1,323.57 for charges made in May through July of 2007, *see* TT28, at TT0349-3511; Tab 11 of TT8, at T00556-561, T00565-568, T00571-575, T00578-583, T00588-93, T00597-598.

These Centurion charges total $46,528.24. New ICC made four post-petition payments, which were credited toward the balance accrued during the months of June and July 2007. A total

of $1,323.57 was paid postpetition by New ICC for charges incurred by Michelle LaBennett, and

New ICC transferred at least $45,204.67 to American Express prepetition for charges made by

Michelle LaBennett.

We find that $55,490.87 was paid by New ICC to American Express for Michelle

LaBennett's purchases on the Platinum and Centurion accounts. Of that amount, $54,167.30 was

transferred prepetition and $1,323.57 was transferred postpetition.

The Trustee's Exhibit TT60 reflects payments by New ICC in the amount of $95,005.43

for "house staff expenses" for the benefit of Michelle LaBennett. TT60, at TT4 1820, 1825,

1896; Tab 256 of TT8. The payments were to The Officers Group Securite for security services

while she was in Paris. Transcript of 11/18/2008, Adv. Doc. No. 111, at 107. There is no

indication that Michelle LaBennett or anyone else ever reimbursed the company. *Id.* However,

Oakland Benta testified that, as the head of security (for EmCom), it was his determination that

Michelle Prosser was in need of security while in France. Transcript of 12/10/2008, Adv. Doc.

No. 118, at 67. He testified as follows:

> Q. And what factors went into your evaluation?
> A. That in Paris any child of a corporate – of any corporation or whose family
> owns a corporation is subject to kidnaping. So it was on those lines we decided
> that it was more appropriate to have security with her.
> Q. Were you aware of any events that might make Michelle Prosser a
> high-security risk?
> A. Yes.
> Q. And what was that?
> A. That she was known and that within the school she was going to that it was
> very obvious that everybody knew who she was. Because of information being
> filtered out of the office unprofessionally to others would make her a high target.
> Q. Were you aware of any other publicity surrounding ICC or its executives and
> their families?
> A. Well, there were some incidents where we'd go back to U.S. Customs again
> and all the other stuff that came up with that. But other than that, that's pretty

much what I had.

*Id.* at 67-68. Mr. Prosser had interests in France and that was a consideration. *Id.* at 68. In

accordance with his evaluation of the risk, Mr. Benta arranged transportation services and also

retained security agents in France. *Id.* at 63-65.[50] We find that transfers were made by New ICC

for the purpose of providing security to Michelle LaBennett, but these payments had a business

purpose.

Excluding tuition payments and payments for security services, New ICC made transfers

to or for the benefit of Michelle LaBennett totaling $250,785.96,[51] of that amount $249,462.39

was transferred prepetition and $1,323.57 was transferred postpetition.


*Transfers were made out of ICC-LLC and New ICC to Adrian Prosser in the form of*

*direct payments beginning in 2000 and continuing through 2005.*

The Chapter 11 Trustee asserts that one or more of the ICC Debtors made non-business

transfers to Adrian Prosser totaling at least $159,508.52. *See* Chapter 11 Trustee's Brief in

Support of Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 105, at 9.

Based upon the books and records of New ICC, Ms. Christian determined that direct

payments totaling $55,376.43 were made to Adrian Prosser which did not relate to his

employment by a subsidiary of New ICC. Transcript of 11/18/2008, Adv. Doc. No. 111, at 87-

---

[50] Mr. Prosser also testified about security concerns as a result of a magazine article
published in 1999 identifying Dawn Prosser, Michelle's mother, as one of the wealthiest black
women in the Caribbean. *See* Transcript of 03/26/2009, Adv. Doc. No. 112-3, at 107.

[51] The $250,785.96 consists of $19,250 in direct payments, plus $142,619.40 in rental
payments, plus $23,293.46 in transportation payments to Chabe Verjat, plus $10,132.23 in air
transportation payments to Crawford, plus $55,490.87 for American Express payments.

111; TT60, at TT4 1820, 1823, 1828-29; Tab 2[52] of TT8. Due to that employment, expense

reimbursements, payroll, and certain housing payments made to or on behalf of Adrian Prosser

were excluded from Exhibit TT60 as other executives of the company received the benefit of

housing payments also.[53] Transcript of 11/17/2008, Adv. Doc. No. 84, at 132. However, other

payments were clearly personal, and even Adrian Prosser testified he did not realize that they

were payments from the corporation. Deposition of 12/19/2007, at 73-74.[54] Thus, he did not

---

[52] Exhibit TT60 indicates that the backup documents of cash payments to Adrian Prosser
are located at Tab 3 of Exhibit TT8. However, the documents are located at Tab 2.

[53] The housing allowance payments were made by New ICC, though according to Ms.
Christian, Adrian Prosser was actually employed by a subsidiary, St. Croix/St. Thomas Cable.
Transcript of 11/17/2008, Adv. Doc. No. 84, at 132. In his Amended Response to Plaintiff's First
Request for Admissions, he stated that he "received wages and/or salary on account of [his]
employment with Innovative Cable TV." TT86. He also stated that he provided services to New
ICC "through work performed in the corporate offices on finance/operational activities of the
companies in the USVI/BVI/St. Maarten/St. Martin/Guadeloupe/Martinique to include CATV,
Internet, Long Distance services." *Id.*

[54] Among the direct payments which the Trustee seeks to avoid is a direct payment made
to Adrian Prosser on May 20, 2004, in the amount of $20,819.59. *See* TT60, at TT4 1828. Adrian
Prosser was specifically asked about that payment at his deposition on December 19, 2007:
    Q. Well, what do you think that might have been for?
    A. A gift, but I didn't realize it was a company deal. Like I said, it's news to me
    that it was coming out of a corporate account.
    Q. And that was from Dawn and Jeff?
    A. Yep.
    Q. Is what you thought, anyway?
    A. Yes.
    Q. And what was it for?
    A. I think I used it to buy furniture.
12/19/2007 Deposition, at 73-74. New ICC's check history report reflects a transfer to "Adrian
Labennett"(Adrian Prosser) on May 20, 2004, in the amount of $20,819.59. Tab 2 of TT8, at
T00062. Exhibit TT60 reflects the transfer in that amount on May 20, 2004, but lists the "Prosser
Related Amount" as $20,876.43, which is $56.84 more than the amount the check history report
reflects. *See* TT60, at TT4 1828. The Virgin Islands Community bank statement lists a debit to
New ICC's account on May 20 in the amount of $20,876.43. Tab 2 of TT8, at T00068.

(continued...)

consider these payments as income for services provided through his employment and by his own admission, these were non-business payments. The $55,376.43 in direct transfers to Adrian Prosser reflects payments for which the books and records of New ICC contain no support to characterize these as business payments, and thus are not related to his employment by the subsidiary of New ICC. *See* Testimony of Christian, Adv. Doc. No. 111, at 90-91. We agree with the Trustee that these payments did not have a business purpose and find that funds unrelated to Adrian Prosser's employment were transferred out of New ICC to him in the amount of $55,376.43.

Adrian Prosser was also the recipient of a wire transfer in the amount of $104,132.09 from the bank account of ICC-LLC on April 28, 2005. TT63, at TE2 01909. In his Amended Response to Plaintiff's First Request for Admissions, Adrian Prosser admitted that approximately $104,132.09 was paid to him by ICC-LLC on or about April 29, 2005, which he used as a down payment on the purchase of a residence, referred to as the West Palm Beach Condominium. TT86, at TE 02472-73. He understood the money to be a gift from his parents. *Id.* at 9-10.[55] At his deposition on December 19, 2007, Adrian Prosser testified that he made a $120,000.00 down payment on the West Palm Beach Condominium. 12/19/2007 Deposition of Adrian Prosser, at 9. We find that the funds provided by the ICC Debtors for the down payment

---

[54](...continued)
Therefore, the higher amount is substantiated by the bank statement.

[55] Jeffrey Prosser testified that "[t]here was certainly an advance. Whether that was through LLC or through the contra equity, I don't know." Testimony of 12/09/2008, Adv. Doc. No. 89, at 215. Mr. Prosser testified that he could not recall the characterization of this transfer. *Id.* The records of the companies reflect that the funds originated in New ICC's account, were transferred to ICC-LLC, and subsequently disbursed to Adrian Prosser. *See* note 57, *infra.*

45

on Adrian Prosser's home were non-business and personal in nature.

In total, New ICC transferred $55,376.43 prepetition to Adrian Prosser, and ICC-LLC transferred $104,132.09 to Adrian Prosser prepetition, for a combined total of $159,508.52.

*The Contra Equity Account*

As set forth above, the evidence substantiates that numerous transfers were made out of the ICC Debtors either directly to the Defendants or to third parties for the benefit of the Defendants in the form of rental payments, American Express payments, and transportation costs. The Adult Prosser Children do not contest that payments were made to or for them, but they assert that the transfers to or for their benefit were actually from Jeffrey Prosser, as opposed to the ICC Debtors.  Transcript of 07/23/2009, Adv. Doc. No. 113, at 38-44.[56] Their theory centers specifically upon how New ICC recorded the transfers in its audited financial statements.[57] The Adult Prosser Children contend that the transfers were actually made by Jeffrey

_____

[56] *See also* Amended Response to Plaintiff's First Request for Admissions from John Justin Prosser, TT87; Response to Plaintiff's First Request for Admissions from Michelle LaBennett Prosser, TT88; Amended Response to Plaintiff's First Request for Admissions from Sybil G. Prosser, TT89; 12/19/2007 Deposition of Adrian Prosser, at 9-10, 73-74.

[57] All except one of the transfers sought to be avoided and recovered through this adversary proceeding are transfers out of New ICC. The exception is the transfer by ICC-LLC to Adrian Prosser in the amount of $104,132.09. TT86, at TE 02472-73; Testimony of Christian, Transcript of 11/18/2008, Adv. Doc. No. 111, at 104; TT63, at TE2 01909. The evidence indicates that the transfer of $104,132.09 originated from New ICC and was booked by New ICC in the contra equity account, *see* discussion, *infra*. Based upon a review of the receivables LLC account on New ICC's general ledger (accounted for as contra equity on the company's audited financial statements), a transaction was posted to the account as a transfer to ICC-LLC in the amount of $104,017.09 the day before ICC-LLC transferred $104,132.09 to Adrian Prosser. The difference in the amount is exactly $115.00.

As to how ICC-LLC recorded the transfer to Adrian Prosser in its books, according to
(continued...)

Prosser on the basis that payments were attributed to him by the company (through recording the

funds as contra equity in the corporate financial statements) and Jeffrey Prosser reported some of

the funds on Schedule C of his and Dawn Prosser's income tax returns.[58] *Id.* The Chapter 11

Trustee contends that the transfers did not flow from Jeffrey Prosser, and the Defendants are

directly liable to the ICC Debtors' bankruptcy estates. *See* Chapter 11 Trustee's Trial Brief

Regarding Fraudulent Transfer Adversary Proceedings, Adv. No. 70, at 4-9.[59] In order to address

_____

[57](...continued)
New ICC's CFO, Dennis Kanai, "There is a general ledger in the [accounting] system for [ICC]
LLC, but it'd never been completed or reviewed or finalized." *Id.* at 35. According to Mr. Kanai,
no one maintained ICC-LLC's books. *Id.* There really were no executives of ICC-LLC, and "[i]t
was purely a shell holding company." *Id.* at 39.


[58] Jeffrey Prosser did not file a Schedule C in every year. Jeffrey and Dawn Prosser's
jointly filed income tax returns for the years 1998 through 2006 have been admitted as evidence
in this proceeding. JP125-JP133. A Schedule C was filed for the years 2000 through 2006.
     For the year 2000, Jeffrey and Dawn Prosser reported "wages, salaries, tips, etc." as
$2,100,000 and a business loss as calculated on Schedule C of $3,374,000 resulting in a negative
adjusted gross income. JP127. A business loss and negative adjusted gross income were reported
in 2001 and 2002. JP128-JP129. Even though business income was reported in 2003, a negative
adjusted gross income was reported. JP130. Business income was also reported in 2004, 2005,
and 2006, resulting in reported adjusted gross income of $1,010,707, $813,465, and $425,584,
respectively. JP131-JP133.
     The Chapter 11 Trustee contends that, even if Jeffrey and Dawn Prosser paid taxes on the
transfers as they contend, "that fact alone does not mean the Transfers were proper or
authorized." *See* Chapter 11 Trustee's Brief in Support of Proposed Findings of Fact and
Conclusions of Law, Adv. Doc. No. 105, at 15, n.13. We agree.


[59] The Chapter 11 Trustee contends that "Even If the Court Determines that the Transfers
Were Initially Distributions to Jeff Prosser, They Are Fraudulent Transfers that Must Be
Returned to the ICC Debtors[.]" Chapter 11 Trustee's Brief in Support of Proposed Findings of
Fact and Conclusions of Law, Adv. Doc. No. 105, at 17. Here, there is no doubt that the transfers
sought to be avoided originated from one of the ICC Debtors' accounts. As discussed *infra* in the
court's conclusions of law, the main focus in the analysis of whether a transfer is an avoidable
fraudulent conveyance is the intent of the transferor. *In re Elrod Holdings Corp.*, 421 B.R. 700,
709 (Bankr. D. Del. 2010). Whether Jeffrey Prosser was the initial recipient of the transfers who
then subsequently transferred the funds to the Defendants, as they contend, is an issue with

(continued...)

the contentions of the parties, an explanation of the contra equity account is necessary.

The contra equity account, although an entry on the capital deficit section of the financial statements, developed from (and is a term used interchangeably with) several receivables accounts that appear on the assets side of the company's internal ledger.[60] According to the Chief Financial Officer of New ICC, Dennis Kanai, the receivables account maintained by New ICC represented "anything that was deemed a distribution not for the benefit of [New] ICC. In other words,...[a distribution to] any of the holding companies or Mr. Prosser personally." Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 8, 13, 81.[61] The company did not characterize these payments as compensation to Jeffrey Prosser. Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 43.[62] If the company had considered any of the payments as

---

[59](...continued)
respect to *recovery* of an avoided transfer pursuant to §550. *See* discussion *infra.*

[60] The contra equity account developed from several receivables accounts. The "due from" account has been referred to by various labels, such as "receivables LLC". *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 80 ("I guess the reason there's such confusion is there's several accounts that are mapped, if you will, into that one category. But generally the activity ran through an account called receivables LLC."); *Id.* at 102 ("There was [*sic*] probably eight to ten accounts that get mapped into that [contra equity] category....For convenience we tried to isolate all the transactions into the receivables LLC account."). The "due from accounts" later were labeled as contra equity accounts for purposes of the audited financial statements.

[61] Mr. Kanai testified that the transactions posted to the receivable LLC account were not solely for expenditures on behalf of the Prosser family as some transactions posted to the account related to payments to New ICC's parent companies. *See* Transcript of 03/10/2009, Adv. Doc. No. 98, at 102-03. *See also* Testimony of Christian, 11/18/2008, Adv. Doc. No. 111, at 195 (testifying that the due from account also includes business related activity of ICC LLC).

[62] Even the biweekly payments of $71,000 to Mr. Prosser were not treated as compensation by New ICC:

    Q. Now, did Mr. Prosser ever describe to you that the entries from the due from

(continued...)

48

compensation, then it would have had an obligation to provide documentation such as a 1099 or
W-2 form, which it did not. *Id.* at 45. Anything booked into the accounts was not a true capital
expenditure of the corporation but rather an expenditure outside the ordinary course of business
operations. Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 28. A
distribution is defined as a transfer of value, in the form of money or property, from a corporation
to or for the benefit of a stockholder. *See* Testimony of Barbee, Transcript of 03/23/2009, Adv.

---

[62](...continued)
shareholder account were his compensation?
A. No, I never heard that.
Q. Are you aware that Mr. Prosser received $71,000 from ICC every two weeks?
A. Yes, sir.
Q. How was this accounted for on the books of ICC?
A. As a receivable from LLC much the same way any of these other distributions
were handled.
Q. Was it booked into that same account we've been talking about?
A. Correct. The receivables LLC account.
Q. Was the 71,000 every two weeks to Mr. Prosser ever expensed on the books
and records of ICC?
A. No, sir.
Q. To your knowledge as the chief financial officer, did ICC ever issue Mr.
Prosser a W2 form with respect to the 71,000 every two weeks?
A. No. No, it did not.
Q. Was the 71,000 every two weeks to Mr. Prosser ever included in the payroll
records of New ICC?
A. No, sir.
Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 33-34.

Doc. No. 112, at 246-248.[63, 64] We find that the non-business transfers by New ICC were treated by the corporation as distributions and not as compensation for services rendered by Jeffrey Prosser.[65]

The use of the term "contra equity account" arose as a result of Grant Thornton's audit of the financial statements of the companies on a consolidated basis[66] for the years 1999 and 2000. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 17; TT190. The auditors opined that what New ICC booked as an account receivable due from shareholder should not be reflected as an asset on the balance sheet of New ICC because it was not being serviced. TT190, at TT4 1613-14. That is, principal and interest were not being paid back to New ICC by the shareholder (ultimately, Jeffrey Prosser) to or for whom loans and advances were made and no collection action was contemplated. Subsequently, the treatment of those transfers was changed

---

[63] Although Mr. Barbee was the Chapter 7 Trustee's witness at trial in support of the Trustees' Turnover Action and the Chapter 7 Trustee is not a party to this adversary proceeding, both the Chapter 11 Trustee and Adult Prosser Children cited to his testimony in their briefs and closing arguments in this adversary proceeding. *See* Adult Prosser Children's Post-Trial Brief, Adv. Doc. No. 102, at 10, and multiple references in Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 104. *See also* Transcript of 07/23/2009, Adv. Doc. No. 113, at 16, 33, 54 (closing arguments).

[64] Despite the fact that distributions are defined as being to or for the benefit of a shareholder, the corporation lumped the non-business transfers to or for the benefit of the Prosser family together as contra equity in the audited financial statements and treated them as distributions.

[65] The fact that a disbursement from a corporation is designated as a "distribution" is not a determination that the distribution was proper or authorized. *See* Testimony of Barbee, Transcript of 03/23/2009, Adv. Doc. No. 112, at 249. A distribution may be fraudulent. *See also* note 10, *supra*.

[66] "New ICC is basically a holding company." Testimony of Barbee, Adv. Doc. No. 112-1, at 15.

50

in the audited financial statements so that the balance sheet no longer reflected the receivables from parent, LLC, or Jeffrey Prosser personally as assets. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 17-18. Instead, these debts were reclassified into a new category referred to as the "contra equity account" in the equity section of the balance sheet.[67] *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 17-18, 21; Grant Thornton Audit Report, Exhibit TT90. Thereafter, (from 2001 forward) on the audited financial statements, payments made by the companies that benefitted the Prossers "were classified in the equity section as a reduction to the capital of the company." Testimony of Barbee, Transcript of 03/23/2009, Adv. Doc. No. 112, at 175. Internally, however, New ICC continued to capture these transfers in a receivables account, that is, an account listed as an asset of the company and as loans to Jeffrey Prosser.[68]

---

[67] We note that, even prior to this reclassification of the receivables account, negative equity was reported. The financial statements report "Total Stockholder's (Deficit) Equity" as negative $27,225,000 as of December 31, 2000. *See* TT190, at TT4 1617.

[68] Dennis Kanai testified as follows regarding the treatment on the internal ledger versus the financial statements:

Q. And when you make that distinction between external reporting -- well, first of all you said as a receivable, right?  That was one -- you said you kept it as a receivable?
A. Yeah.  On the books and records, in the general ledger if you will, that account is a receivable.
Q. Is that because it had always been a receivable?
A. Correct.
Q. So, you just didn't make the switch, you didn't recategorize it on the books and records, within the company, because that's the way it had always been done?
A. Correct.
Q. In other words, you didn't sort of give the account a new name.
A. That's correct.
*See* Transcript of 03/10/2009, Adv. Doc. No. 98, at 86.
*See also id.* at 111-12:

(continued...)

Based upon the credible testimony of the CFO of New ICC, we find that for purposes of

the consolidated financial statements of New ICC and its subsidiaries, New ICC characterized

and treated personal transactions as distributions that reduced equity, and reflected them as such

in the audited financial statements. Internally, however, the same transactions were treated as no-

interest loans (accounts receivable) to Jeffrey Prosser. We note that only a portion of the transfers

reflected as contra equity transactions (i.e., those to or for the benefit of the Adult Prosser

Children) are at issue here. Many of the transactions booked as contra equity were to or for the

benefit of Jeffrey and Dawn Prosser, who are not named as defendants in this proceeding.

---

[68](...continued)
Q. Internally it wasn't considered a contra equity. It was considered an asset.
You've already testified to that. Isn't that correct?
A. No. I believe what I said, or what I intended to say, that the internal book
keeping convention was to accumulate this activity in what was and has always
been an asset account, but it was always mapped into a contra equity account for
external reporting purposes.
Q. Yes. And so, internally it was maintained as a receivable, correct?
A. The information or the activity was accumulated in an account that happened
to be in the asset section on the general ledger.
Q. And the company never wrote that off, did they?
A. No. Again, because it was part of the contra equity.
Dennis Kanai testified that he believes that reporting the transactions as contra equity was the
appropriate characterization and that the internal name for the account was simply retained
because that is what it had always been called. *See* Transcript of 03/10/2009, Adv. Doc. No. 98,
at 84-85.

Because the account was considered an asset on the company's internal records, the
company never reported the distributions to any taxing body and never filed the appropriate
forms to reflect the distributions. Furthermore, to Jeffrey Prosser's benefit, once the receivables
were reclassified as contra equity there was no additional accrual of interest. Nonetheless, we
credit Kanai's testimony that the distributions were considered to be contra equity transactions.
This is not to say that the distributions themselves were appropriate or authorized but simply that,
from an accounting standpoint and based upon the Grant Thornton report, the company
appropriately booked the transfers on its financial statements for external reporting purposes as
contra equity. The effect was to take cash out of the company and give it to, or spend it for the
benefit of, Jeffrey Prosser or his designees.

Mr. Goldman, counsel for the Adult Prosser Children, contends that the transfers alleged to be fraudulent conveyances were transfers from Jeffrey Prosser (not the corporations) to the Defendants based upon the manner in which New ICC recorded the transfers. Transcript of 07/23/2009, Adv. Doc. No. 113, at 40. The Chapter 11 Trustee maintains that "[b]ecause the ICC Debtors, and not Jeffrey Prosser, made the transfers that Trustee Springel seeks to avoid, the ICC Debtors' bankruptcy estates, and not Jeff Prosser's bankruptcy estate, solely hold the appropriate claims and causes of action to avoid those fraudulent transfers and unauthorized post-petition transfers." Chapter 11 Trustee's Trial Brief Regarding Fraudulent Transfer Adversary Proceedings, Adv. Doc. No. 70, at 2.

The evidence does not support Mr. Goldman's contentions. Despite the treatment of the transfers by the corporation as distributions, the reality is that these transfers emanated from one of the ICC Debtors and went directly to either the Adult Prosser Children or third parties for the direct benefit of the Adult Prosser Children. Although Jeffrey Prosser directed the transfers to occur, there is no evidence substantiating that Jeffrey Prosser exercised dominion or control over the funds *after* they were transferred out of the companies. The fact that New ICC recorded the funds posted to the contra equity account as distributions to its ultimate shareholder in the financial statements is not a determination of the identity of the "initial transferee" for purposes of recovering avoided transfers. The company's characterization of non-business expenditures as distributions to Jeffrey Prosser does not make him a recipient of these transfers who then transferred funds to or for the benefit of the Adult Prosser Children.[69] In fact, there is no evidence

---

[69] Jeffrey and Dawn Prosser's jointly filed income tax returns indicate an attempt to report some, but not all, of the transfers recorded as contra equity by the company. The method of

(continued...)

that he was a recipient. The company's accountants made bookkeeping entries reflecting funds

transferred out of the company every time a transfer was made, regardless of its purpose. These

transfers of corporate money out of the companies were made at Jeffrey Prosser's direction, with

the result that payments were issued by one of the ICC Debtors either directly to one of the Adult

Prosser Children or to a third party directly for the benefit of the Adult Prosser Children.[70, 71] We

find that the transfers at issue were either directly to or for the benefit of the Adult Prosser

Children.[72]

---

[69](...continued)
recording does not transform Jeffrey Prosser into a recipient who then transferred funds to the
Adult Prosser Children or to third parties for payment of Defendants' personal expenses, nor is it
a determination that the company received value in exchange for the transfers. *See also* note 58,
explaining that for several years Schedule C reflected a business loss, and, for the years 2000,
2001, 2002, and 2003, negative adjusted gross income was reported on the Prossers' joint tax
returns.

[70] We note that trustees may recover, to the extent a transfer is avoided, from initial
transferees or the entity for whose benefit the transfer was made. *See* 11 U.S.C. §550 and
conclusions of law *infra*.

[71] As we find that the transfers were made by one of the ICC Debtors, and not Jeffrey
Prosser, directly to or for the benefit of the Adult Prosser Children, there is no need to address
the argument that the transfers were in the nature of support by a father for his children. *See* Post-
Trial Brief, Adv. Doc. No. 102, at 5. However, to the extent the Adult Prosser Children cite to
the law regarding a "domestic support obligation" (a defined term, *see* §101(14A)) and treatment
of domestic support obligations in the context of avoidable preferences (§547), we note that this
is not a preference action. *Id.* at 5-6. The Adult Prosser Children provide no basis for their
assertion that the transfers were made "in recognition of [Jeffrey Prosser's] *legal* obligations as a
father to provide food, shelter, and tuition for his children." *Id.* at 6 (emphasis added). Moreover,
except for those few payments for transportation services identified as for the benefit of Sybil
Prosser when she was seventeen years old, these transfers were made to or on behalf of *adults*.
Thus, there was no *legal* obligation to provide support at the time of the transfers.

[72] We note that in the Turnover Opinion, we found as follows:
We find that Mr. Prosser controlled the funds and issued all instructions regarding
the use of corporate funds, recorded as a reduction of equity, to pay for items

(continued...)

2. We find that the distributions created a financial hardship on New ICC and there was substantial negative equity in the corporation throughout the period of time that the transfers were made to the Adult Prosser Children.

The Trustee contends that the non-business transfers to the Prossers made it difficult for the company to run operations and "money was going out of New ICC faster than it could be replaced...." Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 104, at ¶¶72, 94; Chapter 11 Trustee's Brief in Support of Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 105, at 14.  The credible evidence supports this view.

Personal payments made on behalf of Jeffrey Prosser and any of his family members were recorded in the due from shareholder account on the books of New ICC. Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 13-14. The CFO was not aware of the expenditures booked internally to the receivables account before they occurred and there was no budget for this activity. *Id.* at 30-31. For those who managed cash, this was a concern. *Id.* Cash was always a significant challenge for New ICC. *Id.* at 32. Mr. Kanai recalls there being a phase when the due from shareholder account grew at a rate of about $1 million per month. *Id.* at 46-

---

[72](...continued)
purchased for his family....We find that the transfers benefit Mr. Prosser, as well as the recipients of the property. The court notes that payments through the contra equity account often went directly to vendors to purchase items for Jeffrey Prosser and/or his family members; therefore, the funds never passed through his personal account or even passed through his hands. At times, the property purchased went directly to Dawn Prosser or one of the Adult Prosser Children. However, the funds were distributed based upon Jeffrey Prosser's status as the ultimate, sole shareholder and at his direction.
*See* Turnover Opinion, Adv. No. 07-3010, Adv. Doc. No. 728, at 16, n.28.

47. *See also* TT191, at TT4 1655; TT192, at TT4 1688; TT192, at TT4 1689; TT193, at TT4 1729; TT194, at TT4 1780, establishing that from 2002 forward more than $12 million per year was designated to the contra equity account.

    The Trustee correctly states that from 2000 through 2005 the audited financial statements evidence that current total liabilities exceeded current assets. *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 104, at ¶77. The consolidated financial statements of New ICC reveal that current liabilities exceeded current assets from 1999 through 2005 in amounts ranging from over $54 million to over $119 million:[73]

> - For the year ended December 31, 1999, total current assets were $48,464,000 and total current liabilities were $115,848,000. TT190, at TT4 1615. Thus, current liabilities exceeded current assets by $67,384,000.
> - For the year ended December 31, 2000, total current assets were $67,568,000 and total current liabilities were $186,826,000. TT190, at TT4 1615. Thus, current liabilities exceeded current assets by $119,258,000.
> - For the year ended December 31, 2001, total current assets were $37,052,000 and total current liabilities were $119,283,000. TT191, at TT4 1652-53. Thus, current liabilities exceeded current assets by $82,231,000.
> - For the year ended December 31, 2002, total current assets were $28,184,000 and total current liabilities were $91,633,000. TT192, at TT4 1685-86. Thus current liabilities exceeded assets by $63,449,000.
> - For the year ended December 31, 2003, total current assets were $33,901,000 and total current liabilities were $91,331,000. TT192, at TT4 1685-86. Thus current liabilities exceeded current assets by $57,430,000.
> - For the year ended December 31, 2004, total current assets were $29,689,000 and total current liabilities were $83,983,000. TT193, at TT4 1728-29. Thus current liabilities exceeded current assets by $54,294,000.

---

[73] A current asset is defined as "cash and other assets or resources that are reasonably expected to be realized in cash, to be sold, or to be consumed during the normal operating cycle of the business or within one year, whichever is greater." 1-8 Applying GAAP and GAAS § 8.02.

    "A current liability is an obligation that is expected to be liquidated by either a current asset or by the creation of another current liability." 1-8 Applying GAAP and GAAS § 8.08.

    "The objective of accounting for current liabilities is to identify those obligations that will require the use of unrestricted cash, the liquidation of a current asset, or the creation of another short-term debt." *Id.*

- For the year ended December 31, 2005, total current assets were $29,078,000 and total current liabilities were $84,839,000. TT194, at TT4 1776-77. Thus, current liabilities exceeded current assets by $55,761,000.

Thus, from the financial statements, it is clear that New ICC was experiencing financial difficulties.

The consolidated audited financial statements from 1999 through 2005 reveal a capital deficit. TT190, at TT4 1617; TT191, at TT4 1655; TT192; TT192, at TT4 1688-89; TT193, at TT4 1731; TT194, at TT4 1779-80.[74] The consolidated financial statement for the years ended 2004 and 2005, reflect capital deficits of $265,970,000 as of December 31, 2004, and $292,679,000 as of December 31, 2005. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 48; TT194, at TT4 1780. Therefore, according to the CFO, at that time, there was no positive equity in the company and the liabilities significantly exceeded the assets. *See* Transcript of 03/10/2009, Adv. Doc. No. 98, at 49.

The Trustee asserts that the last two years of audited financial statements report the total income from operations was less than expenses in both years. *See* Trustee Springel's Proposed

---

[74] Furthermore, in 2001, the first year that the audited financial statements reflected the "notes and accounts receivable from stockholder" as contra equity, i.e. as a column on the Consolidated Statement of Capital Deficit and Comprehensive Loss, the balance of the notes and accounts receivable column was negative $110,482,000. TT191, at TT4 1655. Thereafter, in 2002, the balance reflected was negative $116,448,000, revealing an increase in the stockholders deficit of $5,960,0000 from the previous year. TT191, at TT4 1655; TT192, at TT4 1688. In the following year, the balance was negative $130,614,000, revealing an in increase in the stockholder's deficit of $14,166,000 from the previous year. TT192, at TT4 1688; *id.* at TT4 1689. In 2004, the balance was negative $143,627,000, revealing an increase in the stockholder's deficit of $13,013,000 from the previous year. TT192, at TT4 1689; TT193, at TT4 1729. In 2005, the most recent year of audited financial statements in evidence, the balance reflected as "notes and accounts receivable from stockholder" was negative $156,612,000, revealing an increase in the stockholder's deficit of $12,985,000 from the previous year. TT193, at TT4 1729; TT194, at TT4 1780.

Findings of Fact and Conclusions of Law, Adv. Doc. No. 104, at ¶77. The consolidated audited

financial statements of New ICC for the years ended December 31, 2005 and 2004, do, in fact,

reveal a net loss in both years on the Consolidated Statements of Operations. *See* TT194, at TT4-

1778.

Based upon the credible testimony of the CFO of New ICC, we find that for purposes of

the consolidated financial statements of New ICC and its subsidiaries, New ICC characterized

and treated personal transactions as distributions that reduced equity to the point where there was

no value to equity, and reflected them as such in their audited financial statements. *See* note 74

and accompanying text *supra.* Furthermore, we find that the transfers resulted in difficulty

managing cash.


### 3. We find that Jeffrey Prosser controlled the transfers out of the ICC Debtors which were for the benefit of himself and his family, and he exercised complete dominion over the ICC Debtors.

The Chapter 11 Trustee contends that Jeffrey Prosser caused the ICC Debtors to make

transfers without disclosure or board approval prior to making the transfers, and, as a result,

"money was going out of New ICC faster than it could be replaced...." Chapter 11 Trustee's Brief

in Support of Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 105, at 14. It is

the Chapter 11 Trustee's position that Jeffrey Prosser controlled where and how transactions

were booked and that he directed many transactions to be posted to the contra equity account.

*See* Transcript of 07/23/2009, Adv. Doc. No. 98, at 63. We agree and so find. The evidence

establishes that Jeffrey Prosser used the funds of New ICC without apparent limits. His control

over the amounts posted to contra equity and how they were characterized is clear from the

58

testimony.

Approval of expenditures posted to the account came from Mr. Prosser or his designees.

*See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 29. The CFO was not

aware of the expenditures before they occurred and there was no budget for this activity resulting

in cash management concerns. *Id.* at 30-31.

Mr. Kanai testified that a quarterly review process of the amounts posted to the contra

equity account was in place for purposes of finalizing the consolidated financial statement. *Id.* at

29. "[B]ased on that activity [in the account], generally it was a number that was not anticipated.

Because of that, we would do a detailed review of all the activity and review it with the senior

executives to make sure that in fact those transactions belong in that account." *Id.* at 29. Mr.

Kanai described how the quarterly reviews were conducted:

> Q. And can you just briefly describe what that process was?
> A. Well, again, when we would do the quarterly financial statements and try to
> complete the consolidation, this number was an actual number that was disclosed
> in this changes of stockholders' equity. And that number would generally be
> larger than what was anticipated. And because of that, we would develop a
> detailed schedule with all the items that were posted to that account for *Mr.*
> *Prosser's review so that he can confirm that in fact those were distributions* to
> [ICC-LLC, one of the parent companies of New ICC, of which Jeffrey Prosser
> was the ultimate owner] and not expenses of [New] ICC.
> Q. Were there ever times during these reviews where Mr. Prosser would challenge
> some of the entries?
> A. Well, I don't know that challenge is a word. *Mr. Prosser was directly involved*
> *in the process*. So, you know, we would review and determine what the proper
> accounting would be for those transactions.
> Q. Is it fair to say then that Mr. Prosser would, in essence, sign off once the
> review was finished and said he'd agreed or -- with the accounting? Excuse me.
> A. Yeah, generally, we would not complete the consolidated financial statements
> without *Mr. Prosser's approval*.

Transcript of 03/10/2009, Adv. Doc. No. 98, at 33 (emphasis added). These reviews were

conducted after-the-fact, i.e., after New ICC paid for the personal transactions, and were simply

for the purpose of determining how to account for the transfers on the company's audited

financial statements. The reviews were not challenges to Mr. Prosser's ability to spend the

corporation's money as he pleased. It is clear from the CFO's testimony that what amounts were

and were not posted to the contra equity account were at Jeffrey Prosser's direction and under his

control.

We find that the board of directors was not involved in or asked to approve any of these

transactions before they occurred.  Jeffrey Prosser so acknowledged when he was questioned as

to whether the board of directors voted to approve the transfers of New ICC funds for the benefit

of his family:

> The...board of directors at least of any company I am familiar with don't [*sic*]
> approve or disapprove specific transactions. Certainly quarterly financial
> statements were presented to the board and also the annual audits were presented
> to the board and in those annual -- in those quarterly financial statements the
> contra-equity account is disclosed and in the annual audits, the contra-equity
> account is disclosed. So certainly that accounts [*sic*] and those issues were issues
> that were before the boards [*sic*] when it had meetings.[75]

---

[75] We note that the audited financial statements were prepared long after the end of the
fiscal years to which they applied. *See* TT189-TT193 (The auditor's report for the consolidated
financial statements for the years ended December 31, 1998, and 1997, is dated June 4, 1999,
TT189, at TT4 1593; for the years ended December 31, 2000 and 1999, the auditor's report is
dated October 16, 2001, TT190, at TT4 1614; for the year ended December 31, 2001, the
auditor's report was dated May 3, 2002, except with respect to Note 13 which was dated May 29,
2002, TT191, at TT4 1651; for the years ended December 31, 2003, and 2002, the auditor's
report was dated April 23, 2004, TT192, at TT4 1684; for the years ended December 31, 2004,
and 2003, the auditor's report was dated April 22, 2005, TT193, at TT4 1727; for the years ended
December 31, 2005, and 2004, the report was dated April 28, 2006, TT194, at TT4 1775.) Thus,
the audited financial statements did not provide the board with information concurrent with the
timing of the transfers. Nor did the financial statements provide an itemized list identifying the
nature, purpose, or ultimate beneficiaries of the transfers.

Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 89, at 224.[76]  There is no

indication from the minutes of the meetings, that the board gave approval or had any knowledge

of payments made to or for the benefit of the Adult Prosser Children, whether through contra

equity or otherwise. TT10. In fact, the board never gave specific approvals for these transactions.

*See* Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 89, at 227.[77]

Moreover, Richard Goodwin, a board member, was questioned about the contra-equity account

and expressed an understanding that is completely inaccurate. He understood the contra equity

account was used for the purpose of "compensat[ing] [Jeffrey Prosser] for his having borne

certain expenses of the company." Exemptions Trial Testimony, Transcript of 09/08/2008, at

189-190 (admitted in this proceeding, *see* TT203). As is evident from the individual and

cumulative testimony of Mr. Kanai, Eling Joseph (Mr. Prosser's corporate executive secretary),

Alan Barbee (Chapter 7 Trustee's expert in the field of accounting), and Jeffrey Prosser, the true

purpose of the account was exactly opposite of that understanding. It was to record payments at

the direction of Jeffrey Prosser to himself or his family or to third parties for the benefit of him

and/or his family members that were **not** reimbursement for corporate expenses.

As further evidence of Jeffrey Prosser's complete dominion over New ICC, when asked if

---

[76] *See also* Transcript of 12/09/2008, Adv. Doc. No. 89, at 225-26 ("Well, the board had to approve the audits. So from that standpoint, the board -- as the board doesn't go through and specifically approve repair [*sic*] expense for a company. I mean, the board is there on a high level to approve or disapprove the financial statements or the high level or [*sic*] the audited financial statements, not specific transaction [sic].")

[77] This conclusion is supported by the testimony of board members. *See* 04/25/2008 Deposition of Michael Prosser, at 44-45, 49, 83, 206; Exemption Trial Testimony of Raynor, Transcript of 09/09/2008, at 121-22 (admitted in this proceeding, *see* TT203); Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 89, at 214.

61

he controlled the board of directors of New ICC, he responded, "It is true that I could – I certainly

through the ownership of LLC who controlled EmCom,...had the authority to appoint the board

of directors of [New] ICC." *See* Transcript of 12/09/2008, Adv. Doc. No. 89, at 223. At his

deposition on August 13, 2008, when asked whether he considered the board to owe any duties to

the company, Jeffrey Prosser responded, "I think the board of directors first...duty is to the

stockholders who in this case was me." *See* Transcript of 12/09/2008, Adv. Doc. No. 89, at 223-

24.

      Jeffrey Prosser testified as follows regarding what he viewed to be the limitations on

distributions to him from New ICC:

> Q. And isn't it true that in your mind there were no limits on your ability to use
> the capital of the company for whatever you and your family may have wished
> for?
> A. Well, the -- I assume that there are always limits. I think that the reality is we
> owned a hundred percent of the company and so to the extent that, you know,
> certainly we had the authority to approve -- I had the ability to approve
> transactions.
> Q. So it's your position that as long as something was okay with you, you could
> do with New ICC's operating capital whatever you personally wished? Is that
> right?
> A. Well, I had the authority to. However, obviously there is corporate
> responsibility and so forth in running the company. So as I said, I think that within
> reasons that are controlled by the corporate needs of the companies.

*See* Transcript of 12/09/2008, Adv. Doc. No. 615, at 219-20.

      Thus, it is abundantly clear from the testimony that Jeffrey Prosser controlled all of the

corporate activities, including the contra equity account, and we so find.


4. We find that the transfers occurred after Jeffrey Prosser and his companies had been targeted

with claims and lawsuits.

The Chapter 11 Trustee contends that the "Pre-Petition Transfers were made after Jeff Prosser and his companies had been targeted with enormous claims and formal lawsuits[.]" Chapter 11 Trustee's Trial Brief Regarding Fraudulent Transfer Adversary Proceedings, Adv. Doc. No. 70, at 12-13.

The evidence substantiates that both Jeffrey Prosser and his companies had been targeted with lawsuits by the former public shareholders of Emerging ("EmCom"), also a debtor. The Greenlight Entities pursued litigation as holders of litigation rights assigned to them by former shareholders of Emerging. TT44. The lawsuit (hereinafter the "Greenlight Litigation") was initiated as a result of Mr. Prosser's taking Emerging private in 1998. *See* TT190, at TT4 1642. On January 9, 2006, a judgment in the principal amount of $56,341,843.00 was entered in favor of the Greenlight Entities and against ICC-LLC, "Innovative Communication Corporation (a dissolved Virgin Islands corporation)", and Jeffrey Prosser. TT44 (Delaware Chancery Court Judgment). At the time the judgment was entered, Jeffrey Prosser read the decision and understood the dollar amount of the judgment. *See* Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 89, at 97-98.

As stated in the notes to the consolidated financial statements for the years ending December 31, 2000, and December 31, 1999, pursuant to a reorganization agreement in 1998, New ICC acquired the assets of the former Innovative Communications Corporation, the dissolved corporation, which was a named party in the Greenlight Litigation. TT190, at TT4 1621. It is upon predecessor in interest liability that this court found that "each of the Greenlight entities is a holder of a claim against New ICC that is not the subject of a bona fide dispute." *See* Order Granting Greenlight's Motion for Summary Judgment and Entry of Order for Relief

Pursuant to 11 U.S.C. §303(h), Fed.R.Bankr.P. 1018 and 7056 and Fed.R.Civ.P. 56, Case No.

07-30012, Doc. No. 72.[78]

It is clear that New ICC was aware of the litigation and contemplated potential liability.

The consolidated financial statements for the years ended December 31, 2000, and 1999, provide

the following information regarding litigation:

> The Company[79] [New ICC] is a named defendant in a Fiduciary Duty Action
> which is currently underway in Delaware Chancery Court for alleged breach of
> fiduciary duty in regard to the approval of the 1998 offer made to purchase the
> outstanding shares of EmCom. This claim is part of a consolidated action with the
> Appraisal Action against EmCom and Civil Action against ICC's President. The
> Company plans to vigorously defend these actions....The minimum liability to
> EmCom would be $7.8 million plus prejudgment and post judgment interest.
> [New] ICC and/or certain [New] ICC directors could be liable for this balance if
> the petitioner wins the Fiduciary Duty Action.

TT190, at TT4 1642. Although the financial statements address the minimum liability to

EmCom, the fact that New ICC could be liable for the balance was also clearly contemplated.[80]

It is undisputed that Jeffrey Prosser and New ICC's board were aware of the Greenlight

Litigation and that the lawsuit was discussed at board meetings as early as November 5, 1999.

*See* TT10, at TT 00183. The board was updated consistently of the status of the litigation  at

---

[78] The court took judicial notice of the Order at trial on December 9, 2008. *See* Transcript
of 12/09/2008, Adv. Doc. No. 89, at 261.

[79] New ICC is referred to as the "Company" or "ICC" throughout the financial statements.
*See* TT190, at TT4 1620.

[80] Subsequently, in the notes to the audited financial statements for the years ended
December 31, 2004, and 2003, a distinction is made between the former Innovative
Communication Corporation, referring to it as "ICC1" and New ICC, referred to as "ICC2"or the
"Company". TT193, at TT4 1769-1770. The notes provide, "The Company was not a
defendant...and is not directly liable....As the Company's ultimate stockholder is named..., the
Company may be called upon to participate in the funding of...settlement." *Id.* at TT4 1770.

board meetings on July 17, 2000; June 15, 2001; September 10, 2001; December 3, 2001;

October 21, 2002; March 25, 2003; October 10, 2003; March 29, 2004; June 28, 2004;

November 5, 2004; May 13, 2005; October 4, 2005; and April 10, 2006. *See* TT10.

The notes to the financial statements for the years 2003 and 2004 also address the

litigation commenced by the Rural Telephone Finance Cooperative ("RTFC"):

> In prior years ICC obtained member loans from RTFC ("ICC Loans").... Such
> loans are collateralized by, among other things, the stock of ICC and its wholly-
> owned subsidiary, Vitelco. By complaint filed June 1, 2004, RTFC commenced an
> action against ICC alleging a default under the ICC Loan (the "ICC Action"). An
> amended complaint was later filed, in which RTFC alleged that ICC had
> committed over 30 defaults under the ICC Loan. RTFC sought damages of over
> $500,000,000. ICC answered, denying liability, and asserted
> counterclaims....While litigation is always uncertain, ICC and its counsel believe
> there is a meritorious defense to each of the alleged defaults and expect to move
> to dismiss all of them.

TT193, at TT4 1766-1769. According to the financial statements for 2004 and 2005, twenty-one

of the thirty-one counts were dismissed, and trial was to be held on the remaining counts. TT194,

at TT4 1815. As noted, the board was regularly updated on the status of the RTFC litigation

beginning with the meeting held June 28, 2004. TT10, at TT0025.

According to the minutes of the board meeting held on April 10, 2006 (the last board

meeting minutes in evidence):

> The Chairman advised the Board that after lengthy negotiations with RTFC and
> Greenlight, he believed that a settlement of all litigation and claims was in sight.
> He stated that the sum involved was approximately $402 million and he had about
> four months to raise the money.
>
> He emphasized that a component of the settlement was a mutual release from all
> liabilities known and unknown.
>
> As far as the funding for the settlement was concerned, the Chairman advised that
> he had been working diligently to secure the financing and he was confident that it

could be achieved.

The Board was then joined on a telephone conference call by Attorneys Lanny
Davis and Joe Holt who confirmed the information provided by the Chairman.
Mr. Davis advised that he had a draft settlement agreement with RTFC and
Greenlight which was the product of intense negotiation. The Attorneys advised
the Board that all directors will have complete releases from all law suits, but that
Mr. Prosser would be exposed to litigation and the company would be forfeited if
the money required for settlement is not paid.

TT10, at TT00203. Ultimately, the financing was not obtained.

Therefore, while the ICC Debtors were facing litigation and clearly analyzing potential

liability, Jeffrey Prosser caused transfers to or for the benefit of the Adult Prosser Children out of

New ICC and ICC-LLC.


## CONCLUSIONS OF LAW

### Count I: To Recover Fraudulent Transfers Made by One or More of the ICC Debtors to or for the

### Benefit of One or More of the Defendants under Section 548(a)(l)(A) of the Bankruptcy Code

The Chapter 11 Trustee asserts that he is entitled to avoid certain transfers to the Adult

Prosser Children pursuant to §548(a)(1)(A), which provides:

The trustee may avoid any transfer...of an interest of the debtor in property...that
was made...on or within 2 years before the date of the filing of the petition, if the
debtor voluntarily or involuntarily (A) made such transfer...with actual intent to
hinder, delay, or defraud any entity to which the debtor was or became, on or after
the date that such transfer was made..., indebted[.]

Once a transfer is avoided, a trustee may recover the transfer pursuant to §550(a):

Except as otherwise provided in this section, to the extent that a transfer is
avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the
trustee may recover, for the benefit of the estate, the property transferred, or, if the
court so orders, the value of such property, from (1) the initial transferee of such
transfer or the entity for whose benefit such transfer was made; or (2) any

immediate or mediate transferee of such initial transferee.

The Trustee bears the burden of proving that the challenged transfers were made with the actual intent to hinder, delay, or defraud a creditor. *In re Valley Bldg. & Constr. Corp.*, 435 B.R. 276, 285 (Bankr. E.D. Pa. 2010).[81] The Trustee must establish the transfers were fraudulent by a preponderance of the evidence. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 211 (3d Cir. 2006).[82]

---

[81] The burden of proof of establishing the elements of a fraudulent transfer pursuant to §548 rests on the trustee and never shifts. *See In re Fruehauf Trailer Corp.,* 444 F.3d 203, 217 (3d Cir. 2006) (citing to *In re Rowanoak Corp.*, 344 F.3d 126, 131-32 (1st Cir. 2003)). The burden of proof should not be confused with the burden of production, which "may shift from side to side as the case progresses, according to the nature and strength of the proofs offered in support or denial of the main fact to be established." *Id.*

[82] "The courts are not in agreement about the evidentiary standard by which the trustee must prove fraudulent transfer under section 548(a)(1)(A), and some decline to decide one way or another. The better reasoned decisions require proof only by the general federal standard of a preponderance of the evidence." 5 COLLIER ON BANKRUPTCY ¶548.11[1][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). In support of cases which have applied the preponderance of the evidence standard, Collier on Bankruptcy cites to *Fruehauf. See* 5 COLLIER ON BANKRUPTCY ¶548.11[1][b] at n.17. Although *Fruehauf* applied the elements for establishing a constructive fraudulent transfer, the court noted the elements for both actual fraud cases and constructive fraud cases and stated that the preponderance of the evidence standard applied without making a distinction between the type of fraudulent transfer case. In *In re Dolata*, a case decided before *Fruehauf*, the bankruptcy court for the Western District of Pennsylvania noted the split of authority:

> [A trustee's burden of proof is] arguably clear and convincing evidence, but perhaps just a preponderance of the evidence, to the extent that the Trustee proceeds under an actual fraudulent intent theory -- ie., pursuant to either §548(a)(1)(A) or [12 Pa.C.S.A.] §5104(a)(1) -- compare *In re Foxcroft Square Co.*, 184 B.R. 671, 674 (E.D.Pa. 1995) ("The requisite intent under §357 [of Pennsylvania's repealed Uniform Fraudulent Conveyance Act ("Pa. UFCA"), which section provided for the avoidance of transfers on the basis of actual fraudulent intent rather than because they are constructively fraudulent,] must be shown by clear and convincing evidence"); *Lease-A-Fleet*, 155 B.R. at 674 (standard of proof is clear and convincing evidence under either Bankruptcy Code or Pa. UFCA), and *United States v. Green*, 1998 U.S. Dist. LEXIS 4821, 1998 WL 167278 at 10 (E.D.Pa. 1998) (creditor "has the burden to show actual intent by clear and convincing evidence"), with *C.F. Foods*, 280 B.R. at 110 n.14

(continued...)

Rarely will an individual admit actual intent to hinder, delay, or defraud; thus, courts

consider a number of factors known as the "badges of fraud." *Valley,* 435 B.R. at 285. These

factors include, but are not limited to, whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

---

[82](...continued)
(pointing out that *Foxcroft* was decided under the repealed Pa. UFCA, noting that "generally, courts do not [now] agree which standard applies to 'actual intent' actions under §548(a)(1)(A)," citing cases for each proof standard, and avoiding ruling on the issue by holding that "the trustee [therein] has met the more strict 'clear and convincing evidence' standard"), and [David B. Young, Preferences and Fraudulent Transfers, 849 PLI/Comm 729, 860-862 (2003) ("The strong current of opinion now holds that actual intent under 11 U.S.C. §548(a)(1)(A) need only be shown by a preponderance of the evidence. … A minority of courts, however, have continued to adhere to the clear and convincing standard in §548(a)(1)(A) cases;" also citing cases for both sides and placing the *Lease-A-Fleet* decision in the minority).
306 B.R. 97, 117 (Bankr. W.D. Pa. 2004). Although we apply the preponderance of the evidence standard to the claim of actual fraud pursuant to §548, we note that we examine the allegations of actual fraudulent intent pursuant to §544 and applicable law *infra* and find that the Trustee has met his burden even under the higher standard of clear and convincing evidence.

*Valley,* 435 B.R. at 285-86.[83] The badges of fraud will be discussed in light of the trial evidence,

*infra.*

The fraud of an officer of a corporation can be imputed to the corporation in certain

circumstances:

> when the officer's fraudulent conduct was (1) in the course of his employment,
> and (2) for the benefit of the corporation. This is true even if the officer's conduct
> was unauthorized, effected for his own benefit but clothed with apparent authority
> of the corporation, or contrary to instructions. The underlying reason is that a
> corporation can speak and act only through its agents and so must be accountable
> for any acts committed by one of its agents within his actual or apparent scope of
> authority and while transacting corporate business.

*In re Personal & Bus. Ins. Agency,* 334 F.3d 239, 242-243 (3d Cir. 2003). According to the

"adverse interest exception" imputation is not appropriate where the officer's interests were

adverse to the interests of the corporation. *Id.* at 243. There is, however, an exception to the

exception, which provides:

> If an agent is the sole representative of a principal, then that agent's fraudulent
> conduct is imputable to the principal regardless of whether the agent's conduct
> was adverse to the principal's interests. The rationale for this rule is that the sole
> agent has no one to whom he can impart his knowledge, or from whom he can
> conceal it, and that the corporation must bear the responsibility for allowing an
> agent to act without accountability.

*Id.* Pursuant to the sole actor doctrine, the "exception is applied to cases in which the agent who

committed the fraud was the sole shareholder of the corporation or dominated the corporation."

---

[83] Generally, courts consider badges of fraud similar to those identified in *Valley. See In re Elrod Holdings Corp.*, 421 B.R. 700, 710 (Bankr. D. Del. 2010) (citing *Rosener v. Majestic Mgmt. (In re OODC, LLC*), 321 B.R. 128, 140 (Bankr. D. Del. 2005) (analyzing the following factors as badges of fraud: "(1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the usual course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance").

*Thabault v. Chait*, 541 F.3d 512, 529 (3d Cir. 2008).

Here, the sole actor exception applies. Jeffrey Prosser was Chairman of the Board, President, and CEO of New ICC and sole member of its ultimate parent company, ICC-LLC. Furthermore, the evidence established that Jeffrey Prosser was the corporate actor who solely determined what funds would be transferred out of the corporation for his and his family's benefit. All of the corporate employees acted solely at his instruction. He was not challenged. According to the CFO, he had the final say as to which transactions were recorded as contra equity. Jeffrey Prosser's own testimony supports the fact that he was able to use the funds without any limit, at his own discretion.[84] His hand-picked board was not provided timely information about the transfers. When the board did get information, in the form of financial statements issued well after the applicable year end, it did not review the minutiae and was not asked to approve specific transfers.[85] The evidence supports the finding that Jeffrey Prosser determined and controlled the amount of distributions through New ICC's contra equity account, and he falls within the exception to the exception. Therefore, his conduct will be imputed to the corporation.

---

[84] *See* Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 89, at 214:
Q. Okay. Isn't it true that excluding you there was never anyone at New ICC or its affiliates that provided any specific approval for the company to remit funds to your family members' personal benefit?
A. Well, again, the -- the funds that were paid to family members or any other issue that was deemed not to be related to ICC was run through the contra equity. So was there specific approval from anybody other than me to write checks? Not that I'm aware of and not that I believe would have been needed.

[85] For example, Mr. Raynor, a board member, testified that he was unaware of the fact that New ICC made payments for credit card charges of the Adult Prosser Children. *See* Exemptions Trial Transcript of 09/09/2008, at 122 (admitted in this proceeding, *see* TT203).

*Reach Back Period*

Only transfers within two years before the date of the filing of the petition may be avoided pursuant to §548(a)(1)(A). All but one of the transfers at issue were made by New ICC. The exception is wire transferred funds used for the down payment on Adrian Prosser's home. Those funds were transferred out of ICC-LLC. An involuntary petition was filed against ICC-LLC on February 10, 2006, in the District of Delaware. Subsequently, ICC-LLC filed a voluntary petition on July 31, 2006 in the District Court of the Virgin Islands, Bankruptcy Division. The transfer in the amount of $104,132.09 from the bank account of ICC-LLC was made on April 28, 2005. TT63, at TE2 01909. Thus, it falls within the two-year time period. All other transfers at issue were made out of New ICC. The involuntary petition was filed against New ICC on July 5, 2007. Therefore, any transfers made by New ICC prior to July 5, 2005, cannot be avoided pursuant to this statute.

As stated above, a number of direct payments were made by New ICC to the Adult Prosser Children. None of the direct cash payments to Adrian Prosser fall within the two-year time frame. TT60, at TT4 1828; Tab 2 of TT8. All of the direct transfers totaling $19,250 to Michelle were made within several months of the bankruptcy filing from January through April of 2007. TT60, at TT4 1878; Tab 106 of TT8. Likewise, all direct payments to Sybil Prosser, save for one $5,000 payment made in 2002, were transfers made within the two-year period, occurring from January through June of 2007. TT60, at TT4 1896; Tab 140 of TT8. Thus, a total of $20,500 in direct payments were made by New ICC to Sybil Prosser within the two-year time frame. *Id.* The direct payments to Justin Prosser spanned from June of 2006 through April of 2007, and the entire $22,500 in direct transfers to him fall within the applicable time frame.

71

TT60, at TT4 1873; Tab 94 of TT8.

Payments by New ICC were consistently made to American Express. TT60, at TT4 1831-1833; Tabs 10 & 11 of TT8; TT28. A number of these payments were made within the two years prepetition.[86] As to the payments made on the Centurion account, the two years prepetition begin with New ICC's payment on July 7, 2005, which paid for charges to the Centurion account made during June of 2005, and concludes with New ICC's June 22, 2007, prepetition transfer, which paid for credit card activity during the month of May 2007. *See* TT28, at TT03046-3476; Tab 10 of TT8, at T00399 - Tab 11 of TT8, at T00576. As to the Platinum account, the two-year time frame includes New ICC's payment on August 2, 2005, for charges incurred during June of 2005, through the payment made on May 8, 2007, for charges incurred during May of 2007. *See* TT28, at TT02329-2473; Tab 10 of TT8, at T00405 - Tab 11 of TT8, at T00563.

New ICC made payments during this timeframe for charges by Justin Prosser to the Centurion account totaling $144,835.56.[87] As stated above, the Trustee is limited to recovering the total amount of $135,699.92 for both prepetition and postpetition transfers made to American Express for Justin Prosser, as listed on Exhibit TT60. Postpetition payments for Justin Prosser in the amount of $12,540.73 are discussed *infra*, and we address only the prepetition transfers that total $123,159.19 here. New ICC also made payments during the two-year period to American

---

[86] As the American Express statements in evidence date back to 2004 and New ICC made payments credited to those statements, some payments by New ICC are excluded from this discussion of avoidable transfers pursuant to §548. Therefore, the total amounts of transfers to the Adult Prosser Children for American Express charges discussed *supra*, at 22-23, 31-33, 40-42, differ from the amounts here. The amounts identified for the purpose of Counts I and II, both §548 claims, are limited to transfers which occurred within two years prepetition.

[87] *See also* explanation of credit card charges made by Justin Prosser and payments made by New ICC, at 21-23.

Express for charges made by Sybil Prosser to the Centurion account totaling $176,199.08 and to

the Platinum account totaling $1,070.85.[88] Also, during the two years prepetition, New ICC made

payments to American Express for the benefit of Michelle LaBennett for charges to the

Centurion account totaling $30,304.45 and to the Platinum account totaling $7,179.40.[89]

The Chapter 11 Trustee has identified transportation payments made for the benefit of

Michelle LaBennett and Sybil Prosser to Crawford's Travel, Inc. TT60, at TT4 1826. None of

these payments were within the applicable time period. *Id.* at TT4 1855; Tab 229 of TT8.

Payments for Michelle's transportation while in France were also made to Chabe Verjat. TT60, at

TT4 1826. None of these payments fell within the two-year time period.

The purchase of the Mercedes by New ICC for Sybil Prosser in May of 2005 did not

occur within the two years prepetition.

Rental payments on behalf of the Adult Prosser Children were made to Madame Marie-

Denise Leymarie (TT60, at TT4 1876-77; Tab 114 of TT8), Cheng Ping Lee (TT60, at TT4 1851;

Tab 50 of TT8), Grand & Associates Realty, Inc. (TT60, at TT41863; Tab 81 of TT8), and

Rafael Nunez (TT60, at TT4 1889; Tab 206 of TT8). TT60, at TT4 1826. Two payments to

Cheng Ping Lee, totaling $16,036.21, (for the benefit of Justin Prosser) and three payments to

Rafael Nunez, totaling $7,590, (for the benefit of Sybil Prosser) fall within the applicable time

frame.

In summary, the amounts at issue for purposes of Count I consist of one transfer to

---

[88] *See also* explanation of credit card charges made by Sybil Prosser and payments made by New ICC, at 30-32.

[89] *See also* explanation of credit card charges made by Michelle LaBennett and payments made by New ICC, at 39-41.

Adrian Prosser from ICC-LLC and multiple payments made by New ICC to or for the benefit of

Justin Prosser, Sybil Prosser, and Michelle LaBennett. The transfer from ICC-LLC to Adrian

Prosser was in the amount of $104,132.09. Within the applicable two year period, transfers were

made by New ICC to or for the benefit of the Adult Prosser Children as follows: Justin Prosser in

the amount of $161,695.40 (consisting of $22,500 in direct payments, $16,036.21 for rental

payments, and $123,159.19 for American Express payments); Sybil Prosser in the amount of

$205,359.93 (consisting of $20,500 in direct payments, $7,590 in rental payments, and

$177,269.93 for American Express payments); Michelle LaBennett in the amount of $56,733.85

(consisting of $19,250 in direct payments and $37,483.85 in American Express payments).

*Badges of Fraud*

As transfers to the Adult Prosser Children occurring within the two years prior to the

petition dates of New ICC and ICC-LLC, respectively, have been identified, we now look to the

badges of fraud to determine whether there was an intent to hinder, delay, or defraud creditors.

For purposes of §548(a)(1)(A), the main focus is the intent of the transferor, i.e., the Debtors'

intent, and not the intent of the transferees or beneficiaries. *See In re Elrod Holdings Corp.*, 421

B.R. 700, 709 (Bankr. D. Del. 2010).

*Transfer or Obligation to an Insider*

The Adult Prosser Children are considered "insiders" of New ICC and ICC-LLC pursuant

to 11 U.S.C. §101(31)(B). "The term 'insider' includes (B) if the debtor is a corporation (i)

director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv)

partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi)

relative of a general partner, director, officer, or person in control of the debtor[.]" 11 U.S.C.

§101(31)(B). The Adult Prosser Children are indisputably insiders of the ICC Debtors as they are

relatives of Jeffrey Prosser, who was Chairman of the Board, President, and CEO of New ICC

and sole member of its ultimate parent company, ICC-LLC.

*Transfer or Obligation Disclosed or Concealed*

Another factor to consider is whether the transfer was disclosed or concealed. As

previously stated, the board of directors was not involved in or asked to approve any of these

transactions before they occurred. Although the board would eventually see that the shareholder's

deficit continued to increase in the audited financial statements, the statements were not reviewed

until long after the transfers were made. In addition, there was no disclosure in the audited

financial statements identifying that transfers were made out of New ICC to or for the benefit of

the Adult Prosser Children.[90]

Furthermore, the transfers remained receivables on the company's *internal* ledger. *See,*

*supra*, note 68 and accompanying text. Because the transfers were accounted internally as

receivables as opposed to distributions, New ICC did not file IRS Form 5452 to report the

transfers as distributions. *See* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98,

at 40. *See also* Testimony of Barbee, Transcript of 03/24/2009, Adv. Doc. No. 112-1, at 61-62.

Nonetheless, on the audited financial statements, New ICC treated the transactions as

distributions. Therefore, the true nature of the payments is unclear from a comparison of New

ICC's internal books and records and the audited financial statements**.**

---

[90] There was no item-by-item breakdown of what the lump sum reported as contra equity
represented. In other words, it was not clear from the financial statements, that the amount
included, for example, payments to American Express for personal expenses of the Adult Prosser
Children.

More specifically, there was blatant concealment internally of some of the transfers. The Mercedes purchased for Sybil Prosser was mischaracterized at the direction of Jeffrey Prosser as equipment for Shoys (the home of Jeffrey and Dawn Prosser in St. Croix). *See* Testimony of Eling Joseph, Transcript of 03/23/2009, Adv. Doc. No. 112, at 15-17, 25-26; Tab 158 to Exhibit TT8, at T 05823. From the time of the purchase, the Mercedes was intended to be for Sybil. Transcript of 03/23/2009, Adv. Doc. No. 112, at 13. Therefore, there was never an intention for the vehicle to go to Shoys, and the mischaracterization made the purchase appear as though it was for Jeffrey Prosser as opposed to a transfer of funds for the benefit of his daughter.[91]

Other concealed transfers were the allowances paid to the Adult Prosser Children. Eling Joseph testified that she was instructed by Jeffrey Prosser to have the allowances of Sybil Prosser, Justin Prosser, and Michelle LaBennett paid through the payroll of New ICC. *See* Transcript of 03/23/2009, Adv. Doc. No. 112, at 37. Although Ms. Joseph testified that Justin Prosser and Michelle LaBennett worked for the company's summer program for a period of time, she testified that these allowance payments were not limited to the period of time that the children worked for the summer program. *Id.* at 36-39. Regardless of Ms. Joseph's testimony about temporary employment in the summer program, Justin Prosser, Sybil Prosser, and Michelle LaBennett admitted that they had neither been employed by nor provided services to the ICC Debtors. *See* Responses to Requests for Admissions, TT87, TT88, TT89. We accept the

---

[91] This is not the only item Jeffrey Prosser instructed his corporate secretary to mischaracterize when informing the accounting department of the nature of a transaction. Although not at issue in this adversary proceeding, Eling Joseph testified that some purchases of furnishings for Mr. Prosser's Palm Beach residence were characterized as St. Croix office equipment or office furniture at Mr. Prosser's instruction. *See* Transcript of 03/23/2009, Adv. Doc. No. 112, at 24**.**

Defendants' admissions. Accordingly, there was no basis for Justin Prosser, Sybil Prosser, or Michelle LaBennett to receive payroll distributions from New ICC. Although the allowances appeared as payroll, they were actually non-business payments to three of the Adult Prosser Children.

*Debtor Sued or Threatened with Suit Before Transfer was Made or Obligation Incurred*

The evidence substantiates that both Jeffrey Prosser and his companies had been targeted with lawsuits by the former public shareholders of Emerging, also a debtor. The status of the Greenlight Litigation was a consistent topic at New ICC's board meetings from at least November 5, 1999, to April 10, 2006. On January 9, 2006, a judgment in the principal amount of $56,341,843.00 was entered against Jeffrey Prosser and his companies, ICC-LLC and the predecessor of New ICC. TT44 (Delaware Chancery Court Judgment).

By 2004, litigation was also commenced by the RTFC against New ICC. The board also received regular updates on the status of the RTFC litigation. *See* Board Minutes, TT10, at TT00225, TT0027, TT00229, TT00231, TT00233.

The consolidated audited financial statements of New ICC noted the litigation and potential liability related to both the RTFC and Greenlight litigation. While the ICC Debtors were facing litigation, analyzing potential liability, and even after judgment was entered, Jeffrey Prosser caused transfers to or for the benefit of the Adult Prosser Children out of New ICC and ICC-LLC.

*Value of Consideration Received By the Debtor in Comparison to Value of Asset Transferred or Obligation Incurred*

The company did not receive anything of value from the Adult Prosser Children in return

77

for the funds transferred to or for their benefit. Justin Prosser, Sybil Prosser, and Michelle

LaBennett admitted that they were not employed by and they did not provide services to the ICC

Debtors. Adrian Prosser provided services to a subsidiary of New ICC for which he received

compensation, but the Trustee is not seeking to avoid and recover those payments. As to certain

transfers which Adrian Prosser believed to be gifts from his parents, the funds were, in fact,

transfers out of the ICC Debtors, which the Trustee is seeking to recover.

The contra equity transactions were not treated by the corporation as salary for services

rendered by Jeffrey Prosser. Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at

43. Even the $71,000 biweekly payments to Jeffrey Prosser (not at issue here) recorded as contra

equity were not treated as salary payments.[92] If the company had considered any of the contra

equity transactions to be compensation to Jeffrey Prosser, then it would have had an obligation to

provide documentation such as a 1099 or W-2 form, which it did not do. Testimony of Kanai,

Transcript of 03/10/2009, Adv. Doc. No. 98, at 45.[93] Also, inconsistent with the concept of

salary, is the fact that the CFO was not aware of the expenditures at issue before they occurred

---

[92] Mr. Barbee opined that the "majority" of the payments posted to the contra equity
account were distributions; however, the biweekly payments of $71,000 which were posted to the
contra equity account were an exception, which he viewed to be more like compensation *even
though the company did not treat the biweekly payments in that manner*. See Transcript of
03/23/2009, Adv. Doc. No. 112, at 234-35. Mr. Barbee testified that, with respect to the $71,000
biweekly payments to Mr. Prosser, there was no FICA withholding which would have been done
if New ICC considered the payments to be wages. *See* Transcript of 03/23/2009, Adv. Doc. No.
112, at 237. These biweekly payments are not at issue here. Only payments to or for the benefit
of the Adult Prosser Children are the subject of this adversary proceeding.

[93] As of 2001, the Prossers jointly filed tax returns do not report income from a W-2 form.
*See* Jeffrey and Dawn Prosser's jointly filed income tax returns for the years 1998 through 2006,
JP125-JP133. The last year that the Prossers reported income from a W-2 was for the year 2000.
*See* JP127.

and there was no budget for this activity. *Id.* at 29-30. Furthermore, viewing the transfers posted to the contra equity account as salary would be contrary to Jeffrey Prosser's own testimony that "repayment" of the contra equity transactions was contemplated through "collapsing" of the corporations. *See* Testimony of Jeffrey Prosser, Transcript of 12/08/2008, Adv. Doc. No. 116, at 98-99. No repayment would be necessary if the contra equity transactions reflected salary payments.[94] Generally, funds taken out of New ICC for the personal benefit of the Prossers were

---

[94] Nonetheless, Jeffrey Prosser testified that the contra equity account was used to pay his salary. *See* Transcript of 12/08/2008, Adv. Doc. No. 116, at 89-90. Even if Mr. Prosser's compensation was being paid through contra equity, the total expenditures were well in excess of what Mr. Prosser previously reported as income. In their joint tax return for 1998, Jeffrey and Dawn Prosser reported $820,672 as total wages, salaries, tips, etc. JP125. For their joint tax return in 1999, the total wages, salaries, tips, etc. reported was $1,800,000. JP126. In 2000, the Prossers reported $2,100,000 as wages, salaries, tips, etc. JP127. *But see* TT191, at TT4 1655; TT192, at TT4 1688; TT192, at TT4 1689; TT193, at TT4 1729; TT194, at TT4 1780, establishing that from 2002 forward more than $12 million per year was designated to the contra equity account. *See* discussion at 55-56, *supra*.

As further evidence that Jeffrey Prosser did not consider the transfers recorded as contra equity to be his compensation, the Chapter 11 Trustee contends that Jeffrey Prosser failed to reflect the transfers to or for the benefit of his family members in filings relating to his bankruptcy case (Case No. 06-30009), such as his Monthly Operating Reports ("MORs") filed before the case was converted and his Statement of Financial Affairs ("SOFA"). *See* Trustee Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 104, at ¶14. Jeffrey Prosser admitted that the transfers made by New ICC to his family members were not reflected on the MORs. *See* Transcript of 12/09/2008, Adv. Doc. No. 89, at 151. The SOFA directs a debtor to provide "Income from employment or operation of business" and requires the debtor to "[s]tate the gross amount of income the debtor has received from employment, trade or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year." *See* TT1, at TT00001. Jeffrey Prosser's SOFA dated September 25, 2006, reports as follows: $1,010,707 (Adjusted Gross Income) in 2004, $1 million (approximately) in 2005, and $720,000 in 2006 year to date. *Id.* These amounts are significantly less than the annual amounts recorded as contra equity. *See* note 74, *supra*. Jeffrey Prosser reported that the section requiring a debtor to report "Income other than from employment or operation of a business" as not applicable to him. *See* TT1, at TT00001. No gifts from Jeffrey Prosser to the Adult Prosser Children are reported within the one year preceding the commencement of the case. *See id.* at TT0003. This is further evidence that the transfers made by

(continued...)

recorded as contra equity and treated as distributions by the corporation.[95] These distributions were within the total discretion of Jeffrey Prosser, who utilized the corporate funds at will, despite the financial hardship that the cash disbursements caused for New ICC. *See* Testimony of Jeffrey Prosser, Transcript of 12/09/2008, Adv. Doc. No. 615, at 219-220; Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 32. As noted, Mr. Kanai testified that he recalled a phase when the account grew at a rate of about $1 million per month, resulting in cash flow problems. Transcript of 03/10/2009, Adv. Doc. No. 98, at 46-47. This testimony is supported by documentary evidence. *See* discussion at 55-56. The transfers were reflected  in the financial statements' ever-growing negative numbers in stockholder's equity.  The distributions to or for the benefit of the Prossers out of New ICC were in excess of the paid-in capital and profits of the corporation. Testimony of Barbee, Transcript of 03/24/2009, Adv. Doc. No. 112-1, at 204. There was no equity available to the stockholder. The company did not receive value in return for the funds transferred.[96]

---

[94](...continued)
the company directly to or on behalf of the Defendants were not gifts from Jeffrey Prosser.

[95] Although the court determined in the Turnover Opinion that the corporate funds transferred to or for the benefit of the Prossers and recorded as contra equity on the audited financial statements were treated by New ICC as distributions to Jeffrey Prosser, that finding does not preclude a determination that the transfers meet the elements of fraudulent transfers. In that Opinion, the court found that Jeffrey Prosser controlled the distributions and that the distributions continued despite the hardship which resulted to New ICC. For the reasons stated herein, we find the same. A distribution is merely a way to record moving an asset (including cash) out of a company. It is not a determination of whether a transfer was proper or authorized. *See* note 10, *supra.*

[96] We note that for purposes of constructively fraudulent transfers, which are avoidable pursuant to §548(a)(1)(B), analysis of whether a debtor received less than reasonably equivalent value is a required element. We find that the ICC Debtors received no value in exchange for the
(continued...)

*Other Badges of Fraud*

There were other signs that New ICC was facing financial difficulty. At the time of New

ICC's bankruptcy filing, the employee pension benefit plans were underfunded, and had been

since 1999.[97] Also, around April of 2005, New ICC ceased making monthly loan payments to its

---

[96](...continued)

transfers at issue and incorporate this finding *infra* as to Count II. If we were to find that the Debtors had received some value, we would examine the totality of the circumstances to determine if the value was "reasonably equivalent", specifically addressing (1) the fair market value of the benefit received as a result of the transfer, (2) the existence of an arm's length relationship between the debtor and the transferee, and (3) the transferee's good faith. *See In re TSIC, Inc.*, 428 B.R. 103, 113, (Bankr. D. Del. 2010). There is no evidence of value provided to the ICC Debtors by the Adult Prosser Children. The Adult Prosser Children, who were either transferees or beneficiaries, were insiders of the ICC Debtors. Thus, these were not arm's length transactions. Although the Adult Prosser Children contend that the transfers were from their father, there is evidence to the contrary such as their direct receipt of corporate checks in some instances. At times, they would contact Eling Joseph (Jeffrey Prosser's corporate executive secretary) directly for funds. These examples are not evidence of good faith. To the extent that Jeffrey Prosser received value in exchange for directing corporate funds to or for the benefit of his family, that is not value to the ICC Debtors. Jeffrey Prosser's control in directing disbursal of corporate funds at will was not an extra incentive to retain a key executive. Jeffrey Prosser was the ultimate owner of the ICC Debtors, and through this ownership he mis-used the ICC Debtors' funds as though they were in his personal wallet.

[97] Jeffrey Prosser testified that New ICC's employee benefit plans were underfunded prepetition, i.e. prior to July of 2007. *See* Transcript of 12/09/2008, Adv. Doc. No. 89, at 265. The audited financial statements establish that the benefit plans, in fact, had been underfunded for some time. The audited financial statements for 1999 and 2000 indicate that the "Salaried Pension Benefits" were underfunded in both years and the "Hourly Pension Benefits" were underfunded in 2000. TT190, at TT4 1637. In 1999, EmCom was the sponsor of the salaried pension plan, and New ICC was the sponsor of the hourly pension plan. *Id.* at TT4 1636. Subsequently, in 2000, New ICC was the sponsor of both plans. *Id.* According to the audited financial statements, the funded status of Salaried Pension Benefits and Hourly Pension Benefits remained underfunded in 2001, 2002, 2003, 2004, and 2005 (the last year of audited financial statements in evidence). *See* TT191, at TT4 1670; TT192, at TT4 1709; TT193, at TT4 1754; TT194, at TT4 1803. The Pension Benefit Guaranty Corporation ("PBGC") filed proofs of claims on the basis that New ICC is a contributing sponsor of these underfunded pension plans. *See* Case No. 07-30012, Claim Nos. 40-45. New ICC's bankruptcy schedules also reflect the claims of the PBGC. *See* Case No. 07-30012, Doc. No. 292 (reflecting a contingent,

(continued...)

81

largest creditor, the RTFC. Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at

68.[98] The money that had previously been used to make those payments was instead spent for

other purposes, such as the activities in the receivable LLC account, i.e., the distributions to or

for the benefit of the Prossers recorded as contra equity in the audited financial statements.

Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 68-69.

In addition, by the terms of the Public Services Commission settlement order dated

November 4, 1991, Jeffrey Prosser was prohibited from taking advances out of Vitelco, which

was the wholly owned subsidiary of New ICC from which most of its cash flows were derived.

*See* TT59; Testimony of Jeffrey Prosser, Transcript of 12/10/2008, Adv. Doc. No. 118, at 116-

119. Rather than the prohibited "advances" (i.e., monies "due from shareholder" that would be

repaid) Mr. Prosser took "distributions" from New ICC (a holding company, which received

funds upstreamed from Vitelco) that reduced his equity to large negative numbers. By the end of

2005, over $150 million had been posted to the contra equity account and the total capital deficit

reported was $292,679,000. *See* TT194, at TT4 1780.

---

[97](...continued)
unliquidated, disputed secured claim in the amount of $8,311,030.00 on Schedule D and a
contingent, unliquidated, and disputed unsecured nonpriority claim in the amount of 104,400.00
on Schedule F).

[98] Jeffrey Prosser testified that there was a justifiable reason for the cessation of payments
to RTFC:
>     Q. Isn't it true that no payments were made after the beginning of 2004 to the
>     RTFC, no affirmative payments in the form of sending debt service?
>     A. RTFC at ICC and VITELCO had a 60-million line matched by RTFC which
>     they took and it was our position that when that account was taken, that it was
>     used to make payments on the account.

Transcript of 12/09/2008, Adv. Doc. No. 89, at 265. Even if the cessation of payments was
appropriate as Jeffrey Prosser contends, payments should have recommenced. *See* discussion
*infra* at 90-93.

*Conclusion Regarding Badges of Fraud*

We find that the Chapter 11 Trustee has met his burden of proof regarding actual fraudulent intent. He has provided substantial, clear and convincing[99] evidence in support of several badges of fraud and avoidance of the transfers made to the Adult Prosser Children identified as occurring within the applicable two-year period is appropriate.

*Recovery Pursuant to §550*

The Chapter 11 Trustee may recover transfers or the value of the transfers pursuant to §550 "from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." The Bankruptcy Code imposes strict liability on both "initial transferees" and "entities for whose benefit such transfer was made". *See In re Red Dot Scenic, Inc.*, 293 B.R. 116, 118 (S.D.N.Y. 2003), *aff'd,* 351 F.3d 57 (2d Cir. 2003).

The Adult Prosser Children contend that, to the extent the Trustee asserts that payments to third party vendors were fraudulent transfers (i.e., payments made by the ICC Debtors to third parties for the benefit of the Adult Prosser Children), "those actions fail because they are not parties to this suit." Post-Trial Brief, Adv. Doc. No. 102, at 15. The language of §550 clearly provides that the Trustee may recover from the initial transferee *or* the entity for whose benefit the transfer was made *or* immediate or mediate transferees of the initial transferee.[100]

---

[99] As noted in the text, *supra* note 82 and accompanying text, his burden was to a preponderance.

[100] *See* 5-550 COLLIER ON BANKRUPTCY ¶550.02 ("Thus, the trustee can recover from any combination of the entities mentioned above subject to the limitation of a single satisfaction. The trustee theoretically can recover from both the initial transferee of the debtor and any subsequent

(continued...)

To determine whether an individual is an initial transferee, courts apply the "dominion and control" test. *In re Red Dot Scenic, Inc.*, 293 B.R. 116, 119 (S.D.N.Y. 2003).[101] When applying the dominion and control test, there is a distinction between the scenario where, for example, a debtor's check is paid directly to its principal's creditor (a one-step transaction) and where a check is issued to the principal who then pays his personal creditor (a two-step transaction). *Id.* In *Red Dot*, the creditor-defendant asserted that "under the dominion and control test, a principal who, for his own benefit, causes a corporate debtor to make a fraudulent transfer, should be considered an initial transferee under section 550(a)(1)." *Id.* The argument was premised on the fact that when the principal used his power as a principal to divert the corporate debtor's assets to a personal creditor, the principal exercised dominion and control over the funds thereby satisfying the requirement of the dominion and control test. *Id.* However, the principal did not exercise dominion and control over the funds *after* the transfer. *Id.* at 120. Citing to *Rupp v. Markgraf*, 95 F.3d 936 (10th Cir. 1996), the court in *Red Dot* applied the conclusion that "the extent to which a principal has de facto control over the debtor before the funds are transferred from the debtor, and the extent to which the principal uses this control for his or her own benefit in causing the debtor to make the transfer, are not relevant considerations in determining the initial transferee under §550." *Red Dot,* 293 B.R. at 120. The purpose behind this rationale is to avoid "the anomalous result that every agent or principal of a corporation would be deemed the

---

[100](...continued)
transferee, as well as from any entity for whose benefit the transfer was made--but the trustee's right to do so is limited by subsections 550(b), (c), (d) and (e).").

[101] The "dominion and control" test is "highly-regarded precedent" and most courts have adopted the test. *See In re Mervyn's Holdings, LLC*, 426 B.R. 96,103 (Bankr. D. Del. 2010); *In re CVEO Corp.*, 327 B.R. 210, 216 (Bankr. D. Del. 2005).

initial transferee when he or she affected a transfer of property in his or her representative

capacity....Such a rule 'gives too much power to an unscrupulous insider to effect a

transfer...without allowing a trustee to have the means for avoiding the transfer for the benefit of

the debtor's creditors.'" *In re Video Depot, Ltd.*, 127 F.3d 1195, 1199 (9th Cir. 1997)(internal

citation omitted).

Here, the evidence regarding transfers to or for the benefit of the Adult Prosser Children,

including Jeffrey Prosser's testimony, established that Jeffrey Prosser was the insider controlling

the amounts transferred and designating the recipients and beneficiaries of the transfers. His

control and dominion over the funds transferred out of the ICC Debtors, however, was *before* the

transfers occurred while he was acting in his representative capacity. Jeffrey Prosser had the final

say as to how transactions were recorded by the company according to the testimony of the CFO.

Regardless of the fact that transfers to the Adult Prosser Children were generally recorded by

New ICC in its consolidated financial statements as contra equity transactions and treated as

distributions by New ICC, once the transfers were made, Jeffrey Prosser no longer exercised

dominion or control over them. Jeffrey Prosser attempted to report some of these transfers as

income on his Schedule C.[102] Nonetheless, there is no evidence that he exercised dominion or

control over the transfers after they were made out of corporate accounts.

In *Video Depot*, Hilton, the principal's creditor and the entity ultimately determined to be

the initial transferee, contended that the transfer of funds out of the corporate debtor constituted a

---

[102] *See supra* note 58, addressing the years that Jeffrey and Dawn Prosser completed a
Schedule C as part of their joint income tax returns and noting that only for the years 2004
through 2006 were both business income (as opposed to loss) and positive adjusted gross income
reported.

loan to the principal, thereby giving him control and dominion over the funds. *See* 127 F.3d at

1200. The court, however, found no evidence that the principal did, in fact, exercise control and

dominion over the funds. The court stated, "Simply referring to the transfer as a 'loan' in the

company ledger does not suffice, however, to demonstrate that at any point in time [the principal]

exercised independent control over the funds." *Id.*[103] The deciding factor was that the check was

specifically designated for the principal's creditor. *Id.*

The facts in *Video Depot* are similar to those presented here. Jeffrey Prosser decided what

transfers to issue, how much to pay, who to pay, and for what purpose. Some of the payments

were to his personal creditors. As relevant here, others were to insiders who were not owed

anything by Jeffrey Prosser or by the companies. Nonetheless, once the funds left the corporate

accounts, there is no evidence that Jeffrey Prosser exerted independent dominion and control

over the funds after they were transferred, such that he could be considered a transferee. Rather,

the initial transferees were either the Adult Prosser Children or their creditors or third parties

paid for their benefit.

The evidence substantiates that each of the transfers at issue was made out of one of the

ICC Debtors either directly to one of the Defendants or to a third party for the benefit of one of

the Defendants. Section 550 permits a trustee to recover from an initial transferee or the entity for

whose benefit the transfer was made.[104] Although the Adult Prosser Children contend that they

---

[103] The court explained that the principal was not a transferee "[p]articularly in view of
the fact that [he], as principal of Video Depot, could direct that the transfer be called anything he
pleased in the company ledger," more substantial evidence of independent control would be
necessary after the funds left the corporate account. *Id.*

[104] "Two frequently cited examples of an entity for whose benefit the transfer was made
(continued...)

were not initial transferees, and in some cases where payments went directly to vendors or their creditors, they clearly were not, they were undeniably beneficiaries of the transfers which the Chapter 11 Trustee seeks to avoid and recover in this adversary proceeding.[105] Moreover, a number of payments were made directly from New ICC to the Defendants, and those clearly were made to the Defendants as initial transferees. Additionally, New ICC made numerous payments for transportation services, American Express charges incurred by the Adult Prosser Children, and rental payments for properties where one or more of the Adult Prosser Children resided. New ICC's funds were used to purchase a Mercedes for Sybil Prosser. All of these were directly for the benefit of the Adult Prosser Children.

The Trustee is entitled to avoid and recover the following payments made during the two-years prepetition pursuant to §§548(a)(1)(A) and 550: $161,695.40 from Justin Prosser, $205,359.93 from Sybil Prosser, $56,733.85 from Michelle LaBennett, and $104,132.09 from Adrian Prosser (relating to the transfer to him from ICC-LLC).


Count II: To Recover Fraudulent Transfers Made by One or More of the ICC Debtors to or for

the Benefit of One or More of the Defendants under Section 548(a)(l)(B) of the Bankruptcy Code

---

[104](...continued)
are (1) a guarantor of the debtor and (2) a debtor of the initial transferee." 5-550 COLLIER ON BANKRUPTCY ¶550.02. Here, the latter applies. For example, where New ICC transferred funds directly to American Express (the initial transferee) for charges made by the Adult Prosser Children (debtors of the initial transferee), the Adult Prosser Children directly benefitted from the payment of their creditor.

[105] "The distinction drawn in the statute between beneficiaries and initial transferees thus strongly indicates that, as a general rule, beneficiaries and initial transferees are separate parties to a fraudulent transfer." *Red Dot*, 293 B.R. at 121.

Although we found that the Chapter 11 Trustee established fraudulent intent, substantial evidence was introduced at trial regarding the financial condition of New ICC throughout the period that transfers were made to the Adult Prosser Children in support of a finding of constructive fraud. We address the Trustee's alternative theory for avoidance and recovery and, for the reasons that follow, find that the Trustee also met his burden to establish constructive fraud.

The Chapter 11 Trustee seeks to avoid transfers to the Adult Prosser Children pursuant to §548(a)(1)(B), which provides:

> The trustee may avoid any transfer...of an interest of the debtor in property, or any obligation...incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily
> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. §548(a)(1)(B). It is the Trustee's burden to establish the elements set forth in §548(a)(1)(B). *Valley Bldg. & Constr. Corp.*, 435 B.R. at 287. The Trustee must establish the transfers were fraudulent by a preponderance of the evidence. *Fruehauf*, 444 F.3d at 211.[106] As stated above, a trustee who avoids a transfer under this section can recover the property or value

---

[106] The burden of proof does not shift from the Trustee. *See* note 81 *supra.*

of the property transferred pursuant to the terms of §550(a).

*Reach Back Period*

The Chapter 11 Trustee is limited to avoiding transfers that occurred within the two years prepetition. 11 U.S.C. §548(a)(1)(A). Therefore, the same transfers which were identified in the court's analysis of Count I, above, as having occurred in that time period are applicable here.

*Reasonably Equivalent Value*

In order to successfully avoid a transfer pursuant to §548(a)(1)(B), the Chapter 11 Trustee must establish that the debtor "received less than a reasonably equivalent value in exchange for such transfer" in addition to one of the four alternatives enumerated above. We begin with the analysis of reasonably equivalent value. Within the Third Circuit, courts have defined "reasonably equivalent value" as follows:

> "any benefit . . . whether direct or indirect . . . [which includes any] 'opportunity' to receive an economic benefit in the future." *In re R.M.L.*, 92 F.3d 139, 148 (3d Cir. 1996). To determine whether a benefit constitutes "reasonably equivalent value," courts routinely look to the "totality of the circumstances" of the transfer in balancing the following factors: (1) the "fair market value" of the benefit received as a result of the transfer, (2) "the existence of an arm's length relationship between the debtor and the transferee," and (3) the transferee's good faith. *Fruehauf Trailer*, 444 F.3d at 213 (quoting *In re R.M.L.*, 92 F.3d at 148-149, 153).

*In re TSIC, Inc.*, 428 B.R. 103, 113 (Bankr. D. Del. 2010)."[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all." *In re R.M.L.*, 92 F.3d 139, 149 (3d Cir. 1996). We have found the ICC Debtors received no value in exchange for the transfers. *See* note 96, *supra*.

Therefore, based upon the foregoing, we find that the Trustee met his burden as to the

first element of 548(a)(1)(B). However, in order to avoid the transfers, in addition to proving that reasonably equivalent value was not received, the Chapter 11 Trustee must prove one of the following pursuant to §548(a)(1)(B): (1) the debtor was insolvent on the date of the transfer or became insolvent as a result; (2) the debtor was engaged in or about to engage in a transaction for which its remaining property was unreasonably small capital; or (3) the debtor intended or believed it would incur debts beyond its ability to pay.[107] We find that the Trustee so clearly established that the debtor intended or believed it would incur debts beyond its ability to pay, that we do not address the other grounds.

*Debts Beyond Ability to Pay*

For the reasons that follow, we find that New ICC intended to incur, or believed that it would incur, debts that would be beyond its ability to pay as such debts matured. The Chapter 11 Trustee asserts that New ICC "failed to generate sufficient cash to satisfy current and future obligations, such as its employee benefit plans and its indebtedness to the RTFC...." *See* Chapter 11 Trustee's Brief in Support of Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 105, at 16.

Mr. Kanai testified that by April of 2005, New ICC had ceased making monthly payments of approximately $3.25 million toward its indebtedness to the RTFC.[108] Transcript of 03/10/2009,

---

[107] Section 548(a)(1)(B)(ii)(IV) provides a fourth alternative when a debtor will be deemed to have made constructively fraudulent transfers: when transfers are made to insiders under an employment contract and not in the ordinary course of business. That is not an issue in this adversary proceeding and is not addressed herein.

[108] *See also* Testimony of Kanai, Transcript of 03/10/2009, Adv. Doc. No. 98, at 69:
 Q. During -- let's just focus, let's see, that happened April of '05, so let's focus generally on the time period of, from April of '05 through '06. So, is it fair to say

(continued...)

90

Adv. Doc. No. 98, at 68. The money that had previously been used to make these monthly

payments was instead "used for other corporate operations and activities...in [the] receivables

LLC account." *Id.* That is, at least a portion of the funds were being used to pay the non-business

expenses of the Prosser family accumulated in the contra equity account (at times exceeding $1

million per month as explained *supra* at 55-56). A lawsuit was filed by the RTFC alleging

defaults, which were, according to Jeffrey Prosser, "technical in nature, like not filing UCC's and

so forth, not renewing UCC's." Transcript of 03/26/2009, Adv. Doc. No. 112-3, at 124.[109] Jeffrey

---

[108](...continued)
that during that time period the monthly debt service payments to the RTFC did
not resume?
A. Correct.
Q. All right. So, for that same time period, as chief financial officer of the
company, can you tell me whether or not ICC was otherwise meeting its
obligations as they came due?
A. Generally. Other than the RTFC.
Q. To your knowledge -- so, at least during your tenure after April of '05, did
payments ever recommence, I guess is the right term, to the RTFC?
A. No, sir.
We note, however, that during this time period, the audited financial statements reveal
that the pension plans were significantly underfunded. As of December 31, 2005, the audited
financial statements provide that both the Salaried and Hourly Pension Benefits were
underfunded in the amounts of $9,704,000 and $7,477,000, respectively. *See* TT194, at TT4
1803.

[109] The RTFC litigation was discussed by the board at the June 28, 2004, meeting. The
minutes reflect the following discussion:

> The Chairman then advised that the Rural Telephone Finance Cooperative
> (RTFC) had sued the Company on 1st June 2004 in the Federal District Court in
> Virginia claiming violations of a 2001 loan agreement. The basis for the suit
> appears to be that a claim that RTFC should have received the proceeds of the sale
> of preferred stock in Innovative Telephone (Vitelco). The Chairman held the view
> that while an RTFC agreement with ICC may give RTFC first call if ICC issues
> stock, Vitelco was not part of this agreement. He also informed the Board that
> ICC is not in default of any payments to RTFC.
>
> The Chairman voiced his disappointment over the manner that RTFC had

(continued...)

Prosser testified that he did instruct New ICC to cease making payments to the RTFC in 2005.

Transcript of 03/26/2009, Adv. Doc. No. 112-3, at 125. However he contends that his instruction

was based upon the RTFC seizing $60 million of New ICC's assets, and it was his position that

the monthly payments would not recommence until that $60 million was used up. *Id.* at 125-

26.[110] Even, *arguendo*, were we to accept Jeffrey Prosser's testimony that the cessation of

---

[109](...continued)
handled this matter. He said that RTFC had given no indication of concern over
the proceeds of the preferred stock until the Judge's decision in the
*Greenlight* matter was handed down, and then RTFC filed a suit without giving
any notice.
    The Board expressed concern about the RTFC law suit and hoped that
efforts could be made to settle the issues with RTFC amicably.
    The Chairman agreed that every effort should be made to settle, and he
advised that Mr. Lanny Davis would be retained as legal counsel in this matter.
*See* Board Minutes of 06/28/2004, TT10, at TT 00225.

[110] The nature of this alleged $60 million seizure was not fully developed on the record. It
is clear that the parties dispute whether the $60 million constituted operating capital of New ICC:
    Q. Well, you've referenced earlier -- your word, not mine -- that there was a
seizure of capital by the RTFC. Isn't it true that the RTFC never seized any
operating capital?
    A. Yes, they did. They absolutely seized $60 million of the investment that we
had. Yes, they did.
    Q. That was not operating capital --
    A. Oh, you call it what you want. All capital is capital.
    Q. I'm asking you to answer my question. Isn't it true that the RTFC never seized
any operating capital of New ICC?
    A. Again, I disagree with that.
    [. . . .]
    Q. Isn't it true, Mr. Prosser, that what you're referring to is patronage capital that
stayed with the RTFC?
    A. Part of it; and part of it was SCC's.
    Q. Was the FCC's?
    A. SCC; another type of capital certificate.
    Q. And it stayed with the RTFC, correct?
    A. Well, the SCC -- no. Those stock certificates would be with us, with ICC.
    Q. But any funds remained with the RTFC, correct – were already with the RTFC,
(continued...)

payments to the RTFC was appropriate "until the $60 million was used up", we note that, at the

rate of $3.25 million per month, New ICC should have recommenced payments in approximately

eighteen months, i.e. on or around September of 2006. This did not occur, and New ICC

remained in default to the date of the filing of the involuntary petition in July of 2007.

New ICC was not current with its obligations. Jeffrey Prosser testified that prior to New

ICC's bankruptcy filing, its employee benefit plans were underfunded.[111] Transcript of

---

[110](...continued)
correct?
A. Yes, but it doesn't matter where -- you can have a number of different funds, of
operating funds. It doesn't have to be one place.
Q. And it wasn't New ICC's operating money; it was actually a percentage of the
initial facility that stayed with the RTFC as a result of the patronage capital
requirements?
A. Well, that's not true. That's not an accurate description. That's not what
patronage capital certificates are. SCC's are that.
Q. Did you ever have access to that, those funds for New ICC's daily operations?
A. The -- which ones?
Q. The patronage capital.
A. Did we ever have access to it? Patronage capital was paid out every year. So
we would have access to it, yes.
Q. You're talking about a dividend now from the RTFC?
A. Which is what patronage capital certificates are.
Q. So they didn't pay you a dividend, and so you consider that a seizure?
A. No, that's not what I said. That isn't what I said.
*See*  Testimony of Jeffrey Prosser, Transcript of 03/26/2009, Adv. Doc. No. 112-3, at 153-55.
The testimony does not clarify the nature of the patronage capital or whether it was appropriate
for New ICC to treat the alleged $60 million seizure as prepayment.

[111] We note that the Bankruptcy Code defines "debt" as "liability on a claim."
*See* §101(12). Claim is very broadly defined:
(A) right to payment, whether or not such right is reduced to judgment, liquidated,
unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,
equitable, secured, or unsecured; or
(B) right to an equitable remedy for breach of performance if such breach gives
rise to a right to payment, whether or not such right to an equitable remedy is
reduced to judgment, fixed, contingent, matured, unmatured, disputed,

(continued...)

93

12/09/2008, Adv. Doc. No. 89, at 265. The audited financial statements for 1999 and 2000

indicate that the "Salaried Pension Benefits" were underfunded in both years and the "Hourly

Pension Benefits" were underfunded in 2000.[112] The funded status of Salaried Pension Benefits

and Hourly Pension Benefits remained underfunded in 2001, 2002, 2003, 2004, and 2005, and up

to the petition date. *See* TT191, at TT4 1670; TT192, at TT4 1709; TT193, at TT4 1754; TT194,

at TT4 1803. *See also* note 97 and accompanying text. Therefore, the employee benefit plans

were underfunded throughout the time period when New ICC was making the transfers at issue.

　　　The pension benefits remained underfunded as personal transfers continued to be made to

or for the benefit of the Prosser family in excess of the paid-in capital and profits of the

corporation. *See* Testimony of Barbee, Transcript of 03/24/2009, Adv. Doc. No. 112-1, at 204.

Thus, the Chapter 11 Trustee has established that the transfers continued when the debtor

intended to incur and believed it would incur debts that were beyond its ability to pay as they

matured.

　　　As an alternative to actual fraudulent intent alleged in Count I, the trustee also established

that avoidance is appropriate pursuant to a finding of constructive fraud and recovery is

warranted pursuant to §550 for the reasons stated relating to Count I. However, as the same

transfers were at issue in Count I, Count II does not provide a basis for additional recovery but

---

[111](...continued)
undisputed, secured, or unsecured.
11. U.S.C. §101(5).

[112] Funded Status of the Salaried Pension Benefits in 1999 was negative $4,232,000 and
negative $4,037,000 in 2000. TT190, at TT4 1637. Hourly Pension Benefits funded status in
2000 was negative $1,450,000. *Id.* By 2005, the Salaried Pension Benefits' funded status was
negative $9,704,000, and the Hourly Pension Benefits' funded status was negative $7,477,000.
TT194, at TT4 1803.

rather is an alternative basis for recovery.

<u>Counts III, IV, and V: To Recover Fraudulent Transfers Made by One or More of the ICC</u>

<u>Debtors to or for the Benefit of One or More of the Defendants under Section 544 of the</u>

<u>Bankruptcy Code and New York Law, Florida Law, and U.S.V.I. Law</u>

      The Chapter 11 Trustee also claims he is entitled to avoid transfers made to the Adult Prosser Children pursuant to state law. Although the Trustee successfully avoided transfers pursuant to 11 U.S.C. §548, a trustee is limited to avoiding and recovering transfers made within the two years prepetition under that section of the Bankruptcy Code. In this action, the Trustee is seeking to avoid and recover transfers which occurred beyond this time period. Depending upon applicable state law, a trustee may be able to avoid and recover transfers which occurred beyond the limitations set forth in §548.

      Section 544(b)(1) of the Bankruptcy Code provides the trustee with the power to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." For the reasons stated herein, we find that the law of the Virgin Islands has the most significant relationship with the transfers at issue and is applicable for purposes of §544(b)(1) of the Bankruptcy Code.

    *Identification of Creditors*

      In order for a trustee to succeed under §544(b), the trustee must show (i) the existence of an actual creditor, (ii) with an allowable unsecured claim, (iii) who, under applicable law, could avoid all or part of the transfer. *See* 11 U.S.C. §544(b). "It is well settled that 'a trustee...can use

this power only if there is an unsecured creditor of the debtor that actually has the requisite

nonbankruptcy cause of action." *In re DBSI, Inc.*, 2011 Bankr. LEXIS 791, at \*14 (Bankr. D.

Del. Feb. 11, 2011) (quoting *In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000)).

Notwithstanding applicable state law, the trustee's avoidance powers are not limited to the

amount that the actual creditor could have recovered. *Grubbs Construction Co. v. The Florida

Department of Revenue*, 321 B.R. 346, 351 (Bankr. M.D. Fla. 2005) (citing to *Moore v. Bay*, 284

U.S. 4 (1931)). The trustee may avoid the entire transfer.

The Chapter 11 Trustee identified both the Greenlight Entities and Comstar, Inc.

("Comstar") as holders of claims that are not subject to a bona fide dispute. *See* Trustee

Springel's Proposed Findings of Fact and Conclusions of Law, Adv. Doc. No. 104, at ¶¶81-83.[113]

The Greenlight Entities obtained a judgment against, *inter alios*, ICC-LLC and New ICC's

predecessor in interest on January 9, 2006, based upon claims originating from a transaction

which took place in 1998. TT44. This court found that "each of the Greenlight entities is a holder

of a claim against New ICC that is not the subject of a bona fide dispute." *See* Order Granting

Greenlight's Motion for Summary Judgment and Entry of Order for Relief Pursuant to 11 U.S.C.

§303(f), Fed.R.Bankr.P. 1018 and 7056 and Fed.R.Civ.P. 56, Case No. 07-30012, Doc. No. 72.

Comstar sold internet type equipment to New ICC beginning in 2001. *See* Testimony of

Lunger,[114] Deposition of 08/14/2008, at 7 (admitted in this proceeding, *see* TT203). Comstar is

---

[113] In their Post-Trial Brief, the Adult Prosser Children contend, without explanation, that Comstar and Greenlight "do not constitute valid §544(b) creditors and none in fact exist." Adv. Doc. No. 102, at 13-14.

[114] William Reed Lunger is the President of Comstar, Inc. *See* Deposition of 08/14/2008, at 5.

listed in New ICC's bankruptcy schedules as a creditor holding an unsecured priority claim in the

amount of $26,989.80. *See* Case No. 07-30012, Doc. No. 915.[115] Thus, the Chapter 11 Trustee

has identified two creditors in existence.[116]

Because the action is based upon §544, the court must determine which state's fraudulent

conveyance law applies. In the Complaint, the Chapter 11 Trustee has asserted that the laws of

New York, Florida, and the Virgin Islands are applicable. Adv. Doc. No. 1, at ¶¶34-63. He does

not, however, state how these laws are applicable to the transfers at issue, whether there is a true

conflict among the laws, and if so, which law has the most significant relationship to the facts of

this case.

*Applicable State Law*

Bankruptcy courts must apply the choice of law rules of the state in which the court sits.

*See In re PHP Healthcare Corp.*, 128 Fed. Appx. 839, 843 (3d Cir. 2005). This case is pending

in the Virgin Islands. By statute, the Virgin Islands applies the Restatement (Second) of Conflict

of Laws (hereinafter "Restatement").[117] In determining applicable substantive law, the court shall

---

[115]  The court took judicial notice of New ICC's amended schedules at trial on March 24,
2009. *See* Transcript of 03/24/2009, Adv. Doc. No. 112-1, at 222.

[116] Although the PBGC filed proofs of claims on the basis of underfunded pension plans,
the Trustee did not identify the PBGC as a creditor for purposes of §544(b). *See* note 97 *supra.*

[117] "The rules of the common law, as expressed in the restatements of the law approved by
the American Law Institute, and to the extent not so expressed, as generally understood and
applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in
cases to which they apply, in the absence of local laws to the contrary." 1 V.I.C. §4. "The
Territory of the Virgin Islands possesses a unique status in American jurisprudence because of its
adoption of the American Law Institute's...Restatements of Law as its primary rules of decision
'in the absence of local laws to the contrary.'" *In re Manbodh Asbestos Litigation Series*, 47 V.I.
215, 226 (V.I. Super. Ct. 2005). "To identify the applicable common law in those circumstances,
(continued...)

apply the governing principles found in the Restatement as there is no local law to the contrary.

*Benjamin v. Eastern Airlines, Inc.*, 18 V.I. 516, 519 (D.C.V.I. 1981).

The fraudulent conveyance laws of all three jurisdictions at issue are similar in nature. In fact, New York and the Virgin Islands both adopted the Uniform Fraudulent Conveyance Act ("UFCA"). Florida's statute conforms with the Uniform Fraudulent Transfer Act ("UFTA"). Both are products of the National Conference of Commissioners on Uniform State Laws, and UFTA revised UFCA. To the extent there is a conflict, we apply the conflict of law rules of the Restatement pursuant to Virgin Islands law. Fraudulent conveyance claims sound in tort.[118]

Pursuant to the Restatement:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in §6.
> (2) Contacts to be taken into account in applying the principles of §6 to determine the law applicable to an issue include:
>> (a) the place where the injury occurred,
>> (b) the place where the conduct causing the injury occurred,
>> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
>> (d) the place where the relationship, if any, between the parties is centered.

---

[117](...continued)
the language of title 1, section 4 directs courts to examine first 'the restatements' and second, only to the extent not so expressed in a Restatement, the common law as understood and applied in the decisions of the courts of the United States. In spite of this seemingly clear directive, there can be little argument that title 1, section 4 is ambiguous, as the phrase 'in the absence of local laws to the contrary,' is susceptible to being understood in two or more ways. To date, courts have interpreted 'local laws' to include both legislation and common law precedent." *Id.* at 226-27.

 Thus, by statute, the Virgin Islands applies the Restatement (Second) of Conflict of Laws. *See Benjamin*, 18 V.I. at 519 (applying Restatement (Second) Conflict of Laws to determine applicable law in the absence of local laws to the contrary).

[118] *See Fountain Valley Corporation v. Wells*, 98 F.R.D. 679, 684 (D. V.I. 1983).

These contacts are to be evaluated according to their relative importance with
respect to the particular issue.

Restatement (Second) Conflict of Laws §145. Section 6 of the Restatement provides the

following factors to consider:

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of
those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

As explained in detail, *supra*, numerous transfers were made by New ICC to or for the

benefit of the Adult Prosser Children. These included a number of direct payments to each of the

Defendants, American Express payments for a variety of charges in various locations,

transportation expenses, the purchase of a vehicle in California, and rental payments for

residences in two different states and even in a different country. All of the transfers out of New

ICC have a connection to the Virgin Islands, as each transfer was a payment made out of a Virgin

Islands corporation.[119] Given that the creditors of New ICC are the entities who are suffering the

injury and those creditors' dealings were with New ICC, a Virgin Islands corporation, (not with

any of the Adult Prosser Children individually), application of Virgin Islands law best satisfies

---

[119] All transfers at issue were made by New ICC, except for one transfer made to Adrian
Prosser by ICC-LLC. ICC-LLC is a Delaware limited liability company. ICC-LLC's voluntary
Chapter 11 Petition lists its street address as a Virgin Islands address. *See* Jeffrey Prosser's
SOFA, TT1, at TT00006; Voluntary Petition, Case No. 06-30008, Doc. No. 1. Therefore, ICC-
LLC also has a connection to the Virgin Islands. Furthermore, we note that the funds for the
transfer originated out of New ICC. *See* note 57, *supra*.

Case 3:08-ap-03004-MFW    Doc 119    Filed 08/05/11    Entered 08/05/11 15:53:27    Desc
Main Document    Page 100 of 127


the protection of their justified expectations.[120] It is unlikely that the creditors would expect that

the local law of any state where the corporation arbitrarily sent funds or where funds were used

by the Adult Prosser Children to be applicable, especially where the creditors were unaware of

transfers to or for the benefit of the children of the CEO and ultimate shareholder. While the

creditors of New ICC were located (and therefore injured) in various places,[121] the conduct

causing the injury was that of New ICC, a Virgin Islands corporation. The Adult Prosser Children

resided in several states during the relevant time period, and, in the case of Michelle LaBennett,

even in a different country. Regardless of where the Adult Prosser Children were located or spent

the funds, the operative conduct was the transfer of funds from a Virgin Islands corporation. The

conduct at issue is a pattern of conduct that continued for years. That is, Jeffrey Prosser,[122] the

Chairman of the Board, President, and CEO of the company, controlled New ICC and caused the

company to make transfers to or for the benefit of the Defendants. Application of Virgin Islands

---

[120] The Restatement directs the court to examine the following contacts: "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *See* Restatement (Second) Conflict of Laws §145. The principles to be considered in light of these contacts include: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested parties states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied." *See* Restatement (Second) Conflict of Laws §6.

[121] In his bankruptcy schedules, Jeffrey Prosser identifies Greenlight as having a New York address. *See* TT5, at TT00046 (Schedule F). The president of Comstar provided a business address in Minnesota. *See* 08/14/2008 Deposition of Lunger, at 4-5.

[122] We note that Jeffrey Prosser considered St. Croix as his domicile. *See* TT160 (The Last Will and Testament of Jeffrey J. Prosser, dated January 12, 2000).

100

law will provide uniformity in result as to all the transfers at issue. It is the place where the

relationship between the parties is centered. Thus, the Virgin Islands has the most significant

connection to these transfers and its law will be applied.

### Application of Virgin Islands Fraudulent Conveyance Law

The Virgin Islands adopted the Uniform Fraudulent Conveyance Act ("UFCA"). There is

a dearth of case law interpreting the territory's fraudulent conveyance statutes. However, 28

V.I.C. §212 provides, "This subchapter shall be so interpreted and construed as to effectuate its

general purpose to make uniform the law of those jurisdictions which enact it." Therefore, in the

absence of interpretation by the courts of the Virgin Islands, we look to other case law

interpreting and applying UFCA.[123] We also note that the elements of an avoidable transfer under

UFCA do not substantially differ from 11 U.S.C. §548(a)(1)(B). *See In re Charys Holding Co.*,

443 B.R. 628, 636 (Bankr. D. Del. 2010).

### Intentional Fraud

"Every conveyance made...with actual intent, as distinguished from intent presumed in

law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present

and future creditors." 28 V.I.C. §207. A "creditor" is defined as "a person having any claim,

whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." 28

V.I.C. §201. States that have adopted UFCA have required a showing of actual fraudulent intent

by clear and convincing evidence.[124]

---

[123] Many states that had adopted UFCA have repealed it and replaced it with the Uniform
Fraudulent Transfer Act (UFTA).

[124] The applicable standard of proof has not been set forth in the case law of the Virgin
(continued...)

When it is asserted that a conveyance was made with actual intent to hinder, delay, or defraud creditors, a showing of insolvency is not necessary in order for the conveyance to be set aside. *See Williams v. Vialet*, Civil No. 77-95, 1982 U.S. Dist. LEXIS 18368, at *2, n.1 (D.V.I. Mar. 25, 1982).[125] Fraud need not be established by direct evidence, but rather can be proven by recognized badges of fraud. *Id.* at *3-4. Suspicion may arise when the evidence supports a finding of a single badge of fraud, but the presence of several badges of fraud may establish an act to defraud conclusively when evidence of a clear legitimate, supervening purpose is lacking. *In re Prichard,* 361 B.R. 11, 17 (Bankr. D. Mass. 2007). "Although the intent must exist at the time the transfer was made, it may be shown by conduct subsequent to the execution of the conveyance of such a nature as to show fraud in its inception.'" *United States v. Doyle*, 276 F. Supp. 2d 415, 430 (W.D. Pa. 2003)(quoting *United States v. Kudasik,* 21 F.Supp.2d 501, 507 (W.D. Pa. 1998)). Where badges of fraud are present, the well-settled rule is that the burden shifts to the parties seeking to uphold the transfer to rebut the inferences created. *See Williams*, 1982 U.S. Dist. LEXIS 18638 at *4.

---

[124](...continued)
Islands. In order to find actual fraudulent intent under UFCA as enacted in New York, "[a]ctual fraud...must be proven by clear and convincing evidence....There is a dispute as to the appropriate standard of proof required to prove constructive fraud...." *Fannie Mae v. Olympia Mortg. Corp.*, No. 04-CV-4971, 2011 U.S. Dist. LEXIS 63564, *13-14 (D.N.Y. 2011) (citing to a case applying the preponderance of the evidence standard and a case applying the clear and convincing evidence standard to constructive fraud claims). Before Pennsylvania repealed its version of UFCA, actual intent was to be established by clear and convincing evidence. *See In re Foxcroft Square Co.*, 184 B.R. 671, 674 (E.D. Pa. 1995). We apply the clear and convincing evidence standard to the Trustee's UFCA claims.

[125] Although the court in *Williams* begins to address the requirements for setting aside a conveyance on the basis of a transferor's insolvency pursuant to 28 V.I.C. §§202 and 204, ultimately the court analyzes common badges of fraud. 1982 U.S. Dist. LEXIS 18638, at *3-7.

102

Among the badges of fraud are transfers made in anticipation of a lawsuit being filed against the transferor and transfers for less than fair consideration between family members. *Williams*, 1982 U.S. Dist. LEXIS 18638, at *4-5. As previously stated, major litigation involving Greenlight was ongoing since 1999, and the RTFC commenced an action against New ICC in 2004. Furthermore, we note that Jeffrey Prosser used corporate funds for the benefit of his children. "The relationship of parent and child when coupled with other suspicious circumstances may be sufficient to raise an inference of fraud in the conveyance." *Williams*, 1982 U.S. Dist. LEXIS 18638, at *5 (quoting *Johnson v. Drew*, 218 Cal. App. 2d 614, 621 (Cal. App. 2d Dist. 1963)). Here, although Jeffrey Prosser was not the transferor, he caused New ICC to transfer funds to his children, who are also insiders of the ICC Debtors. *See* 11 U.S.C. §101(31)(B) (defining "insider" for purposes of the Bankruptcy Code). In addition, the same badges of fraud analyzed for purposes of §548(a)(1)(A) apply here.[126] We found that several badges of fraud exist to support a finding of actual fraud to hinder, delay, or defraud creditors pursuant to §548(1)(1)(A). *See* discussion *supra* at 74-83. The Trustee has met his burden and established fraudulent intent by clear and convincing evidence. Thus, the Trustee is entitled to avoid transfers made prior to the expiration of the limitations period pursuant to 11 U.S.C. §544(b)(1) and 28 V.I.C. §207, *see* discussion, *infra*.

*Constructive Fraud*

For the reasons that follow, we find that the Chapter 11 Trustee established constructive fraud pursuant to UFCA, the applicable law in the Virgin Islands.

---

[126] "The factors considered in a fraudulent conveyance action under the UFCA are similar to the factors considered in a fraudulent conveyance action under 11 U.S.C. § 548(a)." *See In re Prichard*, 361 B.R. 11, 16-17 (Bankr. D. Mass. 2007).

103

<u>Fair Consideration</u>

UFCA provides three circumstances when a transfer will be deemed fraudulent without

evidence of actual intent. As in the Bankruptcy Code, the three circumstances require either a

showing of insolvency, unreasonably small capital, or debts beyond the debtor's ability to pay.

Each of the three require a finding that the transfer was made without "fair consideration." UFCA

deems "fair consideration" to be given in exchange for property or an obligation when one of two

elements is met:

> (a) When in exchange for such property, or obligation, as a fair equivalent
> therefor, and in good faith, property is conveyed or an antecedent debt is satisfied,
> or
> (b) When such property, or obligation, is received in good faith to secure a present
> advance or antecedent debt in amount not disproportionately small as compared
> with the value of the property, or obligation obtained.

28 V.I.C. §203.

We have already concluded that reasonably equivalent value was not given in exchange

for these transfers. *See* note 96 and discussion *supra* at 89-90. In fact, we can identify no value

provided in exchange and thus no "fair value" was given in exchange for the transfers to the

Adult Prosser Children.

Because the Trustee so clearly established that the company intended or believed that it

would incur debts beyond its ability to pay, we address only this ground for avoiding

constructively fraudulent transfers pursuant to the applicable Virgin Island's law.

<u>Debts Beyond Ability to Pay</u>

"Every conveyance made...without fair consideration when the person making the

conveyance...intends or believes that he will incur debts beyond his ability to pay as they mature,

104

is fraudulent as to both present and future creditors." 28 V.I.C. §206. A debt is "any legal

liability, whether matured or unmatured, liquidated or unliquidated, fixed or contingent. *See* 28

V.I.C. §201.

In *Nirvana*, the court addressed this provision of UFCA, adopted in New York as a

section of the New York Debtor and Creditor Law:

> It has been observed that §275, like NYDCL §§273 and 274, involves
> constructive fraud, and may invalidate a conveyance "without regard to any actual
> intent to defraud on the part of the grantor or transferor." 30 N.Y. JUR. 2D,
> CREDITORS' RIGHTS AND REMEDIES, § 338, at 445 (1997); *see Sullivan v.
> Messer (In re Corcoran),* 246 B.R. 152, 159 (E.D.N.Y. 2000)("the intent of the
> parties to the transaction is irrelevant"); *MFS/Sun,* 910 F. Supp. at 936. While
> true, it only tells part of the story. Section 275 requires proof of the debtor's
> subjective intent or belief that it will incur debts beyond its ability to pay as they
> mature. *See MFS/Sun Life,* 910 F. Supp. at 943 (noting support for the view that
> §275 requires proof of subjective intent); *58th Street Plaza Theatre, Inc.*, 287 F.
> Supp. at 498 (finding that corporate taxpayer fraudulently transferred property
> under NYDCL §275 when insider knew that the corporation would be unable to
> pay the federal tax claims if they were upheld); *In re Best Prods. Co.*, 168 B.R.
> 35, 52 n. 28 (Bankr. S.D.N.Y. 1994)(NYDCL §275 requires proof of the
> transferor's subjective belief that it will incur debts beyond its ability to pay);
> *aff'd* 68 F.3d 26 (2d Cir. 1995); *Julien J. Studley, Inc. v. Lefrak*, 66 A.D.2d 208,
> 412 N.Y.S.2d 901, 907 (N.Y. App. Div.)(reversing lower court judgment
> dismissing complaint where, inter alia, the transfers "were made when the
> corporations knew that debts [w]ould be incurred beyond their ability to pay as the
> debts matured (see Debtor and Creditor Law, § 275)"), *aff'd*, 48 N.Y.2d 954, 401
> N.E.2d 187, 425 N.Y.S.2d 65 (N.Y. 1979); see generally PETER A. ALCES,
> LAW OF FRAUDULENT TRANSACTIONS § 5:47 (updated Nov. 2005),
> available at Westlaw, FRAUDTRAN § 5:47(under UFCA §6, "the complaining
> creditor must show that the grantor subjectively believed or actually intended that
> he would incur debts he could not satisfy").

*See Nirvana,* 337 B.R. at 508-509.

For the same reasons expressed when we addressed Count II, we find that New ICC

intended to incur debts beyond its ability to pay as they matured. We find that the continuous

underfunded status of the pension plans is alone sufficient evidence of subjective intent. In

addition, we find the non-payment of the RTFC even after the alleged seizure of $60 million was

recouped through lack of monthly payments, is further evidence of intent. Therefore, the Trustee

has established the transfers as fraudulent pursuant to 28 V.I.C. §206.

*Statute of Limitations*

There are two time requirements implicated when a trustee files an avoidance action

under §544(b). If the creditor in whose place the trustee stands under §544(b) would have been

barred by the statute of limitations on the bankruptcy petition date, then the trustee may not

proceed. *See In re Bernstein*, 259 B.R. 555, at 559 (Bankr. D.N.J. 2001). However, if the

limitations period did not expire with respect to the creditor as of the petition date, then §546(a)

provides the trustee with a two year period after the entry of the order for relief in which to bring

an avoidance action. *Id.* at 558-59.

Therefore, we address the relevant dates as to both ICC-LLC, relating to the transfer

made to Adrian Prosser, and as to New ICC, relating to multiple transfers to the Adult Prosser

Children. ICC-LLC's voluntary petition was filed on July 31, 2006, and the commencement of

the voluntary case constituted an order for relief. *See* §301(b).[127] New ICC's involuntary case was

---

[127] Prior to the filing of the voluntary petitions in the District Court of the Virgin Islands, Bankruptcy Division, involuntary petitions were filed against ICC-LLC, Emerging, and Jeffrey Prosser in the District of Delaware on February 10, 2006. An Order was entered on December 14, 2006, transferring the involuntary cases to the Virgin Islands. *See* Case No. 06-30008, Doc. No. 193. The court noted in its accompanying December 14, 2006, Memorandum Opinion:

> An order will be entered transferring the involuntary cases to the USVI where they
> will be related to the voluntary cases now filed in the USVI. Because the orders
> for relief have been entered in the voluntary cases in the USVI, it appears that,
> after the involuntaries are transferred, no further action will be needed in the
> involuntary cases and they can be closed.

*See* Case No. 06-30008, Doc. No. 192. Section 546 provides that actions pursuant to §544 must be commenced prior to two years after the entry of the order for relief. For ICC-LLC, the

(continued...)

commenced on July 5, 2007, and the order for relief in New ICC's involuntary bankruptcy case

was entered on September 21, 2007. This adversary proceeding was commenced on February 8,

2008. Therefore, it is clear that Trustee Springel timely filed his complaint under §546(a) as to

those transfers made by ICC-LLC and New ICC for which the statute of limitations had not

expired prior to the respective petition dates.

     In the Virgin Islands, a two year statute of limitation applies to "an action for libel,

slander, assault, battery, seduction, false imprisonment, or for any injury to the person or rights of

another not arising on contract and not herein especially enumerated...." 5 V.I.C. § 31(5).

Inasmuch as a fraudulent conveyance claim sounds in tort, a two year statute of limitations

applies. *Fountain Valley Corporation v. Wells*, 98 F.R.D. 679, 684 (D. V.I. 1983). However,

there is a tolling provision in the statute. Pursuant to 5 V.I.C. §32(c), "[i]n an action upon a new

promise, fraud, or mistake, the limitation shall be deemed to commence only from the making of

the new promise or the discovery of the fraud or mistake." Moreover, pursuant to the statute, the

Virgin Islands applies the discovery rule, such that the limitations period will commence either

when the plaintiff discovers the fraud or when the plaintiff reasonably should have discovered the

fraud. *Montgomery v. Estate of Griffith*, 49 V.I. 255, 265 (V.I. Super. Ct. 2008).[128]

---

[127](...continued)
commencement of its voluntary case constituted the order for relief.

[128] The Adult Prosser Children assert that the court consider the following in interpreting
when the creditors should have reasonably discovered the fraud:
> Additionally, at least one bankruptcy court has cited the Supreme Court of New
> Jersey for its "holding that '[i]n our view, a reasonable creditor would perform an
> asset search when the loan goes into default.'" *In re Bernstein*, 259 B.R. 555, 560
> (Bkrtcy D.N.J. 2001) quoting *ASCO 1997 NI, LLC v. Zudkewich*, 166 N.J. 579,
> 767 A.2d 469, 476 (N.J.2001).

(continued...)

There is no evidence indicating how a creditor of New ICC would be aware of the

numerous and substantial funds which were being transferred to or for the benefit of the Adult

Prosser Children on a regular basis. Although there is no evidence that the creditors of New ICC

(other than the RTFC) had access to the consolidated audited financial statements, even if they

had, the financial statements do not indicate the specifics or nature of the transfers recorded as

contra equity.[129] For example, the audited financial statement for the year ended December 31,

2001, (the first year that the contra equity account was implemented) simply designate

---

[128](...continued)
Post-Trial Brief, Adv. Doc. No. 102, at 14. However, it is not clear how this applies to the
transfers to or for the Adult Prosser Children. There was no public record of these transfers. Even
the financial statements did not reflect that transfers were made to or for the benefit of the Adult
Prosser Children. An "asset search" would not have revealed these transfers, which were not
recorded as receivables of the Adult Prosser Children in the corporate records.

[129] In response to a question about whether the treatment of distributions as contra-equity
was appropriate, Mr. Barbee mentioned that the audited financial statements were provided to
"the stakeholders of the company, including creditors, I believe Including the RTFC...."
*See* Transcript of 03/24/2009, Adv. Doc. No. 112-1, at 95. However, he later corrected this
statement:

> Q. And Mr. Abood [counsel for Mr. Prosser in the Turnover Action] asked you,
> before, some questions about the audited financials. You don't have personal
> knowledge of who may or may not have received those audited financial
> statements, do you?
> A. The documents that I have reviewed from the RTFC indicate that they had
> certain of the audited financial statements. I do not have personal knowledge of
> whether the RTFC received them.
> Q. And what about anybody other than the RTFC; you don't have personal
> knowledge of whether or not they received the audited financial statements, do
> you?
> A. No.

*Id.* at 189. Furthermore, the court noted on the record that there was no evidence that any creditor
ever saw the company's books and records. *Id.* at 324. Mr. Goldman contended that,
nevertheless, there was no evidence that creditors were denied access to the books of the
company. *Id.* The Court agrees. Likewise, there was no testimony that any other creditor asked to
see them or that the company would have permitted open access to its financial records.

$111,049,000 as "Notes and Accounts Receivable from Stockholder" reducing equity. The

auditor's note does not provide detail regarding the nature of the transactions. The note simply

states:

> As part of the reorganization of ICC, a related party note receivable from the
> stockholder of the Parent of approximately $21.6 million was acquired as well as
> a note from the Parent of $58.1 million. Effective December 31, 2000, the
> Company grouped these notes, as well as the related accrued interest on them and
> other advances for shared costs through that date, aggregating approximately
> $111.0 million, and reclassified the notes and accounts receivable from
> stockholder to the capital deficit section on the consolidated balance sheet. No
> interest income was accrued in 2001.

*See* TT4-1664. Even the board members did not understand the nature of these transactions. One

board member incorrectly believed that the huge sums paid to or on behalf of the Prossers and

recorded in the financial statements as "contra equity" were actually reimbursements to Jeffrey

Prosser for business expenses, when, in fact, contra equity reflected non-business expenditures to

or on behalf of Jeffrey Prosser and his family.[130] Furthermore, Mr. Lunger, the president of one of

---

[130] *See* Exemption Trial Testimony of Raynor, Transcript of 09/09/2008, at 121 (admitted
in this proceeding, *see* TT203):
> Q. Well, let me ask you this, sir. As a board member did you know that New ICC
> was paying credit card charges for Dawn and the children of Mr. Prosser for their
> personal purchases?
> A. I had no idea of that.
> (Pause)
> Q. As a member of New ICC's board of directors did you know whether New ICC
> ever paid for jewelry that was purchased for Mrs. Prosser?
> A. No, I have no idea of that.

*See also* Exemption Trial Testimony of Goodwin, Transcript of 09/08/2008, at 189-190:
> Q. Were you familiar with - had you ever - did you have any discussions at the
> Board meetings in 1999, 2000 about what we refer to as a contra-equity account?
> A. Oh yeah, I think that those accounts were where expenses were paid and
> compensated for.
> Q. Okay, that was my next question. Can you tell the Court generally in your
> recollection of what the contra-equity account is or was at that time?

(continued...)

New ICC's creditors, Comstar, testified that he was unaware of any transactions between the ICC

Debtors and the Adult Prosser Children. Deposition of 08/14/2008, at 7-9. He was unaware of

whether any of these transactions were approved by the board. *Id.* at 9. Furthermore, he was

unaware of the contra equity account and the due from accounts from which it developed. *Id.* at

10. Non-business transactions would have been of interest to Mr. Lunger as they related to New

ICC's internal controls and ability to pay Comstar. *Id.* at 14-15, 16-17.

Therefore, the evidence establishes that, without review of the internal books and records

of New ICC, there was no way for the board or any creditor to discover the fraudulent transfers

out of New ICC. Even if one or some of the creditors had access to the audited financial

statements, the fact that New ICC was making transfers to or for the benefit of the Defendants is

not explained and it is not evident. Because, as Jeffrey Prosser admitted, he totally controlled the

board through his sole ability to replace board members and to constitute the boards, no one

could reasonably have discovered the nature of the transfers until Jeffrey Prosser was no longer

in control. That event occurred when the Chapter 11 Trustee was appointed in ICC-LLC's

bankruptcy case on March 15, 2007 and in New ICC's bankruptcy case on October 4, 2007.

Thus, the two year statute of limitations is deemed to commence on the date when the plaintiff

could reasonably have discovered the fraud. Here, we found that to be no earlier than

appointment of the Trustee, even for the transfers which occurred in 1999. The fraudulent

conveyance action was filed on February 8, 2008, well within the two year time period from the

---

[130](...continued)
A. Well, it was when get paid, [*sic*] I believe, expenses that were deemed to be
company expenses and he was compensated for those payments if it had come
from him personally. That's essentially what it was, just to compensate him for his
having borne certain expenses of the company.

date the fraud reasonably could have been discovered.

The prepetition, non-business transfers to or for the benefit of the Adult Prosser Children occurring from 1999 through 2007 are avoidable pursuant to §544(b) and the applicable law of the Virgin Islands. The same may be recovered pursuant to §550 for the reasons already stated. The Trustee is entitled to recover the following: $161,695.40 from Justin Prosser, $326,061.49 from Sybil Prosser, $249,462.39 from Michelle Prosser, and $159,508.52 ($55,376.43 on behalf of New ICC and $104,132.09 on behalf of ICC LLC) from Adrian Prosser. A portion of these amounts reflect transfers which occurred during the two years prepetition as addressed in Counts I and II. The Trustee is limited to a single satisfaction. Therefore, his ability to recover for prepetition transfers is limited to the amounts stated under this Count, which include all prepetition transfers at issue.

To the extent that the District Court disagrees and does not find tolling applicable, we find that, pursuant to the two year statute of limitations applicable in the Virgin Islands, the Trustee has established that the transfers identified for purposes of Count I (limited to transfers made during the two years prepetition[131]) are also avoidable and recoverable by the Trustee pursuant to Virgin Islands law as an alternative basis for recovery: $161,695.40 from Justin Prosser, $205,359.93 from Sybil Prosser, $56,733.85 from Michelle LaBennett, and $104,132.09 from Adrian Prosser (relating to the transfer to him from ICC-LLC).

---

[131] If the creditor in whose place the trustee stands under §544(b) would have been barred by the statute of limitations on the bankruptcy petition date, then the trustee may not proceed. *See In re Bernstein*, 259 B.R. 555, at 559 (Bankr. D.N.J. 2001). However, if the limitations period did not expire with respect to the creditor as of the petition date, then §546(a) provides the trustee with a two year period after the entry of the order for relief in which to bring an avoidance action. *Id.* at 558-59.

111

Count VI: To Recover Unauthorized Post-Petition Transfers Made by One or More of the ICC

Debtors to or for the Benefit of One or More of the Defendants under Section 549 of the

Bankruptcy Code

Trustee Springel asserts that transfers made by one or more of the ICC Debtors on or after

their respective petition dates to or for the benefit of one or more of the Defendants should be

avoided pursuant to §549. Complaint, Adv. Doc. No. 1, at ¶¶64-68. Section 549(a),(b) permits

avoidance of postpetition transfers as follows:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee may
> avoid a transfer of property of the estate--
>   (1) that occurs after the commencement of the case; and
>   (2) (A) that is authorized only under section 303(f)[132] or 542(c)[133] of this title; or
>        (B) that is not authorized under this title or by the court.
> (b) In an involuntary case, the trustee may not avoid under subsection (a) of this
> section a transfer made after the commencement of such case but before the order
> for relief to the extent any value, including services, but not including satisfaction
> or securing of a debt that arose before the commencement of the case, is given
> after the commencement of the case in exchange for such transfer,
> notwithstanding any notice or knowledge of the case that the transferee has.

Once avoided, transfers can be recovered pursuant to the terms of §550(a).

The Trustee bears the burden of proving what may be avoided pursuant to §549. *See In re*

---

[132] "Notwithstanding section 363 of this title, except to the extent that the court orders
otherwise, and until an order for relief in the case, any business of the debtor may continue to
operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary
case concerning the debtor had not been commenced." 11 U.S.C. §303(f).

[133] "Except as provided in section 362(a)(7) of this title, an entity that has neither actual
notice nor actual knowledge of the commencement of the case concerning the debtor may
transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in
the manner specified in subsection (d) of this section, to an entity other than the trustee, with the
same effect as to the entity making such transfer or payment as if the case under this title
concerning the debtor had not been commenced." 11 U.S.C. §542(c).

*PSA, Inc.*, 335 B.R. 580, 584 (Bankr. D. Del. 2005).

> The Chapter 11 Trustee must prove the following:
>
> 1) after the commencement of the bankruptcy case in question,
> 2) property of the estate
> 3) was transferred, and
> 4) the transfer was not authorized by the Bankruptcy Court or by a provision of
> the Bankruptcy Code.

*Id.* at 585. The avoidance powers pursuant to §549 are subject to certain enumerated exceptions.

*Id.* Subsection (b) applies to involuntary cases, and thus applies here, as an involuntary petition

commenced New ICC's bankruptcy case. Subsection (c) addresses transfers of real property to a

good faith purchaser, and does not apply to these facts. Once the Trustee establishes the elements

set forth in §549, "[a]ny entity asserting the validity of a transfer under §549 of the Code shall

have the burden of proof." Fed.R.Bankr.P. 6001.

An involuntary petition was filed against New ICC on July 5, 2007. *See* Case No. 07-

30012, Doc. No. 1. Just fourteen days later, New ICC made a rental payment of $8,145.00 to

Grand & Associates Realty, Inc. on behalf of Sybil Prosser. TT60, at TT4 1863; Tab 82 of TT8,

at T02928-30. The Chapter 11 Trustee asserts that "[t]he post-petition Transfer of $8,145.00 to

Sybil Prosser was not authorized under the Bankruptcy Code or by Order of the Court." Chapter

11 Trustee's Brief in Support of Proposed Findings of Fact and Conclusions of Law, Adv. Doc.

No. 105, at 9. The wire transfer indisputably constitutes a transfer made after the commencement

of the bankruptcy case. The funds were a part of New ICC's bankruptcy estate, which is

comprised of "all legal or equitable interests of the debtor in property as of the commencement of

the case." 11 U.S.C. §541(a)(1). There was neither authorization by this court nor a provision of

the Bankruptcy Code which permitted this transfer for the benefit of Sybil Prosser. Thus, the

113

Chapter 11 Trustee has met the elements of §549.

The Trustee's Exhibit TT60 identifies the total amount the Chapter 11 Trustee seeks to avoid and recover for American Express payments made for the benefit of Michelle LaBennett, Sybil Prosser, and Justin Prosser throughout the time period of January 1, 1999, through September 30, 2007. Therefore, the amount includes charges that were paid by post-petition transfers. Through the court's review of the American Express credit card statements, it is apparent that New ICC transferred funds post-petition for the benefit of the Adult Prosser Children. This includes $12,540.73 on behalf of Justin Prosser, $14,415.74 on behalf of Sybil Prosser, and $1,323.57 on behalf of Michelle LaBennett. *See* discussion of American Express charges, *supra*, at 22-23, 31-33, 40-42.

The burden shifts to the Defendants to establish the validity of the transfers. The only §549 exception which is potentially applicable here is subsection (b) which applies in involuntary cases. Section 549(b) does not permit the trustee to avoid a transfer pursuant to subsection (a) where the transfer was made during the gap period (between the filing of the involuntary petition and order for relief) and value was given in exchange. As established above, no value was given in exchange for these transfers. *See supra* note 96.

The Adult Prosser Children have not met their burden of proving the validity of the post-petition transfers, and the transfers are avoidable pursuant to §549. The Chapter 11 Trustee is entitled to recovery of the value of the transfers from the Adult Prosser Children pursuant to §550 as they are the individuals for whose benefit the transfers were made. The Trustee is entitled to recover postpetition transfers in the amount of $12,540.73 from Justin Prosser, $22,560.74 from Sybil Prosser, and $1,323.57 from Michelle LaBennett.

Count VII: Imposition of Constructive Trust

Trustee Springel contends that he is entitled to the imposition of a constructive trust on the Palm Beach residence of Adrian Prosser. *See* Complaint, Adv. Doc. No. 1, at ¶¶69-74. Through the imposition of a constructive trust, a court of equity can order the transfer of title to the true owner. *Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204, 213 (2002). "The imposition of a constructive trust is governed by applicable state law...." *Skilled Nursing Professional Services v. Sacred Heart Hospital,* 175 B.R. 543, 554 (Bankr. E.D. Pa. 1994). This case is pending in the Virgin Islands. By statute, the Virgin Islands applies the Restatement (Second) of Conflict of Laws. *See* note 117, *supra*, and accompanying text. "(1) Whether a conveyance transfers an interest in land and the nature of the interest transferred are determined by the law that would be applied by the courts of the situs. (2) These courts would usually apply their own local law in determining such questions." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 223. Inasmuch, as Florida is the location of the real property, Florida law applies.

"A constructive trust is one raised by equity in respect to property which has been acquired by fraud, or where, though acquired originally without fraud, it is against equity that it should be retained by him who holds it." *Provence v. Palm Beach Taverns*, 676 So.2d 1022, 1025 (Fla. Dist. Ct. App. 1996). The purpose of a constructive trust is two-fold: restoration of property to the rightful owner and prevention of unjust enrichment. *Id.*

The basis upon which the Chapter 11 Trustee relies for imposition of a constructive trust is the payment by the ICC Debtors of funds used by Adrian Prosser as a down payment and

115

mortgage payments. See Complaint, Adv. Doc. No. 1, at ¶70. The Chapter 11 Trustee asserts that

the use of these funds by Adrian Prosser was wrongful and if he continues to maintain possession

of the Palm Beach residence, then he will be unjustly enriched. *Id.* at ¶¶72-73.

  For the three months prior to his deposition, Adrian testified that he made the mortgage

payments from his own accounts. 12/19/2007 Deposition of Adrian Prosser, at 11. Prior to that,

he testified that the mortgage payments were made through the corporation as part of his

compensation. *Id.* at 11-12. Ingrid Christian testified that "Adrian Prosser was an employee of

the company for a few years' time...and so there were housing payments made for him of I think

approximately $5,000 a month. They were excluded from the schedule [of non-business

payments] because he was an employee and it was a benefit that was received by other executives

of the company." Transcript of 11/17/2008, Adv. Doc. No. 84, at 132. The Trustee has not

established how he is entitled to imposition of a constructive trust where it is clear that funds

other than those of the ICC Debtors were used to make mortgage payments on the property.[134]

<u>Count VIII[135]: Disallowance of Claims Asserted by the Defendant pursuant to Section 502(d) of</u>
<u>the Bankruptcy Code</u>

  Section 502(d) provides for disallowance of "any claim of any entity from which property

---

[134] Furthermore, the issue may be moot. On August 12, 2009, counsel for the Adult
Prosser Children filed a Notice of Pending Litigation - Foreclosure attached to which was a
Complaint for Foreclosure and Damages. Adv. Doc. No. 109. The complaint was filed by
Magnolia Court Homeowners Association "for foreclosure of a lien filed pursuant to the
Declaration of Covenants of MAGNOLIA COURT HOMEOWNERS Association, Inc...." Adv.
Doc. No. 109-1, at 2.

[135] In the Complaint, this Count is improperly numbered as "Count Seven".

is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer

avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless

such entity or transferee has paid the amount, or turned over any such property, for which such

entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."

Although the Trustee states in the Complaint that he is "entitled to entry of an order

disallowing any claim of the Defendants against the ICC Estates pursuant to section 502(d)[,]" he

does not identify for the court any claims filed by the Defendants. Adv. Doc. No. 1, at ¶77.  This

court's review of the claims register in the bankruptcy cases of New ICC (Case No. 07-30012),

Emerging (Case No. 06-30007), and ICC-LLC (Case No. 06-30008) did not reveal any claims

filed by the Defendants. The bar dates have passed, and there are no claims to disallow. In the

event that the Adult Prosser Children attempt to file claims, this ruling is without prejudice to

being raised by the Trustee at that time.


Count IX[136]: To Recover from the Defendant Attorney's Fees, Interest, and Costs

Trustee Springel states that he "is entitled to recover attorney's fees and costs and to an

award of interest from the dates on which one or more of the Defendants received or became a

beneficiary of each of the Transfers pursuant to sections 544, 548, 549, and 550 of the

Bankruptcy Code, other federal laws, state law (including sections 5001 and 5004 of the New

York Civil Practice Law and Rules[137]), and other applicable law." Doc. No. 1, at ¶79.

*Attorney's Fees and Costs*

---

[136] In the Complaint, this Count is improperly numbered as "Count Eight."

[137] We determined that New York law is inapplicable. *See* discussion *supra.*

117

Trustee Springel has not provided a statutory basis for an award of attorneys' fees and

costs.[138] Furthermore, Trustee Springel has not provided a reason, such as bad faith or

harassment, to warrant departure from the "American Rule," which generally does not permit

recovery of attorneys' fees by the prevailing party. *Northwestern Corp. v. Magten Asset*

*Management Corp.*, 326 B.R. 519, 524 (Bankr. D. Del. 2005).  With respect to costs, "Rule

7054(b) provides that in an adversary proceeding a '[bankruptcy court] *may* allow costs to the

prevailing party except when a statute...or these rules provides otherwise.'...It is clear an award of

costs under Rule 7054(b) is discretionary." *Id.* at 529 (citations omitted).  Trustee Springel's

counsel can be compensated from estate assets, and Trustee Springel can recoup his costs from

estate proceeds. *See* 11 U.S.C. §330.

*Prejudgment Interest*

With regard to Trustee Springel's claim to prejudgment interest, the Bankruptcy Code

does not include a reference to prejudgment interest. *Hechinger Investment Company v.*

*Universal Forest Products*, 489 F.3d 568, 579 (3d Cir. 2007).  However, "courts have relied on

the word 'value' in §550(a) as authorizing an interest award." *Id.*[139] Section 550(a) provides the

trustee with the ability to "recover, for the benefit of the estate, the property transferred, or, if the

court so orders, the *value* of such property...." (emphasis added). According to the Third Circuit

in *Hechinger*, an award of prejudgment interest is appropriate unless there is a sound reason not

---

[138] *See Giuliano v. U.S. Nursing Corp.,* 339 B.R. 570, 578-79 (Bankr. D. Del. 2006)
("[T]here is no statutory basis for the Trustee's request for attorneys' fees and costs.").

[139] Although the court was addressing preference claims in *Hechinger*, it looked to the
language of §550, which also applies to transfers avoided under §§544, 548, and 549 for
authorization to award prejudgment interest.  489 F.3d at 579.

to award it. *See* 489 F.3d at 580.

We found herein that the Trustee established numerous fraudulent and postpetition

monetary transfers to or for the benefit of each of the Adult Prosser Children, and the Trustee is

entitled to recovery thereon. The court finds that an award of prejudgment interest is appropriate.

The Adult Prosser Children had the use or benefit of the funds for an extended period of time.

"[A]n award of prejudgment interest in an avoidance action furthers the congressional policies of

the Bankruptcy Code by compensating the estate for the time it was without the use of the

transferred funds." *In re Great Point Intermodal, LLC*, 334 B.R. 359, 363 (Bankr. E.D. Pa.

2005). Prejudgment interest shall accrue from the date of commencement of this action at the

federal judgment interest rate in effect as of that date. *See id.* at 363-64.[140] The interest rate

pursuant to 28 U.S.C. §1961(b) is the rate applicable to one year Treasury maturities for the week

preceding February 8, 2008, (the date of the Complaint). The applicable prejudgment interest rate

is 2.23%. *See* http:/www.federalreserve.gov/releases/h15.


Conclusion

For the reasons expressed in this Memorandum Opinion, we find that the Chapter 11

Trustee has established numerous fraudulent transfers to the Adult Prosser Children, which he is

entitled to recover for the benefit of the estate. The Chapter 11 Trustee has also proven that he is

---

[140] In *Great Point*, the court addressed an award of prejudgment interest relating to
preferential transfers. *Id.* at 362. Prejudgment interest is recoverable from the date the return of
the transfer was demanded. *Id.* at 363. If there is no indication that demand for return of the
transfer was made prior to commencement of the litigation, then prejudgment interest will accrue
from the date the adversary proceeding was filed. *Id.* at 363-64. The court found the prevailing
rate to be the federal judgment interest rate. *See id.* at 364 (determining the applicable interest
rate pursuant to 28 U.S.C. §1961).

entitled to recover unauthorized postpetition transfers made to the Adult Prosser Children. The

Trustee has not established that he is entitled to imposition of a constructive trust on the West

Palm Beach residence of Adrian Prosser. The Trustee's request for disallowance of claims will

be denied as Defendants did not file any claims to disallow. The Trustee's request for an award

of attorney's fees is denied. An award of prejudgment interest is appropriate.


Dated: August 5, 2011

Judith K. Fitzgerald

kdv

Judith K. Fitzgerald

United States Bankruptcy Judge

**Exhibit to Memorandum Opinion: Explanation of Calculation of Adult Prosser Children Credit Card Charges Paid for by New ICC**

Centurion Account:

      The first Centurion Card Statement of Account in evidence is for charges made in January of 2004 (i.e., statement with a closing date of 01/29/2004). *See* TT28, at TT02804-810. The previous balance reflected on that statement is $0 (i.e., there was no remaining balance due from December of 2003). No payment activity is reflected on the January 2004 statement. The new charges on the account for activity through January 29, 2004, total $10,058.26. The statement breaks down the total due for each cardholder: Jeffrey Prosser ($2,500 membership fee), Michelle LaBennett ($1,500 membership fee), Dawn Prosser ($1,500 membership fee), Sybil Prosser (total of $2,022.64, including a $1,500 membership fee), and Arthur Stelzer (total of $2,535.62, including a $1,500 membership fee). The total due in full activity for all cardholders is $10,058.26. No payment was made toward the January 2004 charges prior to issuance of the next statement containing February credit activity. TT28, at TT02811.[141] The $10,058.26 balance was carried over, and new activity totaling $42,272.38 was added to the prior balance, resulting in a new balance of $52,330.64. *Id.* The new activity included charges made by Jeffrey Prosser, Sybil Prosser, and Arthur Stelzer. Sybil Prosser's charges (the only of the three relevant here) totaled $8,307.89. As reflected on the March 2004 statement for the Centurion account, a $53,000 payment was made on March 19, 2004. That payment was credited toward the previous balance of $52,330.64 (consisting of charges made in January and February of 2004). That payment was made by New ICC, as reflected in the Virgin Islands Community Bank ("VICB") Statement for Innovative Communication Corporation (showing a $53,115 debit) and a Request for Telegraphic Transfer made by New ICC on March 19, 2004, in the amount of $53,000 to American Express for ultimate credit to the Centurion account, specifically listing that account number. *See* Tab 10 of TT8, at T00363-364. Therefore, New ICC paid for the charges incurred by Sybil Prosser (totaling $10,330.53) and Michelle LaBennett (totaling $1,500) in January and February of 2004.

      The $53,000 payment made by New ICC in March of 2004, was more than the previous balance due ($52,330.64) and therefore the excess funds were credited toward the new activity accrued in March of 2004. *See* TT28, at TT02823-831. The new balance from March activity totaled $82,763.11. Charges were made by Jeffrey Prosser, Michelle LaBennett (totaling $1,144.43), Dawn Prosser, Sybil Prosser (totaling $5,987.24), and Arthur Stelzer. The statement for April of 2004 reflects a payment of $85,000 on April 19, 2004, and a payment of $100,000 (reflected as payments of $99,999.99 and $.01) on April 26, 2004. *Id.* at TT02839. The entire $185,000 was paid by New ICC. *See* Request for Telegraphic Transfer of $85,000 by New ICC on 4/19/2004, Tab 10 of TT8, at T00365; New ICC's VICB statement reflecting a debit of $85,115 on 4/19, *id.* at T00366; New ICC's VICB statement reflecting a debit of $100,115 on 4/26, *id.* at T00370; New ICC's Request for Telegraphic Transfer on 4/26/04 to American Express in the amount of $100,000, *id.* at T00371. The April 19, 2004, payment alone satisfied in

---

      [141] We note that this is one of several times where the bill states that the account is past due and must be paid immediately.

1

full all new activity in March of 2004. This includes $1,144.43 of charges made by Michelle LaBennett and $5,987.24 of charges made by Sybil Prosser.

The excess payments made by New ICC were credited toward the activity in April of 2004, which totaled $158,972.59. *See* TT28, at TT02839. Once New ICC's April payments were credited toward that amount, the new balance for April was $56,735.70. *Id.* Charges on the April 2004 statement were made by Jeffrey Prosser, Michelle LaBennett ($851.80), Dawn Prosser, Sybil Prosser ($4,725.74), and Arthur Stelzer. The May statement reflects two payments. TT28, at TT02853. The first was a New ICC payment on May 3, 2004, in the amount of $80,000, which fully covered all charges remaining from April of 2004 in the amount of $56,735.70. *See* New ICC's VICB statement showing a debit of $80,115 on May 3, Tab 10 of TT8, at T00372; Request for Telegraphic Transfer by New ICC to American Express on 05/03/04 in the amount of $80,000, *id.* at T00373. Therefore, all April of 2004 charges were paid by New ICC. The second payment reflected on the statement was made on May 24, 2004, in the amount of $75,000. The source of the payment is unknown. That payment along with the remaining portion of the payment by New ICC were credited toward May activity. Therefore, without attempting to allocate the portion of the New ICC payment and the $75,000 payment, we do not include any of the May activity in our calculation of payments made by New ICC on behalf of the Adult Prosser Children.

Even though payments of $155,000 from combined sources were made in May, of which $56,735.70 paid off April 2004 charges and the remaining $98,264.30 was credited toward May 2004 charges, new activity in May totaled $169,727.43 and a balance of $71,463.13 resulted. TT28, at TT02853. We note that, although the credit card statements break out the monthly charges incurred by each cardholder, payments made are credited toward the total balance for all cardholders and are not allocated between the cardholders. Thus, even though New ICC made a $75,000 payment on June 7, 2004, which paid off the remaining balance from May 2004 activity in full, we do not attempt to allocate the non-New ICC payment and the New ICC payments, which are credited toward the same month's activity, to the charges reflected on the May 2004 statement. *See* TT28, at TT02867; New ICC's VICB Bank Statement reflecting a $75,115 wire transfer on June 7, Tab 10 of TT8, at T00374; Request for Telegraphic Wire Transfer made by New ICC to American Express for $75,000 on June 7, 2004.

In our analysis, once payment(s) by New ICC were traced to a particular American Express statement and examination of the statement revealed that the entire statement was paid with New ICC's funds, then, and only then, were the Adult Prosser Children's charges on that statement included in our fraudulent conveyance analysis. All payments from non-New ICC sources are excluded. Therefore, any charges paid with non-New ICC funds have not been considered, and to the extent payments from New ICC and a non-New ICC source were credited to the same monthly statement, those too were excluded. We note that this is a conservative approach to this analysis and, without certainty as to how the Trustee calculated the amounts he seeks to recover, we find this approach is appropriate and ensures that only New ICC funds will be recovered.

This is the process used by the court to calculate the amounts that New ICC paid to American Express for the benefit of the Adult Prosser Children. Although the Centurion account was used to provide the example above, we employed this process for the entirety of the

2

American Express Centurion and Platinum accounts (Exhibit TT28) and compared the
statements with the evidence of payments by New ICC (Tabs 10 and 11 of Exhibit TT8).

3

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**DIVISION OF ST. THOMAS AND ST. JOHN**

IN RE

INNOVATIVE COMMUNICATION                   Bankruptcy No. 07-30012
CORPORATION,
                                           Chapter 11

      Debtor.


STAN SPRINGEL, CHAPTER 11                   Adv. No. 08-3004
TRUSTEE OF THE BANKRUPTCY
ESTATE OF INNOVATIVE
COMMUNICATION CORPORATION                   Related to Doc. Nos. 1 & 117
EMERGING COMMUNICATIONS,
INC., AND INNOVATIVE
COMMUNICATION COMPANY, LLC,

      Plaintiff

v.

LYNDON ADRIAN PROSSER,
MICHELLE LABENNETT PROSSER,
SYBIL G. PROSSER, AND JOHN
JUSTIN PROSSER,

      Defendants

**JUDGMENT ORDER**

    **AND NOW**, this **5th** day of **August, 2011,** for the reasons expressed in the foregoing
Memorandum Opinion, it is **ORDERED** that:

    1.     As to Count I of the Complaint, transfers are avoided and judgment is entered in
          favor of Plaintiff and against Defendants on the grounds of actual fraud pursuant
          to 11 U.S.C. §§548(a)(1)(A) and 550 as follows, plus prejudgment interest at the
          federal judgment rate and postjudgment interest at the federal judgment rate:
          $161,695.40 against Justin Prosser; $205,359.93 against Sybil Prosser, $56,733.85

1

against Michelle LaBennett, and $104,132.09 against Adrian Prosser.

2.   As to Count II of the Complaint, transfers are avoided and judgment is entered in favor of the Plaintiff and against the Defendants on the grounds of constructive fraud pursuant to 11 U.S.C. §§548(a)(1)(B) and 550 as follows, plus prejudgment interest at the federal judgment rate and postjudgment interest at the federal judgment rate: $161,695.40 against Justin Prosser, $205,359.93 against Sybil Prosser, $56,733.85 against Michelle LaBennett, and $104,132.09 against Adrian Prosser.

3.   As to Counts III, IV, and V of the Complaint seeking avoidance and recovery of transfers pursuant to 11 U.S.C. §§544 and 550, for the reasons expressed within the Memorandum Opinion, this court's Report and Recommendation is attached hereto and shall be transmitted by the Clerk of Court to the District Court.

4.   As to Count VI of the Complaint, postpetition transfers are avoided and judgment is entered in favor of Plaintiff and against Defendants pursuant to 11 U.S.C. §§549 and 550 as follows, plus prejudgment interest at the federal judgment rate and postjudgment interest at the federal judgment rate: $12,540.73 against Justin Prosser, $22,560.74 against Sybil Prosser, and $1,323.57 against Michelle LaBennett.

5.   As to Count VII, the Trustee's request for imposition of a constructive trust on the West Palm Beach residence of Adrian Prosser is **DENIED.**

6.   As to Count VIII, disallowance of the Defendants' claims is **DENIED** without prejudice as the Trustee has identified no claims to disallow.

7.   As to Count IX, the Trustee's request for attorney's fees and costs is **DENIED**. The Trustee's claim for prejudgment interest is **GRANTED**.


It is **FURTHER ORDERED** that counsel for the Chapter 11 Trustee shall immediately serve a copy of this Memorandum Opinion and Order on all parties in interest who do not receive electronic notice and shall file a certificate of service forthwith.


_Judith K. Fitzgerald_                              **kdv**
Judith K. Fitzgerald
United States Bankruptcy Judge

2

**IN THE DISTRICT COURT OF THE VIRGIN ISLANDS**
**BANKRUPTCY DIVISION**
**DIVISION OF ST. THOMAS AND ST. JOHN**


IN RE

INNOVATIVE COMMUNICATION                    Bankruptcy No. 07-30012
CORPORATION,
                                            Chapter 11

      Debtor.


STAN SPRINGEL, CHAPTER 11                    Adv. No. 08-3004
TRUSTEE OF THE BANKRUPTCY
ESTATE OF INNOVATIVE
COMMUNICATION CORPORATION                    Related to Doc. Nos. 1 & 117
EMERGING COMMUNICATIONS,
INC., AND INNOVATIVE
COMMUNICATION COMPANY, LLC,

      Plaintiff

v.

LYNDON ADRIAN PROSSER,
MICHELLE LABENNETT PROSSER,
SYBIL G. PROSSER, AND JOHN
JUSTIN PROSSER,

      Defendants

**RECOMMENDATION TO THE DISTRICT COURT AS TO**
**COUNTS III, IV, AND V TO AVOID AND RECOVER FRAUDULENT**
**TRANSFERS PURSUANT TO §544 AND APPLICABLE LAW**


    **AND NOW**, this **5th** day of **August**, **2011, WHEREAS** the foregoing Memorandum
Opinion constitutes our Report and Recommendation to the District Court as to Counts III, IV,
and V of the Chapter 11 Trustee's Original Complaint Against the Adult Prosser Children to
Recover Pre-Petition Fraudulent Transfers and Unauthorized Post-Petition Transfers;

    We **RECOMMEND**, as to Counts III, IV, and V, that judgment be entered in favor of the

1

Plaintiff and against the Defendants on the grounds of actual and constructive fraud pursuant to 11 U.S.C. §§544 and 550 and the applicable law of the Virgin Islands as  follows, plus prejudgment interest at the federal judgment rate and postjudgment interest at the federal judgment rate: $161,695.40 against Justin Prosser, $326,061.49 against Sybil Prosser, $249,462.39 against Michelle Prosser, and $159,508.52 ($55,376.43 on behalf of New ICC and $104,132.09 on behalf of ICC LLC) against Adrian Prosser.

It is **FURTHER RECOMMENDED** that, in the alternative, if the District Court does not agree that tolling of the statute of limitations applies, that judgment be entered as to Counts III, IV, and V as follows, plus prejudgment interest at the federal judgment rate and postjudgment interest at the federal judgment rate: $161,695.40 against Justin Prosser, $205,359.93 against Sybil Prosser, $56,733.85 against Michelle LaBennett, and $104,132.09 against Adrian Prosser.

It is **ORDERED** that counsel for the Chapter 11 Trustee shall immediately serve a copy of this Report and Recommendation on all parties in interest who do not receive electronic notice and shall file a certificate of service forthwith.

It is **FURTHER ORDERED** that the Clerk of Court shall forward forthwith a copy of this Report and Recommendation to the District Court of the United States Virgin Islands.

Judith K. Fitzgerald
Judith K. Fitzgerald
United States Bankruptcy Judge

kdv

2